No. 18-16981

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CRISTA RAMOS, et al.,

Plaintiffs-Appellees,

v.

KIRSTJEN NIELSEN, in her official capacity as
Secretary of Homeland Security, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of California

## BRIEF FOR APPELLANTS

JOSEPH H. HUNT
  *Assistant Attorney General*

ALEX G. TSE
  *Acting United States Attorney*

MARK B. STERN
GERARD SINZDAK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7242*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-0718*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION ........................................................3

STATEMENT OF THE ISSUES.............................................................4

PERTINENT STATUTES AND REGULATIONS .................................4

STATEMENT OF THE CASE ................................................................4

    A.    Statutory Background............................................................4

    B.    Factual Background ..............................................................7

        1.    Sudan..........................................................................8

        2.    Nicaragua...................................................................9

        3.    Haiti.........................................................................10

        4.    El Salvador ..............................................................12

    C.    District Court Proceedings..................................................13

SUMMARY OF ARGUMENT...............................................................17

STANDARD OF REVIEW ....................................................................20

ARGUMENT .........................................................................................21

    I.    PLAINTIFFS' APA CLAIM CANNOT SUPPORT
        A PRELIMINARY INJUNCTION.......................................21

        A.    The TPS Statute's Preclusion Provision Bars
            Plaintiffs' APA Claim ........................................21

B.   Plaintiffs' APA Claim Would Fail On The Merits
Even If It Were Not Barred ............................................................30

II.   PLAINTIFFS' EQUAL PROTECTION CLAIM
CANNOT SUPPORT A PRELIMINARY INJUNCTION ..................39

A.   The Plaintiffs Are Unlikely To Succeed On Their
Equal Protection Claim Under *Arlington Heights* ............................40

B.   The Secretaries' Decisions Are Constitutional
Under *Trump v. Hawaii* ........................................................................49

III.   THIS COURT SHOULD NOT CONSTRUE THE
PRELIMINARY INJUNCTION AS APPLYING
NATIONWIDE ................................................................................55

CONCLUSION ....................................................................................................58

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                **Page(s)**

*Alliance for the Wild Rockies v. Pena,*
    865 F.3d 1211 (9th Cir. 2017) ...................................................................38

*American Soc. of Cataract & Refractive Surgery v. Thompson,*
    279 F.3d 447 (7th Cir. 2002).....................................................................25

*Amgen, Inc. v. Smith,*
    357 F.3d 103 (D.C. Cir. 2004) ...........................................................21, 26

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ...................................................................................56

*California Trout v. FERC,*
    572 F.3d 1003 (9th Cir. 2009) ...................................................................24

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ...................................................................................43

*City of Chicago v. Sessions,*
    888 F.3d 272 (7th Cir. 2018).....................................................................57

*City of Rialto v. West Coast Loading Corp.,*
    581 F.3d 865 (9th Cir. 2009) .....................................................................27

*Federal Trade Comm'n v. Enforma Nat. Prods., Inc.,*
    362 F.3d 1204 (9th Cir. 2004) ...................................................................20

*Fiallo v. Bell,*
    430 U.S. 787 (1977) .............................................................. 49, 50, 51, 52

*Florida Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) .............................................................................38, 43

*Galvan v. Press,*
    347 U.S. 522 (1954) ...................................................................................49

*Gebhardt v. Nielsen*,
   879 F.3d 980 (9th Cir. 2018) ........................................................ 26, 28

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ........................................................................56

*Harisiades v. Shaughnessy*,
   342 U.S. 5809 (1952 ............................................................................50

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ................................................................................29

*HP Inc. v. MPHJ Tech. Invs. LLC*,
   817 F.3d 1339 (Fed. Cir. 2016) .........................................................25

*Immigrant Assistance Project of AFL-CIO v. INS*,
   306 F.3d 842 (9th Cir. 2002) .............................................................28

*J.E.F.M. v. Lynch*,
   837 F.3d 1026 (9th Cir. 2016) ...........................................................29

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ......................................................................50, 51

*Kohli v. Gonzales*,
   473 F.3d 1061 (9th Cir. 2007) ...........................................................42

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
   638 F.3d 644 (9th Cir. 2011) ........................................................56, 57

*Martinez v. Napolitano*,
   704 F.3d 620 (9th Cir. 2012) .............................................................23

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ........................................................................49, 50

*McNary v. Haitian Refugee Ctr., Inc.*,
   498 U.S. 479 (1991) ................................................................26, 27, 29

*Morales de Soto v. Lynch*,
   824 F.3d 822 (9th Cir. 2016) .............................................................25

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ...................................................................43

*Painter v. Shalala,*
    97 F.3d 1351 (10th Cir. 1996) ...................................................25

*Proyecto San Pablo v. INS,*
    189 F.3d 1130 (9th Cir. 1999) ...................................................28

*Rajah v. Mukasey,*
    544 F.3d 427 (2d Cir. 2008) ......................................................51

*Regents of the Univ. of Cal. v. DHS,* No. 18-15068,
    2018 WL 5833232 (9th Cir. Nov. 8, 2018) ...................... 48, 53, 54, 57

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ...................................................................30

*Reno v. Catholic Soc. Servs., Inc.,*
    509 U.S. 43 (1993) ..........................................................26, 28, 29

*Ruiz-Diaz v. United States,*
    703 F.3d 483 (9th Cir. 2012) ......................................................51

*SEC v. Chenery,*
    332 U.S. 194 (1947) ...................................................................24

*Sierra Club v. Costle,*
    657 F.2d 298 (D.C. Cir. 1981) ...................................................44

*Skagit Cty. Pub. Hosp. Dist. No. 2 v. Shalala,*
    80 F.3d 379 (9th Cir. 1996) ........................................................27

*St. Marks Place Hous. Co. v. HUD,*
    610 F.3d 75 (D.C. Cir. 2010) .....................................................47

*Staub v. Proctor Hosp.,*
    562 U.S. 411 (2011) ...................................................................43

v

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) .................................................................56

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ............................................................*passim*

*United States R.R. Ret. Bd. v. Fritz*,
   449 U.S. 166 (1980) ....................................................................54

*United States v. AMC Entm't, Inc.*,
   549 F.3d 760 (9th Cir. 2008) .......................................................56

*United States v. Nixon*,
   418 U.S. 683 (1974) ....................................................................43

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ....................................14, 15, 17, 19, 40

*Washington v. Trump*,
   858 F.3d 1168 (9th Cir. 2017) .....................................................45

*Webster v. Doe*,
   486 U.S. 592 (1988) ....................................................................45

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ........................................................................39

*Wisconsin v. City of New York*,
   517 U.S. 1 (1996) ........................................................................47

**U.S. Constitution:**

Art. II, § 1, cl. 8 ...............................................................................45

**Statutes:**

Immigration Act of 1990,
   Pub. L. No. 101-649, 104 Stat. 4978.............................................4

5 U.S.C. § 701(a)(1) .........................................................................21

6 U.S.C. § 557 .................................................................................5

8 U.S.C. § 1103 ...............................................................................5

8 U.S.C. § 1182(f) ..........................................................................54

8 U.S.C. § 1254a ............................................................................54

8 U.S.C. § 1254a(a) ..........................................................................6

8 U.S.C. § 1254a(b) .............................................................1, 5, 6, 52

8 U.S.C. § 1254a(b)(1) ........................................................31, 32, 54

8 U.S.C. § 1254a(b)(1)(B)(i) ..........................................................32

8 U.S.C. § 1254a(b)(1)(C) ..............................................................32

8 U.S.C. § 1254a(b)(2) ......................................................................6

8 U.S.C. § 1254a(b)(3)(A) ..........................................................6, 33

8 U.S.C. § 1254a(b)(3)(B) .................................................................6

8 U.S.C. § 1254a(b)(3)(C) .................................................................6

8 U.S.C. § 1254a(b)(5)(A) .........................................................passim

8 U.S.C. § 1254a(c) ..........................................................................6

28 U.S.C. § 1292(a)(1) ......................................................................4

28 U.S.C. § 1331 ...............................................................................3

## Other Authorities:

*Extension and Redesignation of Somalia for TPS,*
   77 Fed. Reg. 25,723 (May 1, 2012) ............................................36

*Extension of Designation & Redesignation of Liberia Under TPS Program,*
   62 Fed. Reg. 16,608 (Apr. 7, 1997) ..............................................6

*Extension of Designation of Somalia for TPS,*
   83 Fed. Reg. 43,695 (Aug. 27, 2018) ................................................ 7, 31

*Extension of South Sudan for TPS,*
   82 Fed. Reg. 44,205 (Sept. 21, 2017) ...................................................7

*Extension of the Designation of El Salvador for TPS,*
   81 Fed. Reg. 44,645 (July 8, 2016) .....................................................34

*Extension of the Designation of Haiti for TPS,*
   79 Fed. Reg. 11,808 (Mar. 3, 2014) .............................................. 10, 11

*Extension of the Designation of Haiti for TPS,*
   80 Fed. Reg. 51,582 (Aug. 25, 2015) ............................................ 10, 11

*Extension of the Designation of Haiti for TPS,*
   82 Fed. Reg. 23,830 (May 24, 2017) ............................................ 11, 35

*Extension of the Designation of Nicaragua for TPS,*
   75 Fed. Reg. 24,737 (May 5, 2010) .....................................................34

*Extension of the Designation of Nicaragua under TPS Program,*
   68 Fed. Reg. 23,748 (May 5, 2003) .....................................................36

*Extension of the Designation of Sudan for TPS,*
   79 Fed. Reg. 52,027 (Sept. 2, 2014) ...................................................34

*Extension of the Designation of Syria for TPS,*
   83 Fed. Reg. 9329 (Mar. 5, 2018) .........................................................7

*Extension of the Designation of Yemen for TPS,*
   83 Fed. Reg. 40,307 (Aug. 14, 2018) ............................................. 7, 32

*Sierra Leone Termination for TPS,*
   81 Fed. Reg. 66,054 (Sept. 26, 2016) ...................................................7

*Termination of Designation of Angola Under TPS Program,*
   68 Fed. Reg. 3896 (Jan. 27, 2003) .....................................................36

*Termination of Designation of Kuwait Under TPS Program,*
    57 Fed. Reg. 2931 (Jan. 24, 1992) ..................................................................36

*Termination of Designation of Rwanda Under TPS,*
    62 Fed. Reg. 33,442 (June 19, 1997) ............................................................35

*Termination of Guinea's Designation for TPS,*
    81 Fed. Reg. 66,064 (Sept. 26, 2016) ...........................................................35

*Termination of the Designation of Burundi for TPS,*
    72 Fed. Reg. 61,172 (Oct. 29, 2007) ............................................................35

*Termination of the Designation of El Salvador for TPS,*
    83 Fed. Reg. 2654 (Jan. 18, 2018) ........................................................ 12, 31

*Termination of the Designation of Haiti for TPS,*
    83 Fed. Reg. 2648 (Jan. 18, 2018) ...................................................11, 12, 31

*Termination of the Designation of Nicaragua for TPS,*
    82 Fed. Reg. 59,636 (Dec. 15, 2017) ...................................................... 9, 31

*Termination of the Designation of Sudan for TPS,*
    82 Fed. Reg. 47,228 (Oct. 11, 2017) ........................................................ 8, 31

*Termination of the Province of Kosovo Under TPS Program,*
    65 Fed. Reg. 33,356 (May 23, 2000) .............................................................36

**INTRODUCTION**

In 1990, Congress created the Temporary Protected Status (TPS) program to provide on a discretionary basis temporary relief to aliens who cannot safely return in the short-term to their home nation as a result of a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). The Secretary of Homeland Security may designate a country for TPS status only if the Secretary determines that certain statutory criteria justifying the designation are met. When a country is designated, eligible aliens from that country who are present in the United States on the effective date of the designation and register with the federal government are temporarily protected from removal and receive authorization to work in the United States. Consistent with the temporary nature of the relief, Congress dictated that the Secretary must regularly review a country's TPS designation, and must terminate that designation if she determines that the conditions giving rise to the designation are no longer met.

This case involves decisions by former Acting Secretary Elaine Duke and current Secretary Kirstjen Nielsen to terminate the TPS designations of four countries—Sudan, Nicaragua, Haiti, and El Salvador. Sudan was first designated for TPS status in 1997 because of an ongoing armed conflict; Nicaragua was designated in 1999 in response to Hurricane Mitch; El Salvador was designated in 2001 as a result of conditions caused by an earthquake; and Haiti was designated in 2010, also in response to damage caused by an earthquake. In each case, Acting Secretary Duke or

Secretary Nielsen, after consulting with other government agencies, determined that the conditions that gave rise to the years-old TPS designations no longer persisted. The Secretaries supplied the bases for their determinations in Federal Register notices that explain why the Secretaries no longer believed that temporary relief was warranted.

Plaintiffs, who are TPS beneficiaries and the children of TPS beneficiaries, brought suit challenging the terminations and asserting claims under the Administrative Procedure Act (APA) and the equal protection component of the Fifth Amendment. The district court entered a preliminary injunction barring the implementation of the termination decisions after concluding that plaintiffs were likely to succeed on the merits of their APA claim and had raised serious questions with respect to their equal protection claim.

The district court's conclusions are fatally flawed, and, accordingly, the injunction should be set aside. The TPS statute expressly bars judicial review of TPS termination decisions. Plaintiffs' claims—which challenge the manner in which the Secretaries arrived at their termination decisions and seek to set those decisions aside—fit squarely within the statute's bar on judicial review.

Even if plaintiffs' claims were not barred, they are without merit. Plaintiffs' APA claim rests on the false premise that Secretaries Duke and Nielsen departed from past agency practice in making the termination decisions at issue in this case. But, as a review of the record and past termination and extension decisions reveals, Secretaries

2

Duke and Nielsen considered the same types of materials as past Secretaries and applied the legal standard previous Secretaries have used in deciding whether to extend or terminate a TPS designation.

Plaintiffs' equal protection claim is likewise unavailing. Neither plaintiffs nor the district court identified any evidence indicating that either Secretary was motivated by discriminatory animus. To the contrary, the record demonstrates that the Secretaries carefully considered the relevant factors, consulted with the necessary agencies, and offered explanations for their actions that are supported by the record. Moreover, the Secretaries' decision to extend the TPS designations of several countries with similar ethnic demographics demonstrates that their decisions were the product of reasoned analysis and not discriminatory animus. Plaintiffs' alleged evidence of animus consists in large measure of an uncharitable and erroneous interpretation of the Administration's immigration policy and remarks attributed to the President. That the President has advanced an immigration policy that places America's interests foremost and emphasizes a "merit-based" system for entry of aliens in no way supports the conclusion that the decisions the Secretaries made in this case were motivated by racial animus towards the aliens who had benefited from TPS.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 1331, raising claims under the APA and the Constitution. Excerpts of Record (ER)

1022. The district court entered a preliminary injunction on October 3, 2018. ER.1-43. The government filed a timely notice of appeal on October 11, 2018. ER.101-02. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in concluding that plaintiffs were likely to succeed on their APA claim challenging the Secretaries' termination decisions.

2. Whether the court erred in concluding that plaintiffs' equal protection claim raised serious legal questions.

3. Whether the court's preliminary injunction should be interpreted as applying only to plaintiffs.

## PERTINENT STATUTES AND REGULATIONS

The TPS statute is reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Immigration Act of 1990 established a program for providing temporary shelter in the United States on a discretionary basis for aliens from countries experiencing armed conflict, natural disaster, or other "extraordinary and temporary conditions" that prevent the aliens' safe return. Pub. L. No. 101-649, 104 Stat. 4978.

4

The program authorizes the Secretary of Homeland Security,[1] "after consultation with appropriate agencies of the Government," to designate countries for "Temporary [P]rotected [S]tatus," if she finds:

> (A) … that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) … that—
>
>> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
>>
>> (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
>>
>> (iii) the foreign state officially has requested designation under this subparagraph; or
>
> (C) … that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety[.]

8 U.S.C. § 1254a(b).

When the Secretary designates a country for TPS, eligible aliens from that country who are physically present in the United States on the effective date of the designation (and continuously thereafter) may not be removed from the United States

---

[1] The statute originally vested the Attorney General with the power to make TPS designation, extension and termination decisions. Congress transferred these powers to the Secretary of Homeland Security. *See* 8 U.S.C. § 1103; 6 U.S.C. § 557.

and are authorized to work here for the duration of the country's TPS designation. 8 U.S.C. § 1254a(a), (c).

Initial designations may not exceed eighteen months. 8 U.S.C. § 1254a(b)(2). The Secretary must consult with appropriate agencies and review each designation sixty days before the designation period ends to determine whether the conditions for the country's designation continue to be met. *Id.* § 1254a(b)(3)(A). If the Secretary finds that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation" by publishing notice in the Federal Register of the determination and the basis for the termination. *Id.* § 1254a(b)(3)(B). If the Secretary "does not determine" that the foreign state "no longer meets the conditions for designation," then "the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C). In addition to terminating or extending a TPS designation, the Secretary may also redesignate a country for TPS, the functional equivalent of a new designation. *See Extension of Designation & Redesignation of Liberia Under TPS Program*, 62 Fed. Reg. 16,608, 16,609 (Apr. 7, 1997) (discussing redesignation authority contemplated by 8 U.S.C. § 1254a(b)).

The statute makes the Secretary's TPS decisions unreviewable. Section 1254a(b)(5)(A) states: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."

### B.     Factual Background

Since the inception of the program, the government has designated a total of
twenty-one countries and the Province of Kosovo for TPS.  The government
terminated twelve of those designations prior to 2017, including three terminations in
2016.  *See, e.g., Sierra Leone Termination*, 81 Fed. Reg. 66,054 (Sept. 26, 2016).

In 2017 and 2018, Acting Secretary Duke and Secretary Nielsen extended the
TPS designations of four countries: Somalia, South Sudan, Syria, and Yemen.  In each
case, the Secretary determined that the conditions that prompted the country's TPS
designation persisted and prevented the safe return of the country's nationals,
warranting an 18-month extension.  *See Extension of South Sudan for TPS*, 82 Fed. Reg.
44,205 (Sept. 21, 2017); *Extension of the Designation of Syria for TPS*, 83 Fed. Reg. 9329
(Mar. 5, 2018); *Extension of the Designation of Yemen for TPS*, 83 Fed. Reg. 40,307 (Aug.
14, 2018); *Extension of Designation of Somalia for TPS*, 83 Fed. Reg. 43,695 (Aug. 27,
2018).

But not all of the countries with current TPS designations merited extensions.
After consulting with other government agencies, Secretaries Duke and Nielsen
determined that conditions in Sudan, Nicaragua, Haiti, and El Salvador no longer met

the statutory requirements for TPS designations. As required by the statute, they terminated those designations. [2]

### 1. Sudan

In October 2017, Acting Secretary Duke terminated the TPS designation of Sudan, which had initially been designated in 1997 because of an ongoing civil war. *Termination of the Designation of Sudan for TPS*, 82 Fed. Reg. 47,228 (Oct. 11, 2017) (*Sudan Termination*). By October 2017, Acting Secretary Duke concluded, the conflict in Sudan was "limited to Darfur and the Two Areas (South Kordofan and Blue Nile states)." *Id.* at 47,230. Moreover, she explained, "in Darfur, toward the end of 2016 and through the first half of 2017, parties to the conflict renewed a series of time-limited unilateral cessation of hostilities declarations, resulting in a reduction in violence and violent rhetoric from the parties to the conflict." *Id.* Consequently, she found that "[t]he remaining conflict [was] limited and [did] not prevent the return of nationals of Sudan to all regions of Sudan without posing a serious threat to their personal safety." *Id.*

---

[2] On October 3, 2018, the district court entered a preliminary injunction prohibiting the government from implementing the TPS termination decisions. Subsequently, the court, pursuant to the parties' request, entered an order staying further proceedings pending appellate review of the preliminary injunction. Dkt. 138. Under that order, the government stipulated that the TPS designations for Sudan, Nicaragua, Haiti, and El Salvador will remain in effect on a nationwide basis until the later of a) 120 days following the issuance of any mandate to the district court reversing the injunction or b) the Secretary's previously announced termination date. *Id.* at 3-4.

8

The Acting Secretary further determined that "food security" had improved "across much of Sudan" because of above-average harvests. *Id.* Even in conflict-affected areas where food remained scarce, there had been "some improvement in access for humanitarian actors to provide much-needed humanitarian aid." *Id.* The Acting Secretary noted that Sudan's human rights record "remain[ed] extremely poor in general." *Id.* But after taking into account the "geographically limited scope of the conflict, the renewed series of unilateral cessation of hostilities declarations and concomitant reduction in violence and violent rhetoric from the parties to the conflict, and improvements in access for humanitarian actors to provide aid," she concluded that the ongoing conflict and extraordinary and temporary conditions that justified Sudan's most recent TPS re-designation had "sufficiently improved such that they no longer prevent nationals of Sudan from returning in safety to all regions" of the country. *Id.* Sudan's designation was scheduled to end on November 2, 2018. *Id.*

## 2. Nicaragua

In December 2017, the Acting Secretary terminated the TPS designation of Nicaragua, which had initially been designated in 1999 as a result of conditions caused by Hurricane Mitch. *Termination of the Designation of Nicaragua for TPS*, 82 Fed. Reg. 59,636 (Dec. 15, 2017) (*Nicaragua Termination*). The Acting Secretary noted that, by 2017, "[r]ecovery efforts relating to Hurricane Mitch ha[d] largely been completed" and the "social and economic conditions affected by Hurricane Mitch ha[d] stabilized." *Id.* at 59,637. She emphasized that Nicaragua had "received a significant

9

amount of international aid to assist in its Hurricane Mitch-related recovery efforts, and many reconstruction projects ha[d] now been completed." *Id.* As a result, "[a]ccess to drinking water and sanitation ha[d] improved." *Id.* She also noted other significant infrastructure improvements. For example, whereas 50% of the country had electricity in 2007, that figure had risen to 90% in 2017. *Id.* The Acting Secretary further stressed that per-capita GDP was higher than it had been prior to the hurricane, and Nicaragua's gross domestic product grew by an average of 5% per year since 2010, reaching an all-time high in 2016. *Id.* She also found it significant that conditions had improved to the point where the country attracted tourism and foreign investment. *Id.* In light of the above, the Acting Secretary concluded that it was "no longer the case that Nicaragua is unable, temporarily, to handle adequately the return of nationals of Nicaragua." *Id.* The Secretary announced that Nicaragua's designation will end on January 5, 2019.

### 3. Haiti

In January 2018, Acting Secretary Duke terminated the TPS designation for Haiti, which had initially been designated in 2010 after a 7.0-magnitude earthquake. *Termination of the Designation of Haiti for TPS*, 83 Fed. Reg. 2648 (Jan. 18, 2018) (*Haiti Termination*). Secretary Jeh Johnson had previously extended Haiti's designation in March 2014 and August 2015. *Extension of the Designation of Haiti*, 79 Fed. Reg. 11,808 (Mar. 3, 2014); *Extension of the Designation of Haiti*, 80 Fed. Reg. 51,582 (Aug. 25, 2015). In doing so, however, the Secretary noted the Haitian government's "considerable

10

progress in improving security and quality of life of its citizens." 79 Fed. Reg. at
11,809; 80 Fed. Reg. at 51,584.

Secretary John Kelly had likewise extended Haiti's designation in May 2017 for
six months. *Extension of the Designation of Haiti for TPS*, 82 Fed. Reg. 23,830 (May 24,
2017). Like Secretary Johnson, Secretary Kelly noted that "Haiti has made significant
progress in addressing issues specific to the earthquake," that 96% of people living in
displaced-person camps had left those camps, and that security had improved enough
for the United Nations to announce its intention to withdraw its peacekeeping
mission in the following months. *Id.*

In terminating Haiti's TPS status eight months later, Acting Secretary Duke
determined that the country had made sufficient progress recovering from the 2010
earthquake that the conditions giving rise to its TPS designation were no longer met.
*Haiti Termination*, 83 Fed. Reg. at 2650. The Acting Secretary noted that Haiti had
closed 98% of the displaced-person sites and that only approximately 38,000 of the
estimated two million Haitians who lost their homes in the earthquake were still living
in camps as of June 2017. *Id.* Haiti's recovery was further evidenced by the fact that
the United Nations had withdrawn its peacekeeping mission in October 2017. *Id.*
The Acting Secretary also noted that Haiti had completed a presidential election in
February 2017, its Supreme Court was again operational, and the country was in the
process of rebuilding government infrastructure destroyed by the earthquake. *Id.*
Indeed, Haiti had experienced continuing growth of its GDP since the earthquake

11

and, although Haiti had grappled with a cholera epidemic that began after the earthquake, cholera was at its lowest level since the earthquake occurred. *Id.* Haiti's designation is scheduled to end on July 22, 2019.

### 4. El Salvador

In January 2018, Secretary Nielsen terminated the TPS designation of El Salvador, which had originally been designated in 2001 because of the effects of three earthquakes. *Termination of the Designation of El Salvador for TPS*, 83 Fed. Reg. 2654 (Jan. 18, 2018) (*El Salvador Termination*). Secretary Nielsen found that the "conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster due to the damage caused by the 2001 earthquakes are no longer met." *Id.* at 2655-56. The Secretary highlighted that recovery efforts relating to the 2001 earthquakes "ha[d] largely been completed"; that "social and economic conditions affected by the earthquakes have stabilized"; that El Salvador had received millions of dollars in international aid, enabling it to complete many reconstruction projects; and that "schools and hospitals have been reconstructed and repaired, homes have been rebuilt, and money has been provided for water and sanitation and to repair damaged roads and other infrastructure." *Id.* The Secretary also emphasized that El Salvador's economy was steadily improving, with GDP reaching an all-time high in 2016 and more growth expected through 2020. *Id.* The Secretary also noted that had El Salvador accepted almost 40,000 of its nationals who had been removed from the United States in 2016 and 2017. *Id.* And while the Secretary acknowledged that

"[g]overnment assistance and resources for returnees [was] reportedly limited," she concluded that "the Salvadoran Government, U.S. Government, and international organizations are working cooperatively … to lay the groundwork for an eventual return of many Salvadorans from the United States." *Id.* El Salvador's designation is scheduled to end on September 9, 2019. *Id.*

## C. District Court Proceedings

**1.** Plaintiffs in this case are nine individual TPS beneficiaries and five U.S. citizen children of beneficiaries. In March 2018, plaintiffs filed this putative class action challenging the Secretaries' decisions terminating the TPS status of Sudan, Nicaragua, Haiti and El Salvador. As relevant here, the complaint alleges that the termination decisions were unlawful because (1) the Secretary's actions violated the APA by departing from prior practice without an adequate explanation; and (2) the decisions were motivated by discriminatory animus in violation of equal-protection principles. ER.1049-52.

The government moved to dismiss, urging that plaintiffs' suit was precluded by the statute's bar on judicial review and that in any event the claims failed as a matter of law.

**2.** The district court denied the government's motion. ER.44-100. The court held that the statutory bar on judicial review of TPS decisions, 8 U.S.C. § 1254a(b)(5)(A), did not apply. The court acknowledged that the statute precludes review of "any *determination* … with respect to the designation, or termination or

13

extension of a designation, of a foreign state under this subsection." ER.59 (quoting 8 U.S.C. § 1254a(b)(5)(A)). But it concluded that plaintiffs' APA claim challenged "DHS's change in interpretation of the TPS statute (a general procedural issue), not an individual determination," and that "[t]he Department's general interpretation of the TPS statute is a question distinct from the Department's designation or termination of a particular country's TPS status." ER.61.

With respect to whether § 1254a(b)(5)(A) barred plaintiffs' constitutional claims, the court observed that, "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," and concluded that the statute did not satisfy that standard. ER.63.

The court then held that plaintiffs plausibly alleged that Secretaries Duke and Nielsen violated the APA by taking a different approach to TPS determinations than past Administrations without acknowledging or explaining the change. ER.77. The court determined that plaintiffs' plausibly alleged that "'[u]nder prior administrations, DHS or its predecessors considered intervening natural disasters, conflicts, and other serious social and economic problems as relevant factors when deciding whether to continue or instead terminate a TPS designation,'" whereas "'DHS has now taken the position that such factors cannot be considered.'" ER.69 (quoting Compl. ¶ 75).

With respect to plaintiffs' equal protection challenge, the court stated that *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), provided the relevant standard of review. Under that standard, "government action

14

may violate equal protection if a discriminatory purpose was one motivating factor."
ER.87.  The court declined to apply the standard set out in *Trump v. Hawaii*, 138 S. Ct.
2392, 2419 (2018), in which the Supreme Court held that courts are to apply the
"deferential" rational-basis-review standard when reviewing constitutional challenges
to discretionary agency decisions in "admission and immigration cases."  The district
court cited three reasons for refusing to apply the rational-basis standard: (1) DHS did
not cite national security or foreign policy as a reason for its termination decision; (2)
persons affected by the TPS determinations are already in the United States and have
greater rights than persons outside the United States; and (3) the Presidential
proclamation at issue in *Hawaii* was issued pursuant to a broad grant of authority.
ER.94-96.  Applying the *Arlington Heights* standard, the district court concluded that
plaintiffs had plausibly alleged that animus on the part of the President was a
motivating factor in the TPS decisions.  ER.97-99.

    **3.**  After denying defendants' motion to dismiss, the district court ordered the
Secretary to produce an administrative record for the four termination decisions.  *See*
Dkt. 34, at 4-5.  The court further concluded that "[d]eliberative material that was
relied upon directly or indirectly [by the Secretaries] is presumptively part of the
administrative record."  *Id.* at 5.  The court also permitted plaintiffs to take extra-
record discovery on the questions whether the Secretaries had taken a new approach
to TPS determinations and whether their termination decisions were motivated by
animus.  *Id.*

In subsequent rulings, the district court held that the deliberative process privilege was largely unavailable in this case. *See, e.g.*, Dkt. Nos. 63, 67, 79. Accordingly, the government produced thousands of documents, including a significant number of drafts, e-mails, and other deliberative materials.

**4.** On October 3, 2018, the district court granted plaintiffs' motion for a preliminary injunction. ER.1-43. The court first concluded that the likelihood of irreparable injury, the balance of hardships, and the public interest favored plaintiffs. ER.8-14.

On the merits, the court held that plaintiffs had demonstrated a substantial likelihood of success on their APA claim because a "wealth of record evidence" supported plaintiffs' assertion that DHS had made an unexplained change in its approach to evaluating TPS designations. ER.19. The court stated that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad, and that this was a clear departure from prior administration practice" that the Secretaries failed to explain. ER.26.

With respect to the equal protection claim, the court held that plaintiffs "have provided sufficient evidence to raise serious questions as to whether a discriminatory purpose was a motivating factor in the decisions to terminate the TPS designations." ER.27. Although the court found no evidence that either Acting Secretary Duke or Secretary Nielsen harbored discriminatory animus, the court reasoned that a

16

discriminatory motive could be imputed to the Secretaries because there was evidence "suggesting that the White House was putting pressure on DHS to end TPS," ER.28-29; that the pressure "did, in fact, have influence on the TPS decisions," ER.29; and that "President Trump harbors an animus against non-white, non-European aliens," ER.30. The court also stated that there was "circumstantial evidence of race being a motivating factor." ER.31.

The court reiterated its prior holding that *Arlington Heights,* not *Trump v. Hawaii,* provides the governing standard of review, but also held, in the alternative, that "[e]ven if *Trump v. Hawaii* did provide the governing legal standard for the Equal Protection claim here, the Court nevertheless finds that there are serious questions" as to whether the terminations met the *Hawaii* standard. ER.41-42.

## SUMMARY OF ARGUMENT

1. Plaintiffs' APA claim is precluded by § 1254a(b)(5)(A)'s bar on judicial review of the Secretary's TPS determinations and is without merit in any event. Section 1254a(b)(5)(A) provides that there is "no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a [TPS] designation." Through their APA claim, plaintiffs seek a declaration and injunction setting aside the four TPS termination decisions at issue. Plaintiffs' APA claim thus clearly challenges "determination[s] of the [Secretary] with respect to the … termination" of a TPS designation and is barred by § 1254a(b)(5)(A).

17

The district court concluded that plaintiffs could circumvent § 1254a's unambiguous bar on review on the theory that they are not challenging the determinations themselves, but rather a purported unexplained change in the Secretary's approach to TPS determinations under which Secretaries Duke and Nielsen declined to place weight on intervening events that were not related to or did not affect a country's recovery from the event that gave rise to the country's TPS designation.

The distinction drawn by the district court is without basis and does not permit plaintiffs' claims to go forward. The criteria and evidence a Secretary deems important in arriving at a particular TPS determination and the weight the Secretary accords to those criteria cannot be separated from the decision itself. And judicial review of a Secretary's reasons for reaching a particular TPS determination is precisely what § 1254a(b)(5)(A) bars. Indeed, plaintiffs' suit runs counter to the fundamental purposes of the judicial-review bar: to avoid judicial second-guessing of sensitive judgments about foreign policy and conditions that a TPS designation requires and that the Executive Branch is uniquely suited to handle, and to preclude the inevitable and protracted litigation that TPS determinations (which Congress expressly designed to be temporary) would otherwise engender.

Even if it were not barred, plaintiffs' APA claim would fail on the merits. The TPS statute confers significant discretion on the Secretary in determining whether such a designation should be granted and when to end such a designation. The legal

18

standard Secretaries Duke and Nielsen applied in arriving at the TPS termination decisions follows from a natural reading of the TPS statute and neither that approach nor the decision-making process differed materially from those used by past Secretaries.

2. Plaintiffs are likewise unable to demonstrate that they are likely to succeed on the merits of their equal protection claim, or that such a claim raises serious questions. That is the case even assuming the claim is reviewable and should be analyzed under the standard provided by *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). And it is even more clearly the case under *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), which furnishes the relevant standard where, as here, a court is reviewing TPS determinations that involve immigration-related policy decisions that "implicate relations with foreign powers" and involve country-wide "classifications defined in the light of changing political and economic circumstances," *id.* at 2418-19.

After obtaining extensive discovery, plaintiffs have identified no evidence indicating that either Acting Secretary Duke or Secretary Nielsen harbored discriminatory animus against "non-white, non-European" immigrants. On the contrary, the record reflects that the Secretaries carefully considered the TPS termination decisions after consulting with relevant government stakeholders and fully explained their decisions to terminate TPS for the four countries at issue. That the Secretaries extended the TPS designations for South Sudan, Syria, Yemen, and

19

Somalia—four non-European countries with significant non-white populations—further undermines any suggestion that the Secretaries' decisions were motivated by discriminatory animus.

Without evidence of animus on the part of the decision-makers, the district court characterized alleged statements made by the President as reflecting impermissible animus and then imputed that alleged animus to the Secretaries. That conclusion is flawed at every level. The various statements, objectively construed, reflect an emphasis on an immigration policy that focuses on America's economic and security interests, not racial or ethnic animus. This is even clearer once this Court reviews the remarks—as it must, but the court below did not—in light of the presumption of regularity afforded to the President. The district court laid great stress on the fact that Acting Secretary Duke believed the termination decisions were consistent with the President's "America First" immigration policy. But an immigration policy that seeks to further American strategic and foreign policy interests and emphasizes a "merit-based" approach to immigration cannot be the basis of an equal protection claim, no matter how much a court may disagree with that policy.

## STANDARD OF REVIEW

"[T]he legal premises underlying a preliminary injunction" are reviewed de novo. *Federal Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1211 (9th Cir.

2004). Otherwise, the district court's entry of the preliminary injunction is reviewed for abuse of discretion. *Id.*

## ARGUMENT

## I. PLAINTIFFS' APA CLAIM CANNOT SUPPORT A PRELIMINARY INJUNCTION

### A. The TPS Statute's Preclusion Provision Bars Plaintiffs' APA Claim

The TPS statute unambiguously provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A). The statute thus makes clear that TPS designation, extension, and termination determinations, such as the four termination determinations plaintiffs challenge, are committed to the unreviewable authority of the Secretary of Homeland Security. Accordingly, an APA challenge seeking to set aside any such determination is precluded. *See* 5 U.S.C. § 701(a)(1); *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004) ("If a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective.").

The district court mistakenly concluded that plaintiffs could evade the statutory bar by characterizing their suit as a "collateral" challenge to a supposed unexplained change in the Secretary's general practice of making TPS determinations, rather than a challenge to the specific determinations themselves. ER.60-61. In its order denying

the government's motion to dismiss, the district court described the alleged change in practice as a change from a previous policy under which Secretaries "considered intervening natural disasters, conflicts, and other serious and social economic problems as relevant factors when deciding whether to continue or instead terminate a TPS designation," to one in which such intervening factors were not considered. ER.69. In its order granting plaintiffs' motion for a preliminary injunction, however, the court defined the alleged change in policy more narrowly. *See* ER.16. There, it described the alleged new policy not as a failure to consider intervening events altogether, but rather as a failure to consider "intervening conditions not directly related to the originating condition." *Id.* Moreover, in concluding that plaintiffs were likely to succeed on the merits of their APA claim, the court did not conclude that plaintiffs were likely to show that the alleged new policy was impermissible, but rather that the Secretaries had failed to adequately explain the change in policy. ER.17.

Contrary to the district court's conclusion, plaintiffs' APA claim involves a direct challenge to the Secretary's country-specific determinations themselves and is therefore barred by the express language of § 1254a(b)(5)(A). Nothing in that categorical preclusion (or common sense) suggests that Congress intended to permit an alien to obtain review of a Secretary's application of the statute in making her determination, including the manner in which a Secretary weighs conditions in a foreign country or what factors a given Secretary finds most significant. That is precisely what the statute bars. The criteria and evidence a Secretary deems important

22

in arriving at a particular TPS determination and the weight the Secretary accords to those criteria cannot be separated from the determination itself. Similarly, a claim that the Secretary failed to adequately explain why she did not offer a detailed discussion of a particular substantive factor that was discussed at greater length by a previous Secretary is simply a challenge to the Secretary's determination. Reviewing a determination by contrasting it with earlier determinations is quite plainly review of the determination at issue. It is precisely such second-guessing of the Secretary's assessments of conditions in foreign countries, her predictive judgments, and the adequacy of her basis for making a particular TPS determination that § 1254a(b)(5)(A) prohibits.

The relief plaintiffs seek also clearly demonstrates that they are challenging the determinations themselves. *See Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012). Plaintiffs do not seek an injunction invalidating a collateral agency policy or practice. Rather, plaintiffs seek an order barring implementation of the termination decisions themselves. ER.1054 (asking the Court to "[d]eclare th[e] Defendants' termination of the TPS designations for El Salvador, Nicaragua, Haiti, and Sudan … unlawful under the [APA]" and to "[v]acate Defendants' unlawful termination of the TPS designations").

Moreover, plaintiffs' contention that an agency's approach to making a decision committed to its judgment and discretion required more explanation because it assertedly is inconsistent with the approach taken in past cases is a classic arbitrary-

and-capricious challenge to the decision itself, as is clear from *California Trout v. FERC*, 572 F.3d 1003 (9th Cir. 2009), relied on by the district court. In *California Trout,* this Court reviewed an agency decision to determine whether it constituted an unexplained change of policy (and concluded that it did not). The district court quoted this Court's statement that "while an agency may announce new principles in an adjudicatory proceeding, it may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case," and that "if [an agency] announces and follows—*by rule or by settled course of adjudication*—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act." ER.16 (quoting *California Trout*, 572 F.3d at 1023). But nothing in *California Trout*—which did not involve a bar on judicial review—remotely suggests that a plaintiff can circumvent such a bar by characterizing his or her challenge to the determination Congress insulated from judicial review as a challenge to a purportedly "collateral" policy that supposedly influenced that decision. This Court's discussion only underscores the long-established principle that an agency may announce a new practice or policy either by "general rule or by individual, ad hoc litigation[.]" *SEC v. Chenery*, 332 U.S. 194, 203 (1947). Congress enacted § 1254a(b)(5)(A) against the background of such approaches to judicial review where

24

judicial review is *allowed*, further confirming that the express *bar* to judicial review precludes such claims.

That plaintiffs' argument, regardless of its rubric, is fundamentally a challenge to the determinations themselves, is further confirmed by decisions of other courts of appeals addressing judicial review restrictions. *See, e.g.*, *American Soc. of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 452 (7th Cir. 2002) (provision of the Medicare Act that provided there "shall be no … judicial review" of "the [Secretary of HHS's] determination of relative values" foreclosed review of "a systemic challenge to the Secretary's interpretation of Congress's" instructions as to how the Secretary should determine those values); *HP Inc. v. MPHJ Tech. Invs. LLC*, 817 F.3d 1339, 1347 (Fed. Cir. 2016) (statute barring judicial review of an agency's decision barred "review of the [agency's] reasons" for that decision); *Painter v. Shalala*, 97 F.3d 1351, 1356 (10th Cir. 1996) (statutory provision providing that there will be no judicial review of the determination of conversion factors "clearly indicate[d] Congress' intent to preclude administrative and judicial review of the manner in which the conversion factor is calculated by the Secretary"). And, as this Court has explained, when a decision is committed to an agency's unreviewable discretion, "changes in departmental policies surrounding the factors to be considered or emphasized when exercising that discretion" are irrelevant to a court's review. *Morales de Soto v. Lynch*, 824 F.3d 822, 827-28 (9th Cir. 2016). Because the underlying decision is not reviewable, a court has no authority to review the bases for that decision or whether

25

that decision was arrived at in a "procedurally defective" manner. *See Amgen*, 357 F.3d at 113; *see also id.* at 114 (Where "judicial review [of a decision] is precluded[,] … it does not matter how the Secretary made the decision.").

This Court's decision in *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018), exemplifies these principles and further demonstrates that the statute bars plaintiffs' APA claim. *Gebhardt* involved INA provisions which barred review of any "decision or action" relating to "no risk" determinations made by the Secretary of Homeland Security. *Id.* at 984. Plaintiff, who was the subject of an adverse "no risk" determination, asserted that the judicial-review bar did not apply to his statutory claims challenging the "standard" the Secretary applied in making "no risk" determinations and the process through which the Secretary adopted that standard. *Id.* at 987.

This Court rejected that argument. *Gebhardt*, 879 F.3d at 987. In so doing, it stressed that "[t]he standards by which the Secretary reaches a decision within his or her 'sole and unreviewable discretion'—and the methods by which the Secretary adopts those standards—are just as unreviewable as the Secretary's ultimate decisions themselves." *Id.* Like the plaintiffs in *Gebhardt*, plaintiffs here challenge the standard the Secretaries used in making their TPS determinations and the manner in which they adopted that standard. As in *Gebhardt*, such a challenge is barred.

Neither *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991), nor *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993) (*CSS*), supports the district court's

26

decision. *See* ER.59-62. *McNary* addressed whether a statutory provision which channeled judicial review of determinations concerning special agricultural worker (SAW) status to removal proceedings barred the district court from considering plaintiffs' challenge to an alleged "pattern or practice of procedural due process violations by the Immigration and Naturalization Service (INS) in its administration of the SAW program." 498 U.S. at 483. The Supreme Court held that district court jurisdiction could lie over such an action because the channeling provision applied to review of individual denials rather than "collateral challenges to unconstitutional practice and policies." *Id.* at 492. The Court observed that plaintiffs did "not seek a substantive declaration that they [were] entitled to SAW status;" even if they prevailed on the merits, they would "only be entitled to have their case files reopened and their applications reconsidered in light of … newly prescribed INS procedures." *Id.* at 495.

Unlike the collateral challenge in *McNary*, plaintiffs here seek (and only seek) declaratory and injunctive relief setting the termination decision aside, and thus their claim is squarely covered by the review bar. *See City of Rialto v. West Coast Loading Corp.*, 581 F.3d 865, 877 (9th Cir. 2009) (concluding that *McNary*-type rationale was inapplicable to a "pattern and practice" claim that sought "the very same [relief] that successful direct review … would produce: invalidation of the" underlying unreviewable agency decision); *Skagit Cty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 386 (9th Cir. 1996) (rejecting reliance on *McNary* where "a procedure is challenged

27

only in order to reverse the individual [unreviewable] decision"); *see also Gebhardt*, 879 F.3d at 987.

*CSS* addressed the question whether a district court had jurisdiction to review regulations issued by INS. The Court rejected the contention that a provision withholding "judicial review" of "determination[s] respecting an application for adjustment of status" "precludes district court jurisdiction over an action challenging the legality of a regulation without referring to or relying on the denial of any individual application." 509 U.S. at 56.

Plaintiffs here are not challenging a DHS regulation; they seek declaratory and injunctive relief that would set aside specific determinations. Their contentions rely on an analysis of the factors that Secretaries Duke and Nielsen relied on in making the four TPS termination determinations at issue, and thus "refer to [and] rely on," 509 U.S. at 56, the specific determinations.[3]

---

[3] *Immigrant Assistance Project of AFL-CIO v. INS*, 306 F.3d 842 (9th Cir. 2002), and *Proyecto San Pablo v. INS*, 189 F.3d 1130 (9th Cir. 1999), cited by the district court (ER.61 n.14), are likewise inapposite because both involved collateral challenges to an agency's procedures, not to the agency's decision itself. *See Immigrant Assistance Project*, 306 F.3d at 864 (emphasizing that the plaintiffs "do not challenge INS's interpretations of IRCA's *substantive* eligibility requirements," but rather "the *procedure* by which they have to prove that they are eligible for adjustment of status"); *Proyecto San Pablo*, 189 F.3d at 1138 (plaintiffs' claimed injury was their "inability to get access to their prior deportation records in a timely fashion"). Plaintiffs' challenge to the manner in which the Secretaries weighed various factors in arriving at the termination decisions bears no resemblance to the collateral challenges at issue in *Immigrant Assistance Project* and *Proyecto San Pablo*.

28

Moreover, the Supreme Court's conclusion that review was not precluded in *McNary* and *CSS* turned on the specific preclusion provisions at issue. *See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1036 (9th Cir. 2016). Neither case establishes a rule that applies to other preclusions of review—especially ones directed at shielding sensitive judgments like those that must be made under TPS.

Allowing plaintiffs to circumvent § 1254a's bar on judicial review through a thinly veiled challenge to the determinations themselves and the reasoning underlying those determinations would run counter to the very purpose of the bar. In enacting the TPS statute, Congress recognized that TPS designations will involve sensitive and uncertain foreign-policy judgments (about, for example, the nature of foreign hostilities, an assessment of on-the-ground conditions abroad and a foreign government's response, and the ability of foreign nations to accept the return of their nationals) made at a country-wide level of generality. It is well-established that such considered judgments, "implicat[ing] sensitive and weighty interests of national security and foreign affairs" and based on an "evaluation of the [ever-changing] facts," are within the province of the Executive Branch, not the courts. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010). Congress thus deliberately shielded such judgments, as reflected in the TPS determinations, from judicial second-guessing.

Moreover, Congress was aware that TPS designations would affect thousands of individuals, many of whom could be expected to desire that TPS designations be

29

extended indefinitely. It thus would not have been difficult for Congress to predict that litigation over the termination of TPS designations, under the APA or otherwise, could mire TPS-related decisions (which Congress expressly intended to be temporary) in litigation for years and undermine the discretionary nature of the designations. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) (noting that delay "is often the principal object of resistance to a deportation proceeding"). Congress may also have concluded that Secretaries would be less likely to designate countries initially if doing so would inevitably lead to protracted and burdensome litigation, with corresponding lengthy extensions. Congress precluded judicial review of TPS determinations to avoid these consequences. Plaintiffs' suit is precisely the kind of action Congress sought to prevent.

### B. Plaintiffs' APA Claim Would Fail On The Merits Even If It Were Not Barred

Assuming that judicial review were available, plaintiffs' arbitrary-and-capricious APA claim would fail on the merits. Plaintiffs' claim rests on the premise that Secretaries Duke and Nielsen, in arriving at the four TPS termination decisions, deviated from past practice by failing to weigh adequately the impact of events that occurred after the initial TPS designation. That is not the case. Secretaries Duke and Nielsen applied a process and legal standard that is materially similar to those used by past Secretaries when evaluating TPS termination decisions. That they reached different conclusions than recent Secretaries regarding whether conditions in the four

countries at issue here justified an extension of the countries' TPS status merely reflects a difference in the Secretaries' assessment of evolving country conditions.

Plaintiffs' suggestion that Secretaries Duke and Nielsen ignored intervening events altogether is belied by even a cursory inspection of the Federal Register notices announcing the terminations. *See supra* pp. 8-13. In each case, the Secretary analyzed current conditions in the four countries to determine whether the conditions that gave rise to the initial TPS designation persisted. *See Sudan Termination*, 82 Fed. Reg. at 47,230; *Nicaragua Termination*, 82 Fed. Reg at 59,637; *Haiti Termination*, 83 Fed. Reg. at 2650; *El Salvador Termination*, 83 Fed. Reg. at 2655-56. The Secretary's analysis of a country's current conditions (including, for example, its current infrastructure, GDP, food security, housing stock, and government services) necessarily involved consideration of whether intervening events hampered the country's recovery from the events that resulted in the initial TPS designation. That the statute required the Secretaries to consider whether aliens can safely return to their countries, 8 U.S.C. § 1254a(b)(1), likewise demonstrates that the Secretaries necessarily considered current country conditions and intervening events. The Secretaries' consideration of intervening events is also evident in their contemporaneous decisions to extend TPS for other countries. *See, e.g.*, *Somalia Extension*, 83 Fed. Reg. at 43,696 (concluding that the conditions that gave rise to Somalia's 2012 TPS re-designation persisted in part because of "new conflict patterns, drought, and flooding" that occurred following the

31

re-designation); *Yemen Extension*, 83 Fed. Reg. at 40,309 (discussing ongoing cholera epidemic).

Perhaps recognizing that the Secretaries did, in fact, consider intervening circumstances in making the four termination determinations, the district court in its preliminary injunction order identified the Secretaries' alleged change in policy not as a refusal to consider intervening events altogether, but rather as "eliminating consideration of intervening conditions not directly related to the originating condition." ER.16. The district court erred in concluding that Secretaries Duke and Nielsen's focus on whether the conditions that gave rise to a country's TPS designation persist constituted a break from past practice.

The approach Secretaries Duke and Nielsen used in evaluating whether to extend or terminate the four TPS designations at issue follows from a natural reading of the statute. The statute ties a country's initial TPS designation to specific events or conditions—*i.e.*, an "ongoing armed conflict," "an earthquake, flood, drought, epidemic, … other environmental disaster," or other "extraordinary and temporary conditions." 8 U.S.C. § 1254a(b)(1). The statute emphasizes that the conditions that give rise to the TPS designation must be "temporary" and "extraordinary." *See id.* § 1254a(b)(1)(B)(i) (permitting the Secretary to designate a country for TPS if it finds, among other things, that an environmental disaster causes a "substantial, but temporary, disruption of living conditions"); *id.* § 1254a(b)(1)(C) (the Secretary may designate a country for TPS if she finds that "there exist extraordinary and temporary

conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety"). Thus, when the statute mandates that the Secretary periodically evaluate whether "the conditions for [a country's TPS] designation … continue to be met," *id.* § 1254a(b)(3)(A), it follows that the Secretary is to evaluate whether the "extraordinary and temporary" conditions caused by the event that gave rise to the TPS designation continue to exist. Nothing in the statute suggests that a Secretary's periodic evaluation of a TPS designation must incorporate entirely unrelated intervening events, some of which may have occurred years later.

That the statute contemplates the Secretary will focus her decision to terminate or extend an existing TPS designation on the originating event is underscored by DHS's longstanding interpretation of the TPS statute as providing that the Secretary, when reviewing a country's TPS status, may redesignate a country for TPS, as opposed to extending the country's existing TPS designation. *See supra* p. 6. DHS's longstanding recognition of a distinction between redesignations and extensions of previous designations demonstrates that the agency understands the statute to differentiate between whether new country conditions justify a TPS designation independently (thus warranting a redesignation) and whether conditions resulting from the events that gave rise to the initial designation continue to exist (thus warranting an extension of the initial designation).

Given that the standard applied by Secretaries Duke and Nielsen follows from the TPS statute, it is unsurprising that, as the district court's own analysis makes clear,

33

prior determinations generally considered intervening conditions only to the extent that they could be linked to or impeded recovery from the event underlying the initial designation or re-designation. *See* ER.60 (stating that, in prior extension notices, DHS considered "whether intervening events had frustrated or impeded recovery efforts *from the originating conditions* in Sudan, Haiti, Nicaragua, and El Salvador"); *see also*, *e.g., Extension of the Designation of El Salvador*, 81 Fed. Reg. 44,645 (July 8, 2016) ("Recovery from the [2001] earthquakes has been slow and encumbered by subsequent natural disasters and environmental challenges, including hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity, an ongoing coffee rust epidemic, and a prolonged regional drought that is impacting food security."); *Extension of the Designation of Haiti*, 80 Fed. Reg. 51,582 (Aug. 25, 2015) ("Haiti's ability to recover [from the 2010 earthquake] has been further constrained by political instability."); *Extension of the Designation of Sudan*, 79 Fed. Reg. 52,027 (Sept. 2, 2014) ("[T]he Secretary has determined that an 18-month extension is warranted because the armed conflict [in Sudan] is ongoing and the extraordinary and temporary conditions that prompted the May 2013 extension and redesignation continue to exist."); *Extension of the Designation of Nicaragua*, 75 Fed. Reg. 24,737 (May 5, 2010) (extending Nicaragua's TPS designation "because there continues to be a substantial, but temporary, disruption of living conditions in Nicaragua resulting from Hurricane Mitch").

Indeed, the district court identified only a single instance in which the Secretary purportedly addressed an intervening event without identifying a causal relationship between that event and the original TPS designation. ER.73 n.22 (citing *Haiti Extension*, 82 Fed. Reg. 23,830 (May 24, 2017)). And even in that case, the Secretary made clear that he was extending Haiti's TPS designation only because the conditions "supporting its [initial] designation for TPS persist[ed]." 82 Fed. Reg. at 23,831.

A review of termination decisions made by prior Secretaries likewise indicates that they focused their analyses on whether the event and conditions that led to the original designation persisted—precisely the standard Secretaries Duke and Nielsen used here. *See Termination of Guinea's Designation*, 81 Fed. Reg. 66,064 (Sept. 26, 2016) (noting that "[w]hile the impacts of the [Ebola] epidemic pose a lasting challenge to Guinea's economy and the capacity of its health system to provide treatment for preventable or treatable conditions," "the extraordinary and temporary conditions that prompted Guinea's TPS designation have substantially resolved and no longer prevent nationals of Guinea from returning to Guinea in safety"); *Termination of the Designation of Burundi*, 72 Fed. Reg. 61,172 (Oct. 29, 2007) ("[C]onditions that warranted the initial designation of TPS [for Burundi] in 1997 and the re-designation in 1999 no longer continue to be met."); *Termination of Designation of Rwanda*, 62 Fed. Reg. 33,442 (June 19, 1997) ("The ability of so many to return in relative safety demonstrates the end of the extraordinary circumstances that existed in 1994," when Rwanda was designated for TPS.); *Termination of Designation of Kuwait Under TPS*

*Program*, 57 Fed. Reg. 2931 (Jan. 24, 1992) ("[T]he extraordinary and temporary conditions found to exist in Kuwait on March 27, 1991 are not presently in existence."); *see also, e.g.*, *Extension of the Designation of Nicaragua*, 68 Fed. Reg. 23,748 (May 5, 2003) ("Each decision to extend the TPS designation was made on the determination that the conditions that warranted the TPS designation initially continued to exist."); *Extension and Redesignation of Somalia*, 77 Fed. Reg. 25,723 (May 1, 2012) ("The Secretary has determined that an 18-month extension is warranted because the armed conflict is ongoing, and the extraordinary and temporary conditions that prompted [Somalia's] 2001 redesignation persist.").

TPS designations have also been terminated in the past despite significant ongoing problems in the relevant countries. *See, e.g.*, *Termination of Designation of Angola Under TPS Program*, 68 Fed. Reg. 3896 (Jan. 27, 2003) (terminating Angola's TPS designation despite the remaining "challenge of assisting an estimated 4 million displaced Angolan nationals," ongoing "concern that Angola lacks housing, medical services, water systems, and other basic services destroyed by a 27-year-long war"); *Termination of the Province of Kosovo*, 65 Fed. Reg. 33,356 (May 23, 2000) (terminating Kosovo's designation because, "[a]lthough conditions remain difficult with bursts of ethnically-motivated violence, the situation in Kosovo cannot now be classified as ongoing internal conflict").

In short, Acting Secretary Duke and Secretary Nielsen's focus on whether the conditions that gave rise to the original TPS designation persisted and their

36

consideration of intervening events only to the extent those events bear some relation to the originating conditions is consistent with the statute and the approach in prior determinations. Plaintiffs' claim that the Secretaries acted arbitrarily and capriciously in departing from past practice *sub silentio* is without merit.

That Secretaries Duke and Nielsen did not depart from past practice is underscored by their decision-making process more generally. Like prior Secretaries, Secretaries Duke and Nielsen received input from both within and outside of the agency in reaching their respective determinations, including (a) a country conditions report from the USCIS Refugee, Asylum, and International Operations ("RAIO") Directorate; (b) a recommendation from the Secretary of State; (c) a country condition report from the State Department; and (d) a "Decision Memorandum" providing USCIS's recommendation. *See, e.g.*, ER.148-308. Moreover, those inputs included analyses of the countries' current conditions and intervening events, with the RAIO reports being particularly exhaustive. *See, e.g.*, ER.961-72; ER.645-61; ER.362-79; and ER.227-44.

As evidence that the Secretary previously considered intervening events unrelated to the event giving rise to the TPS designation, the district court cited a declaration submitted by a former USCIS director, who opined that USCIS, in recommending whether to continue a TPS designation, had the discretion to consider the impact of intervening factors "regardless of whether those intervening factors had any connection to the event that formed the basis for the original designation or to

37

the country's recovery from that originating event." ER.20. The district court erred
in relying on such evidence outside the administrative record, which is irrelevant to
judicial review of the determinations, and in allowing discovery. *See Florida Power &
Light Co.* v. *Lorion*, 470 U.S. 729, 743 (1985) ("The focal point for judicial review [of
agency action] should be the administrative record already in existence, not some new
record made initially in the reviewing court."). Indeed, judicial review of the question
whether the Secretaries departed from past practice can be made entirely by reviewing
past, public TPS termination decisions. But even assuming that extra-record evidence
could properly be considered, that testimony finds no support in prior TPS
determinations, which, as noted, routinely cite intervening events only where those
events related to the conditions that gave rise to the TPS designation.[4]

In sum, because § 1254a(b)(5)(A) precludes review of plaintiffs' APA claim and
because that claim fails in any event, plaintiffs cannot establish that they are "likely to
succeed on the merits" of that claim or even that the claim raises "serious questions
going to the merits," *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir.

---

[4] Because prior determinations considered intervening events only to the extent
they related to the originating condition, the district court's "wealth of record
evidence" indicating that the determinations here likewise follows that practice,
ER.19-25, is of no moment, even if it could be properly considered. Moreover, the
district court's reliance on Acting Secretary Duke's description of her decision to
extend Honduras's TPS status for only an additional six months as a "strong break
with past practice" was likewise misplaced. ER.22. As is clear from context, the "past
practice" Acting Secretary Duke was referring to was the "routine[]" extension of TPS
for Nicaragua. ER.632.

2017).  The district court abused its discretion in entering a preliminary injunction on that ground.[5]

## II.  PLAINTIFFS' EQUAL PROTECTION CLAIM CANNOT SUPPORT A PRELIMINARY INJUNCTION

After considering the current conditions in Sudan, Nicaragua, Haiti, and El Salvador, Secretaries Duke and Nielsen determined that those countries no longer met the qualifications for TPS because the "temporary" conditions that gave rise to their TPS designations were no longer present.  Congress clearly precluded review of those determinations, *see* 8 U.S.C. § 1254a(b)(5)(A), and the district court wrongly concluded that this clear bar on judicial review could be circumvented by a constitutional challenge that—in any event—is flatly at odds with the reasoning of the challenged determinations, which show no sign of being infected by discriminatory animus.[6]  The district court likewise erred in concluding that, even if the constitutional claim were reviewable, plaintiffs could rely on extra-record evidence and discovery to establish that claim, because the APA and its record-review limits also govern such challenges to agency action.  *See* 5 U.S.C. § 706(2)(B) (providing cause of action to "set aside

---

[5] The district court applied this Court's standard under which a plaintiff seeking a preliminary injunction need only show "that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits"—if the "balance of hardships tips *sharply* in the plaintiffs' favor[.]" *Alliance for the Wild Rockies*, 865 F.3d at 1217.  Although binding on the panel, the government respectfully submits that the standard is inconsistent with the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).

[6] Section 1254a(b)(5)(A) provides a far clearer bar on review than the statutory provision at issue in *Webster v. Doe*, 486 U.S. 592, 603-04 (1988).

39

agency action" "contrary to constitutional right"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).

In any event, plaintiffs' equal protection claim would not raise "serious legal questions" even if it were reviewable. That is the case, even assuming that the district court correctly held that plaintiffs' equal protection claim should be reviewed under the standard set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), which requires plaintiffs to establish that "a discriminatory purpose has been a motivating factor in the [government's] decision," *id.* at 265-266. But to be clear, to the extent review is permitted in the face of the express statutory bar, the appropriate standard is that set forth in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), which held that constitutional challenges to Executive Branch immigration policies are to be judged under a rational-basis standard and affirmed so long as they are "plausibly related" to the objective of the policy. *Id.* at 2420. Ultimately, though, because plaintiffs cannot establish that animus towards "non-white, non-Europeans" was a motivating factor in the Secretaries' decisions, their equal protection claim fails under any standard.

## A. The Plaintiffs Are Unlikely To Succeed On Their Equal Protection Claim Under *Arlington Heights*

Secretaries Duke and Nielsen provided reasoned explanations for their decisions to terminate the temporary protected status of four countries, and, as discussed above, those decisions would properly be sustained under normal principles

of APA review, if Congress had not explicitly precluded such review. Still less do the decisions permit any inference of impermissible discriminatory intent. Despite having extraordinarily obtained hundreds of privileged documents reflecting internal government deliberations, plaintiffs have not demonstrated that either Acting Secretary Duke or Secretary Nielsen harbored animus in making the termination decisions at issue.

The record demonstrates that the Secretaries carefully considered the conditions of each country and based their termination decisions on an independent determination, amply supported by the record, that conditions in Sudan, Nicaragua, Haiti, and El Salvador had improved enough that the initial TPS designation was no longer sustainable. *See supra* pp. 8-13, 37, 52-53. The record makes clear that the Secretaries received input from a number of sources, both within and outside DHS. *See id.* The record further shows that Acting Secretary Duke "was a very active consumer of information about TPS," ER.109, and that she "was struggling with" the decision "in a good sense of the word … as an intelligent, hard-working government employee would struggle with a very consequential decision." ER.136. And the Federal Register notices set forth the Secretaries' reasoning for their decisions. Moreover, as the White House Chief of Staff explained in a contemporaneous, internal communication, "the decision on TPS was entirely [the Secretary's]" to make. ER.144.

The plaintiffs' allegations of discriminatory animus are especially implausible because Secretaries Duke and Nielsen extended TPS designations for South Sudan, Syria, Yemen, and Somalia. *See supra* p. 7. That the Secretaries extended the TPS designations of several "non-white, non-European" countries underscores that their TPS decisions were driven by a reasoned analysis of the existing conditions in each country, not racial or ethnic animus.

The district court acknowledged that plaintiffs have failed to produce any evidence of animus on the part of Secretaries Duke and Nielsen. ER.27. But the court declared that plaintiffs presented a "serious question" on the merits because "President Trump has expressed animus against non-white, non-European immigrants" and his alleged animus could be imputed to the Secretaries. *Id.* That conclusion is flawed in every respect.

The asserted animus in the President's purported statements cannot be a basis for questioning the good faith of Secretaries Duke and Nielsen, who are "entitled to a presumption that they act properly and according to law." *Kohli v. Gonzales*, 473 F.3d 1061, 1068 (9th Cir. 2007). The district court was quite wrong to assume that it could import from the employment discrimination context the so-called "cat's paw" theory of animus and apply it to statutory determinations made by Cabinet Secretaries in the foreign-policy and national-security context. *See* ER.86-87. This Court should not blithely extend the doctrine to an exercise of statutory authority by a Cabinet Secretary acting under an oath to uphold the Constitution. As the Supreme Court explained in

42

*Staub v. Proctor Hospital*, 562 U.S. 411 (2011), "general principles of … agency law" "suggest[] that the malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold the principal liable for a tort that requires both." *Id.* at 418. Although the Court was nevertheless willing to hold an employer liable by deeming a biased supervisor responsible for the adverse action of an unbiased supervisor if the former's own discriminatory acts were the intended and proximate cause of the latter's adverse action, *id.* at 418-20, extending that sort of imputation to the government regulatory context would severely undermine the ability of government officials to make decisions exclusively within their purview.

Rather than "judicial review of agency action" focusing on "the administrative record already in existence," *Florida Power & Light,* 470 at 743, absent a "strong showing of bad faith or improper behavior" to overcome the presumption of regularity, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), the "cat's paw" approach would invite judicial second-guessing of an agency official's actions based on mere allegations of discriminatory motive on the part of a different government official who played some role in the decision-making process. That would invite impermissible intrusion on privileged Executive Branch deliberations, *see United States v. Nixon*, 418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982).

43

Here, in particular, Secretaries Duke and Nielsen have given eminently rational reasons that are supported by the record for terminating TPS for the four countries in question, and no one has accused them of acting with a discriminatory intent. It would severely intrude on agency decision-making to allow plaintiffs to attack the Secretaries' decisions based on the President's alleged bias, or to require the Secretaries to show that such bias was not a proximate cause of their decisions.

The district court sought to bridge the gap from alleged presidential statements to impermissible discrimination by the Secretaries on the ground that "the White House was putting pressure on DHS to end TPS" and that "the White House did, in fact, have influence on the TPS decisions." ER.28-29. The court's analysis necessarily assumes that the various White House officials at issue who communicated with the Secretaries (or their staff) about TPS were motivated by discriminatory animus. There is no basis for that extraordinary assumption. It is neither unusual nor improper for White House officials to convey their views on a significant policy decision with the relevant agency decision-maker, particularly where, as here, that decision has significant foreign-policy implications. "Our form of government simply could not function effectively or rationally if key executive policymakers were isolated from each other and from the Chief Executive." *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981).

In all events, the district court gravely erred in inferring impermissible motives from Acting Secretary Duke's statements that her termination decisions were

44

"consistent with the President's position on immigration" and were "the result of an America first view of the TPS decision." ER.29-30. Nothing in the record supports the court's extraordinary interpretation of the Secretary's references to the President's position on immigration and the widely and publicly used "America First" slogan as "code word[s] for removal of immigrants who are non-white and/or non-European." ER.36. As reflected in the America First slogan, the Administration's position on immigration is one that emphasizes a "merit-based entry" system and focuses on America's interests foremost. *See* https://www.whitehouse.gov/issues/immigration/. That Acting Secretary Duke mentioned that her determinations were generally consistent with these broad principles does not remotely suggest that she was motivated by discriminatory animus.

Because neither the district court nor plaintiffs have identified specific evidence linking the President's alleged animus to the Secretaries' termination decisions, this Court need not consider plaintiffs' evidence of that animus, which consists of purported statements made by the President. ER.30-31. Indeed, it would be plainly inappropriate to rely on campaign statements by then-candidate Trump to impugn the legitimate foreign-policy-related judgments of unbiased Cabinet Secretaries. *See Washington v. Trump*, 858 F.3d 1168, 1173 & n.4 (9th Cir. 2017) (Kozinski, J., dissenting from denial of rehearing en banc). Some of those statements were made more than a year before the President took the prescribed oath to "preserve, protect and defend the Constitution," U.S. Const. art. II, § 1, cl. 8. But even taking the

45

purported statements on their own terms, such statements are entirely inadequate to show that the decisions to terminate TPS for the four countries in question were motivated by racial or ethnic animus.

The offered statements, construed from an objective legal perspective, reflect the current Administration's focus on America's economic and security interests, not unconstitutional bias. Any statement about "shithole countries," ER.30, for example, should be understood as a denigrating reference to the conditions in certain developing nations. Similarly, the proffered comments about Haitians and Nigerians likewise can be readily construed as a reflection on the problems that plague those two countries, rather than a commentary on the race or ethnicity of the countries' inhabitants. And the President's statements about MS-13 and unlawful immigrants in general should be understood as demonstrating concern about the security risks attendant to lax enforcement of the immigration laws. Indeed, this objective interpretation of the alleged statements is compelled by the presumption of regularity to which the President is especially entitled as the head of a coordinate branch of government.

The district court's reliance on purported circumstantial evidence of racial and ethnic animus in the Secretaries' termination decisions likewise misses the mark. For example, the court pointed out that the TPS terminations "bear[] more heavily on non-white, non-European individuals." ER.31. But that fact is of little relevance since *every* country currently designated for temporary protected status is majority non-

46

white and non-European. Plaintiffs thus can identify no comparative group of predominantly white, European countries that has been treated differently, and it is implausible that the race of the citizens of the foreign country was a significant factor in the Secretaries' determinations that the "temporary" conditions that gave rise to the TPS designations between ten and twenty years ago had ended. There is no reason to think the Secretaries would have treated differently an impoverished European country that received a TPS designation following a now decades-old environmental disaster, even if other adverse events unrelated to the disaster and not independently supporting a TPS designation occurred in the interim.

The district court also cited evidence that political appointees in DHS overruled recommendations from career employees at the agency. ER.32-36. But that commonplace feature of agency decision-making is far from evidence of discriminatory animus. *See Wisconsin v. City of New York*, 517 U.S. 1, 23 (1996) ("[T]he mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision."); *St. Marks Place Hous. Co. v. HUD*, 610 F.3d 75, 83 (D.C. Cir. 2010) (The "[S]ecretary, like all agency heads, usually makes decisions after consulting subordinates, and those subordinates often have different views."). It is evidence only of disagreements about policy—here, how to weigh the different factors that go into deciding whether to extend or terminate TPS designations.

47

This case is both procedurally and factually distinguishable from this Court's recent decision in *Regents of the University of California v. DHS*, No. 18-15068, 2018 WL 5833232, at *30 (Nov. 8, 2018), in which it held that the plaintiffs had plausibly alleged an equal protection claim challenging the termination of the Deferred Action for Childhood Arrivals (DACA) program. Because the Court was evaluating whether the district court had erred in denying the government's motion to dismiss the equal protection claim in *Regents*, it was required to "take all the complaints' allegations as true" and to "construe them in the light most favorable to the plaintiffs." *Id.* at *30. In this case, by contrast, plaintiffs sought a preliminary injunction on the basis of their equal protection claim, and thus bore the burden of affirmatively establishing that they were likely to succeed on the merits of that claim, or at least raise serious questions with respect to the claim. For the reasons explained above, plaintiffs fall short of doing so.

Moreover, the facts of this case differ markedly from those alleged in *Regents*. The Secretaries' termination decisions did not stem from what the *Regents* plaintiffs alleged was an "unusual" decision-making process purportedly done at "lightning speed" and based on a "contrived excuse." *Regents*, 2018 WL 5833232, at *30. The Secretaries' termination decisions were made after a months-long process that included consultations with the Secretary of State and other agencies and was not materially different from the process used by previous Secretaries. The Secretaries applied the same legal standard that has been employed in the past when terminating

48

TPS designations, and their determinations were supported by the record. The Secretaries' TPS termination decisions are thus akin to the Presidential proclamation that the Supreme Court upheld in *Hawaii*, 138 S. Ct. at 2422. Like the proclamation, the termination decisions were the product of a "review process undertaken by multiple Cabinet officials and their agencies" and have "a legitimate grounding" in the record. *Id.* at 2421.

### B. The Secretaries' Decisions Are Constitutional Under *Trump v. Hawaii*

**1.** Although plaintiffs' equal protection claim fails under any standard, the district court erred at the threshold in failing to limit its review to whether a rational basis existed for the termination decisions. The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). Because decisions in these matters implicate "relations with foreign powers" and involve "classifications … defined in the light of changing political and economic circumstances," such judgments "are frequently of a character more appropriate to either the Legislature or the Executive." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government.").

The Supreme Court has accordingly made clear that decisions by the political branches about which classes of aliens to exclude or expel will generally be upheld against constitutional challenges so long they satisfy deferential rational-basis review. *Hawaii*, 138 S. Ct. at 2420; *see also Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies pertaining to the entry of aliens and their right to remain here" is limited to whether the Executive gave a "facially legitimate and bona fide" reason for its action); *Mathews*, 426 U.S. at 82 (a "narrow standard of review" applies to "decisions made by Congress or the President in the area of immigration and naturalization"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

The Supreme Court's decision in *Fiallo* illustrates that constitutional claims, including equal protection claims, challenging broad executive and legislative action in the immigration context are reviewed for rationality. There, the Court considered a challenge to a statutory preferential immigration status given to mothers of illegitimate children but not fathers. 430 U.S. at 788–89. The Court acknowledged that the law treated fathers and mothers differently, and thus discriminated on the basis of gender. *Id.* at 798–99. But it refused to apply "a more exacting standard" than rational-basis review. *Id.* at 795, 799. As the Court explained, more searching review was inconsistent with the well-established principle recognizing that "the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Id.* at 792 (collecting cases).

50

Although cases such as *Hawaii*, *Mandel*, and *Fiallo* involved policies directed at aliens seeking to enter the country, as opposed to aliens already within the United States, those decisions support applying rational-basis review in the specific context of the TPS program. The Supreme Court made clear in *Hawaii* that the rational-basis standard applies "across different contexts and constitutional claims." 138 S. Ct. at 2419. In support of that proposition, the Court cited *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008), a case which, like this one, involved an equal protection challenge to an Executive Branch action brought by aliens within the United States. *Hawaii*, 138 S. Ct. at 2419; *see also Ruiz-Diaz v. United States*, 703 F.3d 483, 487 (9th Cir. 2012) (stating that this Court applies "rational basis rather than heightened scrutiny [in immigration classification cases] because we defer to the political branches in the immigration field" and applying rational-basis review to religious discrimination claim brought by aliens who were in the country lawfully).[7]

TPS termination decisions involve unique country-specific determinations that both "implicate relations with foreign powers" and "involve classifications defined in

---

[7] The district court distinguished *Rajah* on the grounds that (1) the aliens in *Rajah* were "undisputedly … deportable," and (2) the aliens' equal protection claim was "really one for selective prosecution/enforcement." ER.41. But the Second Circuit's application of rational-basis review in *Rajah* did not turn on either of those facts. Rather, the court relied on the general principle that "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive … and must be upheld so long as they are not wholly irrational." *Rajah*, 544 F.3d at 438; *see also id.* (stating that "[t]he most exacting level of scrutiny that we will impose on immigration legislation is rational basis review").

the light of changing political and economic circumstances," *Hawaii*, 138 S. Ct. at 2418, precisely the situation in which the Supreme Court has repeatedly applied rational-basis review. *See id.*; *Fiallo*, 430 U.S. at 799. The TPS statute requires the Secretary to determine whether a foreign state is able "to handle adequately the return" of its nationals from the United States and whether conditions in the country prevent the country's nationals "from returning to the state in safety." 8 U.S.C. § 1254a(b). Such determinations are fraught with potential implications for our relations with the relevant country.

The record in this case reflects the foreign-policy and national-security considerations inherent in any TPS termination decision. For example, the record shows that, before arriving at their termination decisions, the Secretaries consulted with the State Department, whose recommendation emphasized "the significant humanitarian, foreign policy, and political interests at play" in the TPS decision. *See* ER.189. The State Department noted in particular that "[t]ermination of TPS will … likely generate a backlash from the governments themselves," who may view the termination as "undermin[ing]" cooperative arrangements between the country and the United States. *Id.* The State Department also cautioned that the governments "may take retaliatory actions counter to our long-standing national security and economic interests." *Id.* The record also includes correspondence from foreign government officials and diplomats, who urged the Secretaries to extend the TPS designations. *See, e.g.*, ER.211-12 (letter from El Salvador's Minister of Foreign

52

Affairs); ER.315-17 (letter from Haiti's ambassador to the United States). The Secretaries also consulted military leaders, *see* ER.312-314, ER.148. Even the district court recognized that "terminating TPS status may have adverse ramifications internationally," ER.11, and that the Secretary "did appear to consider foreign policy" for at least some of the designations. ER.38 n.15.

In light of the unique foreign-policy and national-security considerations that arise during a Secretary's assessment of a TPS designation, the district court's conclusion that the rational-basis-review standard was inapplicable because neither foreign-policy nor national-security considerations played a role in the Secretaries' TPS termination decisions, and, "unlike the aliens in *Trump v. Hawaii*, the [TPS beneficiaries] are already in the United States," ER.38; *see also Regents*, 2018 WL 5833232, at *32, was erroneous.

Equally erroneous was the district court's assertion that the *Hawaii* standard was inapplicable because, unlike Congress's broad delegation of authority in *Hawaii*, "Congress has not given the Secretary *carte blanche* to terminate TPS for any reason whatsoever." ER.38. The scope of the President's statutory authority played no role in the Supreme Court's conclusion that rational-basis review applied to the *Hawaii* plaintiffs' Establishment Clause claim. *See Hawaii*, 138 S. Ct. at 2418-20. Nor did the statute at issue in *Hawaii* provide the President with unlimited authority to suspend the entry of aliens "for any reason whatsoever," as the district court suggested. It permitted the President to suspend entry only upon a finding that entry "would be

53

detrimental to the interests of the United States." *Id.* at 2408 (quoting 8 U.S.C. § 1182(f)). So too, the Secretary may act only after making a finding about the interests specified by Congress. *See id.* § 1254a(b)(1). And the fact that Congress expressly barred judicial review of the Secretary's TPS determinations, 8 U.S.C. § 1254a(b)(5)(A), underscores the wide discretion the Secretary is afforded in making TPS decisions and further demonstrates the applicability of deferential review.

This Court also suggested in *Regents* that the application of *Hawaii*'s rational-basis standard may depend on "the nature of the constitutional claim raised." *Regents*, 2018 WL 5833232, at *31. There is, however, no reason why the protections afforded citizens under the Establishment Clause (the constitutional provision at issue in *Hawaii*) are in any way less weighty than those offered by the equal protection component of the Due Process Clause.

**2.** Secretaries Duke and Nielsen's termination decisions easily pass rational-basis review. In enacting the TPS program, Congress created a special immigration classification to provide "temporary" relief to aliens who cannot safely return to their home countries because of extraordinary *but temporary* conditions in those countries. *See* 8 U.S.C. § 1254a. Secretary Duke and Nielsen's termination decisions plainly are "plausibly related" to the objectives of the TPS program. *Hawaii*, 138 S. Ct. at 2420; *see also United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). After consulting with other appropriate governmental agencies, the Secretaries determined in each case that the extraordinary and temporary conditions that gave rise to each country's TPS

54

designation no longer existed. That is fully consistent with Congress's goal of providing interim relief to aliens until the conditions necessitating that relief come to an end and with the temporary nature of the relief authorized.

Moreover, the Secretaries set forth their reasons for concluding that conditions in the countries had improved to such an extent that TPS designations were no longer warranted. *See supra* pp. 8-13. The Secretaries' explanations included an analysis of such factors as the country's current economic condition, its ability to provide basic services to its citizens, its political climate, and its recovery efforts since the events giving rise to its TPS designation. In short, the termination decisions reflect the results of a careful analysis undertaken by a Cabinet official in consultation with other Cabinet officials and their agencies, the upshot of which was that the conditions giving rise to the country's TPS designation no longer persisted. There is no serious question that the termination decisions can "reasonably be understood to result from a justification independent of unconstitutional grounds," ER.42.

## III. THIS COURT SHOULD NOT CONSTRUE THE PRELIMINARY INJUNCTION AS APPLYING NATIONWIDE

The preliminary injunction enjoins the Secretary from enforcing the decisions to terminate TPS for Sudan, Nicaragua, Haiti, and El Salvador. ER.42. Though the government construes the order as applying nationwide, the order does not expressly state whether the injunction so applies; nor did the district court make findings to justify application of the injunction beyond the plaintiffs. If this Court affirms the

injunction, it should hold that the injunction goes no further than redressing any

cognizable injuries to plaintiffs.

Under Article III, a plaintiff must "demonstrate standing … for each form of

relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

The Supreme Court recently applied this principle to hold that a set of voters had not

demonstrated standing to challenge alleged statewide partisan gerrymandering beyond

the legislative districts in which they resided, reasoning that a "plaintiff's remedy must

be limited to the inadequacy that produced [his] injury in fact" and that "[t]he Court's

constitutionally prescribed role is to vindicate the individual rights of the people

appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018). Equitable

principles likewise require that "injunctive relief should be no more burdensome to

the defendant than necessary to provide complete relief to the plaintiffs." *Califano v.*

*Yamasaki*, 442 U.S. 682, 702 (1979).

Nationwide injunctions "take a toll on the federal court system—preventing

legal questions from percolating through the federal courts, encouraging forum

shopping, and making every case a national emergency for the courts and for the

Executive Branch." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring). This Court

has articulated similar concerns. *See Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d

644, 664 (9th Cir. 2011); *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 773 (9th Cir.

2008). That nationwide injunctions are a recent invention, "not emerg[ing] until a

century and a half after the founding," underscores their inconsistency with

56

"longstanding limits on equitable relief and the power of Article III courts." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring).

Nationwide injunctions also create an inequitable "one-way-ratchet" under which any prevailing party obtains relief on behalf of all others, but a victory by the government does not preclude other potential plaintiffs from "run[ning] off to the 93 other districts for more bites at the apple." *City of Chicago v. Sessions*, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., concurring in the judgment and dissenting in part). Indeed, this Court has explained that nationwide injunctions are especially inappropriate "where there is no class certification." *Los Angeles Haven Hospice*, 638 F.3d at 664.

This Court's decision in *Regents*, which affirmed the district court's issuance of a nationwide injunction, does not support a nationwide injunction here. This Court concluded that a nationwide injunction was justified in *Regents* because it was necessary "to provide complete relief to the plaintiffs, including the entity plaintiffs," and to "promote[] uniformity in immigration enforcement." 2018 WL 5833232, at *24-25. Neither factor is present here. An injunction barring the government from enforcing the TPS termination decisions against the individual plaintiffs and their relatives would provide plaintiffs with complete relief. Moreover, the TPS program already treats nationals of the same foreign state non-uniformly. TPS protections are available only to aliens who are present in the United States on the effective date of a

TPS designation. Individuals who arrive one month later, are fleeing the same conditions, and are required to return to the same home nation receive no protection.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*

ALEX G. TSE
*Acting United States Attorney*

MARK B. STERN

*s/ Gerard Sinzdak*
GERARD SINZDAK
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-0718*
*gerard.j.sinzdak@usdoj.gov*

November 2018

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they are unaware of any related case pending in this Court.

*s/ Gerard Sinzdak*
Gerard Sinzdak

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,998 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Gerard Sinzdak*
Gerard Sinzdak

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2018, I electronically filed the foregoing

brief with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the appellate CM/ECF system. Participants in the case are registered

CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ Gerard Sinzdak*
Gerard Sinzdak

**ADDENDUM**

# TABLE OF CONTENTS

8 U.S.C. § 1254a...............................................................................................................A1

**8 U.S.C. § 1254a**

**§ 1254a. Temporary Protected Status**

**(a) Granting of status**

**(1) In general**

In the case of an alien who is a national of a foreign state designated under subsection (b) (or in the case of an alien having no nationality, is a person who last habitually resided in such designated state) and who meets the requirements of subsection (c), the Attorney General, in accordance with this section--

(A) may grant the alien temporary protected status in the United States and shall not remove the alien from the United States during the period in which such status is in effect, and

(B) shall authorize the alien to engage in employment in the United States and provide the alien with an "employment authorized" endorsement or other appropriate work permit.

**(2) Duration of work authorization**

Work authorization provided under this section shall be effective throughout the period the alien is in temporary protected status under this section.

**(3) Notice**

**(A)** Upon the granting of temporary protected status under this section, the Attorney General shall provide the alien with information concerning such status under this section.

**(B)** If, at the time of initiation of a removal proceeding against an alien, the foreign state (of which the alien is a national) is designated under subsection (b), the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

**(C)** If, at the time of designation of a foreign state under subsection (b), an alien (who is a national of such state) is in a removal proceeding under this subchapter, the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

**(D)** Notices under this paragraph shall be provided in a form and language that the alien can understand.

**(4) Temporary treatment for eligible aliens**

**(A)** In the case of an alien who can establish a prima facie case of eligibility for benefits under paragraph (1), but for the fact that the period of registration under subsection (c)(1)(A)(iv) has not begun, until the alien has had a reasonable opportunity to register during the first 30 days of such period, the Attorney General shall provide for the benefits of paragraph (1).

**(B)** In the case of an alien who establishes a prima facie case of eligibility for benefits under paragraph (1), until a final determination with respect to the alien's eligibility for such benefits under paragraph (1) has been made, the alien shall be provided such benefits.

### (5) Clarification

Nothing in this section shall be construed as authorizing the Attorney General to deny temporary protected status to an alien based on the alien's immigration status or to require any alien, as a condition of being granted such status, either to relinquish nonimmigrant or other status the alien may have or to execute any waiver of other rights under this chapter. The granting of temporary protected status under this section shall not be considered to be inconsistent with the granting of nonimmigrant status under this chapter.

## (b) Designations

### (1) In general

The Attorney General, after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if--

**(A)** the Attorney General finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

**(B)** the Attorney General finds that--

**(i)** there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

**(ii)** the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

**(iii)** the foreign state officially has requested designation under this subparagraph; or

**(C)** the Attorney General finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

A designation of a foreign state (or part of such foreign state) under this paragraph shall not become effective unless notice of the designation (including a statement of the findings under this paragraph and the effective date of the designation) is published in the Federal Register. In such notice, the Attorney General shall also state an estimate of the number of nationals of the foreign state designated who are (or within the effective period of the designation are likely to become) eligible for temporary protected status under this section and their immigration status in the United States.

**(2) Effective period of designation for foreign states**

The designation of a foreign state (or part of such foreign state) under paragraph (1) shall--

**(A)** take effect upon the date of publication of the designation under such paragraph, or such later date as the Attorney General may specify in the notice published under such paragraph, and

**(B)** shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B).

For purposes of this section, the initial period of designation of a foreign state (or part thereof) under paragraph (1) is the period, specified by the Attorney General, of not less than 6 months and not more than 18 months.

**(3) Periodic review, terminations, and extensions of designations**

**(A) Periodic review**

At least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met. The Attorney General shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register.

A3

### (B) Termination of designation

If the Attorney General determines under subparagraph (A) that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination). Such termination is effective in accordance with subsection (d)(3), but shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C).

### (C) Extension of designation

If the Attorney General does not determine under subparagraph (A) that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months).

### (4) Information concerning protected status at time of designations

At the time of a designation of a foreign state under this subsection, the Attorney General shall make available information respecting the temporary protected status made available to aliens who are nationals of such designated foreign state.

### (5) Review

#### (A) Designations

There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

#### (B) Application to individuals

The Attorney General shall establish an administrative procedure for the review of the denial of benefits to aliens under this subsection. Such procedure shall not prevent an alien from asserting protection under this section in removal proceedings if the alien demonstrates that the alien is a national of a state designated under paragraph (1).

### (c) Aliens eligible for temporary protected status

#### (1) In general

##### (A) Nationals of designated foreign states

Subject to paragraph (3), an alien, who is a national of a state designated under subsection (b)(1) (or in the case of an alien having no nationality, is a person who last habitually resided in such designated state), meets the requirements of this paragraph only if--

    **(i)** the alien has been continuously physically present in the United States since the effective date of the most recent designation of that state;

    **(ii)** the alien has continuously resided in the United States since such date as the Attorney General may designate;

    **(iii)** the alien is admissible as an immigrant, except as otherwise provided under paragraph (2)(A), and is not ineligible for temporary protected status under paragraph (2)(B); and

    **(iv)** to the extent and in a manner which the Attorney General establishes, the alien registers for the temporary protected status under this section during a registration period of not less than 180 days.

### (B) Registration fee

The Attorney General may require payment of a reasonable fee as a condition of registering an alien under subparagraph (A)(iv) (including providing an alien with an "employment authorized" endorsement or other appropriate work permit under this section). The amount of any such fee shall not exceed $50. In the case of aliens registered pursuant to a designation under this section made after July 17, 1991, the Attorney General may impose a separate, additional fee for providing an alien with documentation of work authorization. Notwithstanding section 3302 of Title 31, all fees collected under this subparagraph shall be credited to the appropriation to be used in carrying out this section.

## (2) Eligibility standards

### (A) Waiver of certain grounds for inadmissibility

In the determination of an alien's admissibility for purposes of subparagraph (A)(iii) of paragraph (1)--

    **(i)** the provisions of paragraphs (5) and (7)(A) of section 1182(a) of this title shall not apply;

    **(ii)** except as provided in clause (iii), the Attorney General may waive any other provision of section 1182(a) of this title in the case of individual

A5

aliens for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest; but

**(iii)** the Attorney General may not waive--

(I) paragraphs (2)(A) and (2)(B) (relating to criminals) of such section,

(II) paragraph (2)(C) of such section (relating to drug offenses), except for so much of such paragraph as relates to a single offense of simple possession of 30 grams or less of marijuana, or

(III) paragraphs (3)(A), (3)(B), (3)(C), and (3)(E) of such section (relating to national security and participation in the Nazi persecutions or those who have engaged in genocide).

**(B) Aliens ineligible**

An alien shall not be eligible for temporary protected status under this section if the Attorney General finds that--

**(i)** the alien has been convicted of any felony or 2 or more misdemeanors committed in the United States, or

**(ii)** the alien is described in section 1158(b)(2)(A) of this title.

**(3) Withdrawal of temporary protected status**

The Attorney General shall withdraw temporary protected status granted to an alien under this section if--

**(A)** the Attorney General finds that the alien was not in fact eligible for such status under this section,

**(B)** except as provided in paragraph (4) and permitted in subsection (f)(3), the alien has not remained continuously physically present in the United States from the date the alien first was granted temporary protected status under this section, or

**(C)** the alien fails, without good cause, to register with the Attorney General annually, at the end of each 12-month period after the granting of such status, in a form and manner specified by the Attorney General.

**(4) Treatment of brief, casual, and innocent departures and certain other absences**

**(A)** For purposes of paragraphs (1)(A)(i) and (3)(B), an alien shall not be considered to have failed to maintain continuous physical presence in the United States by virtue of brief, casual, and innocent absences from the United

States, without regard to whether such absences were authorized by the Attorney General.

**(B)** For purposes of paragraph (1)(A)(ii), an alien shall not be considered to have failed to maintain continuous residence in the United States by reason of a brief, casual, and innocent absence described in subparagraph (A) or due merely to a brief temporary trip abroad required by emergency or extenuating circumstances outside the control of the alien.

## (5) Construction

Nothing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for temporary protected status under this section.

## (6) Confidentiality of information

The Attorney General shall establish procedures to protect the confidentiality of information provided by aliens under this section.

## (d) Documentation

### (1) Initial issuance

Upon the granting of temporary protected status to an alien under this section, the Attorney General shall provide for the issuance of such temporary documentation and authorization as may be necessary to carry out the purposes of this section.

### (2) Period of validity

Subject to paragraph (3), such documentation shall be valid during the initial period of designation of the foreign state (or part thereof) involved and any extension of such period. The Attorney General may stagger the periods of validity of the documentation and authorization in order to provide for an orderly renewal of such documentation and authorization and for an orderly transition (under paragraph (3)) upon the termination of a designation of a foreign state (or any part of such foreign state).

### (3) Effective date of terminations

If the Attorney General terminates the designation of a foreign state (or part of such foreign state) under subsection (b)(3)(B), such termination shall only apply to documentation and authorization issued or renewed after the effective date of the publication of notice of the determination under that subsection (or, at the Attorney General's option, after such period after the effective date of the

determination as the Attorney General determines to be appropriate in order to provide for an orderly transition).

**(4) Detention of alien**

An alien provided temporary protected status under this section shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States.

## (e) Relation of period of temporary protected status to cancellation of removal

With respect to an alien granted temporary protected status under this section, the period of such status shall not be counted as a period of physical presence in the United States for purposes of section 1229b(a) of this title, unless the Attorney General determines that extreme hardship exists. Such period shall not cause a break in the continuity of residence of the period before and after such period for purposes of such section.

## (f) Benefits and status during period of temporary protected status

During a period in which an alien is granted temporary protected status under this section--

**(1)** the alien shall not be considered to be permanently residing in the United States under color of law;

**(2)** the alien may be deemed ineligible for public assistance by a State (as defined in section 1101(a)(36) of this title) or any political subdivision thereof which furnishes such assistance;

**(3)** the alien may travel abroad with the prior consent of the Attorney General; and

**(4)** for purposes of adjustment of status under section 1255 of this title and change of status under section 1258 of this title, the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant.

## (g) Exclusive remedy

Except as otherwise specifically provided, this section shall constitute the exclusive authority of the Attorney General under law to permit aliens who are or may become otherwise deportable or have been paroled into the United States to remain in the United States temporarily because of their particular nationality or region of foreign state of nationality.

## (h) Limitation on consideration in Senate of legislation adjusting status

**(1) In general**

Except as provided in paragraph (2), it shall not be in order in the Senate to consider any bill, resolution, or amendment that--

**(A)** provides for adjustment to lawful temporary or permanent resident alien status for any alien receiving temporary protected status under this section, or

**(B)** has the effect of amending this subsection or limiting the application of this subsection.

**(2) Supermajority required**

Paragraph (1) may be waived or suspended in the Senate only by the affirmative vote of three-fifths of the Members duly chosen and sworn. An affirmative vote of three-fifths of the Members of the Senate duly chosen and sworn shall be required in the Senate to sustain an appeal of the ruling of the Chair on a point of order raised under paragraph (1).

**(3) Rules**

Paragraphs (1) and (2) are enacted--

**(A)** as an exercise of the rulemaking power of the Senate and as such they are deemed a part of the rules of the Senate, but applicable only with respect to the matters described in paragraph (1) and supersede other rules of the Senate only to the extent that such paragraphs are inconsistent therewith; and

**(B)** with full recognition of the constitutional right of the Senate to change such rules at any time, in the same manner as in the case of any other rule of the Senate.

**(i) Annual report and review**

**(1) Annual report**

Not later than March 1 of each year (beginning with 1992), the Attorney General, after consultation with the appropriate agencies of the Government, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of this section during the previous year. Each report shall include--

**(A)** a listing of the foreign states or parts thereof designated under this section,

**(B)** the number of nationals of each such state who have been granted temporary protected status under this section and their immigration status before being granted such status, and

A9

**(C)** an explanation of the reasons why foreign states or parts thereof were designated under subsection (b)(1) and, with respect to foreign states or parts thereof previously designated, why the designation was terminated or extended under subsection (b)(3).

## (2) Committee report

No later than 180 days after the date of receipt of such a report, the Committee on the Judiciary of each House of Congress shall report to its respective House such oversight findings and legislation as it deems appropriate.