**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CRISTA RAMOS; CRISTINA MORALES; BENJAMIN ZEPEDA; ORLANDO ZEPEDA; JUAN EDUARDO AYALA FLORES; ELSY YOLANDA FLORES DE AYALA; MARIA JOSE AYALA FLORES; HNAIDA CENEMAT; WILNA DESTIN; RILYA SALARY; SHERIKA BLANC; IMARA AMPIE; MAZIN AHMED; HIWAIDA ELARABI, *Plaintiffs-Appellees*, <br><br> v. <br><br> CHAD F. WOLF, Acting Secretary of Homeland Security; KENNETH T. CUCCINELLI, Senior Official Performing the Duties of the Deputy Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; UNITED STATES OF AMERICA, *Defendants-Appellants.* | No. 18-16981 <br><br> D.C. No. 3:18-cv-01554-EMC <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted August 14, 2019
Submission Vacated August 21, 2019

Resubmitted September 4, 2020
Pasadena, California

Filed September 14, 2020

Before:  Consuelo M. Callahan, Morgan Christen, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge Callahan;
Concurrence by Judge R. Nelson;
Dissent by Judge Christen

## SUMMARY[*]

### Immigration /Preliminary Injunction

The panel vacated a preliminary injunction barring implementation of decisions to terminate Temporary Protected Status (TPS) designations of Sudan, Nicaragua, Haiti, and El Salvador, and remanded, holding that: (1) judicial review of Plaintiffs' claim under the Administrative Procedure Act (APA) is barred by 8 U.S.C. § 1254a(b)(5)(A); and (2) Plaintiffs failed to show a likelihood of success, or even serious questions, on the merits of their Equal Protection claim.

The TPS program is a congressionally created humanitarian program administered by the Department of Homeland Security (DHS) that provides temporary relief to

_____

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

nationals of designated foreign countries that have been stricken by a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). In 2017 and 2018, Secretaries of DHS under the Trump Administration terminated the TPS designations of the four countries.

Plaintiffs, who are TPS beneficiaries from these countries and their children, challenged the terminations on two grounds. First, Plaintiffs alleged that DHS justified the terminations with a novel interpretation of the TPS statute that rejected, without explanation, a decades-old agency policy and practice of considering "intervening natural disasters, conflicts, and other serious social and economic problems as relevant factors when deciding whether to continue or instead terminate a TPS designation." Second, Plaintiffs alleged that DHS's new rule was motivated in significant part by racial and national-origin animus against "non-white and non-European immigrants," which was "evidenced by numerous statements made by President Donald J. Trump and other officials." The district court entered a preliminary injunction barring implementation of the termination decisions, concluding that the balance of hardships weighed in Plaintiffs' favor and that, under the applicable "sliding scale" preliminary injunction standard, Plaintiffs had established serious questions on the merits of both their claims.

First, the panel held that the district court abused its discretion in issuing the preliminary injunction when it deemed Plaintiffs' APA claim reviewable. The panel concluded that Plaintiffs' claim was unreviewable in light of 8 U.S.C. § 1254a(b)(5)(A), which states: "There is no judicial review of any determination of the [Secretary of Homeland Security] with respect to the designation, or

termination or extension of a designation, of a foreign state under this subsection." Considering the issue in light of relevant precedent, the panel concluded that § 1254a(b)(5)(A) precludes review of non-constitutional claims that fundamentally attack the Secretary's specific TPS determinations, as well as the substance of her discretionary analysis in reaching those determinations, but does not bar review of a challenge to an agency "pattern or practice" that is collateral to, and distinct from, the specific TPS decisions and their underlying rationale.

Applying these principles, the panel concluded that the APA claim was not reviewable, explaining that the claim does not challenge any agency procedure or regulation, but rather essentially raises a substantive challenge to the Secretary's underlying analysis. Moreover, the panel noted that consideration of "intervening events" in a TPS determination is a task squarely within the agency's "special expertise" and "institutional competence," and that Plaintiffs appeared to seek direct relief from the challenged decisions, rather than collateral relief.

Second, the panel held that the district court abused its discretion in concluding that Plaintiffs presented at least serious questions on the merits of their Equal Protection claim. The panel rejected the Government's argument that the court should apply the deferential rational basis review standard applied in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), as opposed to the standard articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The panel explained that the level of deference that courts owe to the President in his executive decision to exclude foreign nationals who have not yet entered the United States may be greater than the deference to an agency in its administration of a humanitarian relief

program established by Congress for foreign nationals who have lawfully resided in the country for some time.

Applying *Arlington Heights*, under which Plaintiffs needed to show that racial discrimination was at least a motivating factor for the challenged TPS terminations, the panel concluded that Plaintiffs failed to present even serious questions on the merits of their animus claim. The panel explained that, while the district court's findings that President Trump expressed racial animus against "non-white, non-European" immigrants, and that the White House influenced the TPS termination decisions, were supported by record evidence, the district court cited no evidence linking the President's animus to the TPS terminations—such as evidence that the President personally sought to influence the TPS terminations, or that any administration officials involved in the TPS decision-making process were themselves motivated by animus.

Concurring, Judge R. Nelson addressed two issues implicating separation-of-powers concerns. First, Judge Nelson wrote that the district court erred by not waiting until *after* the government produced the administrative record to order extra-record discovery. He wrote that errors like this are an affront to the limited waiver of sovereign immunity under the APA, disrespect the integrity of the administrative process, and improperly subvert the executive branch to the judiciary. Second, Judge Nelson addressed the increasing frequency of universal injunctions, observing that such an injunction issued recently by a district court in New York on Haiti's TPS designation effectively nullified part of the panel's decision. He wrote that universal injunctions: (1) result in an imbalance of power between the judicial and the other branches of government because such injunctions disregard the usual constraints on judicial powers by binding

parties not before the court; and (2) lead to a lack of percolation of issues among the circuits that has serious consequences for judicial decisionmaking and breeds the more serious problem of "forum-shopping." Judge Nelson wrote that courts must carefully assess not only limits on injunctive relief, but also those under Rule 23, before granting universal relief.

Dissenting, Judge Christen wrote that she would affirm the district court's order. She wrote that the majority erred by concluding that the panel lacked jurisdiction to review Plaintiff's APA claim. In her view, Plaintiffs' claim is a classic and reviewable collateral challenge because the complaint plainly alleged that the Secretary violated the APA by interpreting the TPS statute in a way that starkly differs from previous administrations and by denying that there had been any resulting change to the agency's practice of considering intervening events. Judge Christen also wrote that Plaintiffs demonstrated a likelihood of success on the merits of their claim, observing that the district court identified an unambiguous and abrupt change in DHS's practice, and that the record includes compelling evidence that the process DHS used resulted from the Secretaries' new interpretation of the TPS statute. Judge Christen also wrote that she agreed with the majority's decision not to reach the issue of whether the district court prematurely ordered discovery.

With respect to the Equal Protection claim, Judge Christen wrote that the doctrine of constitutional avoidance counsels that the panel should not reach the claim at this stage because the preliminary injunction is easily supported by Plaintiffs' demonstration that they will likely succeed on their APA claim alone.

## COUNSEL

Gerard Sinzdak (argued), Mark B. Stern, and James Y. Xi, Appellate Staff; Alex G. Tse, Acting United States Attorney; and Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington D.C.; for Defendants-Appellants.

Ahilan T. Arulanantham (argued), Jessica Karp Bansal, and Zoë N. McKinney, ACLU Foundation of Southern California, Los Angeles, California; William S. Freeman, ACLU Foundation of Northern California, San Francisco, California; Emilou MacLean, and Caleb Soto, National Day Laborer Organizing Network, Pasadena, California; Alycia A. Degan, Sean A. Commons, Andrew B. Talai, Amanda Farfel, Mohindra Rupram, and Katelyn N. Rowe, Sidley Austin LLP, Los Angeles, California; Nicole M. Ryan and Ryan M. Sandrock, Sidley Austin LLP, San Francisco, California; Cory D. Szczepanik, Sidley Austin LLP, Dallas, Texas; and Mark E. Haddad, USC Gould School of Law, Los Angeles, California; for Plaintiffs-Appellees.

Margaret L. Carter and Daniel R. Suvor, O'Melveny & Myers LLP, Los Angeles, California; Michael N. Feuer, City Attorney; Kathleen Kenealy, Chief Assistant City Attorney; Valerie L. Flores, Senior Assistant City Attorney; and Michael J. Dundas, Deputy City Attorney; Office of the City Attorney, Los Angeles, California; Donna R. Ziegler, County Counsel, Office of the County Counsel, Alameda County, Oakland, California; Donald A. Larkin, City Attorney, Morgan Hill, California; James L. Banks, Jr., City Attorney, Alexandria, Virginia; Zachary W. Carter, Corporation Counsel, New York, New York; Nina Hickson, City Attorney, Atlanta, Georgia; Jeff P.H. Cazeau, City Attorney, North Miami, Florida; Anne L. Morgan, City

Attorney, Austin, Texas; Barbara J. Parker, City Attorney, Oakland, California; Andre M. Davis, City Solicitor, Baltimore, Maryland; Marcel S. Pratt, City Solicitor, Philadelphia, Pennsylvania; Eugene O'Flaherty, Corporation Counsel, Boston, Massachusetts; Tracy P. Reeve, City Attorney, Portland, Oregon; Nancy E. Glowa, City Solicitor, Cambridge, Massachusetts; Jeffrey Dana, City Solicitor, Providence, Rhode Island; Cheryl Watson Fisher, City Solicitor, Chelsea, Massachusetts; Susana Alcala Wood, City Attorney, Sacramento, California; Edward N. Siskel, Corporation Counsel, Chicago, Illinois; Lyndsey M. Olson, City Attorney, Saint Paul, Minnesota; Kristin M. Bronson, City Attorney, Denver, Colorado; Mara W. Elliot, City Attorney, San Diego, California; Howard G. Rifkin, Corporation Counsel, Hartford, Connecticut; Dennis J. Herrera, City Attorney, San Francisco, California; Paul Payer, City Solicitor, Holyoke, Massachusetts; James R. Williams, County Counsel, County of Santa Clara, San Jose, California; Ronald C. Lewis, City Attorney, Houston, Texas; Lane Dilg, City Attorney, Santa Monica, California; Eleanor M. Dilkes, City Attorney, Iowa City, Iowa; Peter S. Holmes, City Attorney, Seattle, Washington; Jennifer Vega-Brown, City Attorney, Las Cruces, New Mexico; Francis X. Wright, Jr., City Solicitor, Somerville, Massachusetts; Susan Segal, City Attorney, Minneapolis, Minnesota; Stephanie Steele, Corporation Counsel, South Bend, Indiana; Charles J. McKee, County Counsel, County of Monterey, Salinas, California; Mike Rankin, City Attorney, Tucson, Arizona; and Michael Jenkins, City Attorney, City of West Hollywood, Manhattan Beach, California; for Amici Curiae 6 Counties and 31 Cities.

Ivy Kagan Bierman and Dimitry Krol, Loeb & Loeb LLP, Los Angeles, California; Andrew DeVooght, Nina Ruvinsky, and Alexandra J. Schaller, Loeb & Loeb LLP,

Chicago, Illinois; Brian R. Socolow, Loeb & Loeb LLP, New York, New York; Steven M. Freeman and Kimberley Plotnik, Anti-Defamation League, New York New York; for Amici Curiae Anti-Defamation League; Bet Tzedek; LatinoJustice PRLDEF; National Council of Jewish Women; OneJustice; Public Counsel; Service Employees International Union; UnidosUS; Esperanza Immigrant Rights Project; Union for Reform Judaism; Central Conference of American Rabbis; Women of Reform Judaism; Men of Reform Judaism; United Food and Commercial Workers International Union; T'Ruah: The Rabbinic Call for Human Rights; United Farm Workers of America; Japanese American Citizens League; American Federation of Teachers; and Jewish Council for Public Affairs.

Xavier Becerra, Attorney General; Michael L. Newman, Senior Assistant Attorney General; Christine Chuang, Supervising Deputy Attorney General; and James F. Zahradka II, Deputy Attorney General; California Department of Justice, Oakland, California; Karl A. Racine, Attorney General, District of Columbia; Maura Healey, Attorney General, Massachusetts; William Tong, Attorney General, Connecticut; Kathleen Jennings, Attorney General, Delaware; Clare E. Connors, Attorney General, Hawaii; Kwame Raoul, Attorney General, Illinois; Tom Miller, Attorney General, Iowa; Aaron M. Frey, Attorney General, Maine; Brian E. Frosh, Attorney General, Maryland; Dana Nessel, Attorney General, Michigan; Keith Ellison, Attorney General, Minnesota; Aaron D. Ford, Attorney General, Nevada; Gurbir S. Grewal, Attorney General, New Jersey; Hector Balderas, Attorney General, New Mexico; Letitia James, Attorney General, New York; Joshua H. Stein, Attorney General, North Carolina; Ellen F. Rosenblum, Attorney General, Oregon; Peter F. Neronha, Attorney

General, Rhode Island; Thomas J. Donovan Jr., Attorney General, Vermont; Mark R. Herring, Attorney General, Virginia; and Robert W. Ferguson, Attorney General, Washington; for Amici Curiae States of California, Massachusetts, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, and Washington, and the District of Columbia.

Michael V. Mancini and John W. Shenk, Mancini Shenk LLP, Los Angeles, California; Hiroshi Motomura, UCLA School of Law, Los Angeles, California; Jaya Ramji-Nogales, Temple University Beasley School of Law, Philadelphia, Pennsylvania; and Andrew I. Schoenholtz, Georgetown University Law Center, Washington, D.C.; for Amici Curiae Immigration Law Scholars.

**OPINION**

CALLAHAN, Circuit Judge:

The Temporary Protected Status (TPS) program is a congressionally created humanitarian program administered by the Department of Homeland Security (DHS) that provides temporary relief to nationals of designated foreign countries that have been stricken by a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). In 2017 and 2018, Secretaries of DHS under the Trump Administration terminated the TPS designations of four countries: Sudan, Nicaragua, Haiti, and El Salvador. Plaintiffs, who are TPS beneficiaries from these countries and their children, challenged the TPS termination decisions as unlawful under, *inter alia*, the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, and the Equal Protection Clause (EPC) of the Fifth Amendment.

The district court entered a preliminary injunction barring the implementation of the termination decisions. On appeal, the Government argues that the district court abused its discretion in issuing the injunction because Plaintiffs have not shown a likelihood of success on either of their claims. We agree. Based on our reading of the TPS statute, we hold that Plaintiffs' APA claim is foreclosed from judicial review. We also conclude that Plaintiffs are unable to show a likelihood of success, or even serious questions going to the merits of their EPC claim. Accordingly, we reverse and vacate the preliminary injunction.

## I.

## A.

With the passage of the Immigration Act of 1990, Congress created the TPS program. Pub. L. No. 101-649, 104 Stat. 4978. TPS provides temporary relief to aliens who cannot safely return in the short term to their home nation as a result of a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(b). The impetus for the establishment of the TPS program stemmed from concerns with the "extended voluntary departure" (EVD) process, which was the primary mechanism by which the federal government allowed groups of nationals to remain in the United States for humanitarian reasons prior to TPS. *See* Lynda J. Oswald, Note, *Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 157–60 (1986). Because administrations granted EVD on an *ad hoc* basis without "any specific criterion or criteria," the practice led to arbitrary results and drew widespread criticism. *Id.* at 178 n.153 (quoting Letter from Attorney General W.F. Smith to Representative L.J. Smith (July 19, 1983)). Beginning in 1980, Congress introduced a series of bills to address its concerns with EVD and to provide a "more formal and orderly mechanism" for group-based grants of humanitarian protection. H.R. Rep. No. 100-627, at 4 (1988). These efforts eventually culminated in the 1990 enactment of the TPS statute, now codified in section 244 of the Immigration and Nationality Act, or 8 U.S.C. § 1254a.

The TPS statute authorizes the Secretary of Homeland Security[1] to designate foreign countries for TPS "after consultation with appropriate agencies of the Government" and "only if" the Secretary finds one or more of the following criteria met:

> (A) . . . that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

> (B) . . . that—

>> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

>> (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

---

[1] The statute originally provided the Attorney General with this authority. With the Homeland Security Act of 2002 (Pub. L. No. 107-296, 116 Stat. 2135), the former Immigration and Naturalization Service was transferred to the Department of Homeland Security, and the responsibility for administering the TPS was transferred from the Attorney General to the Secretary of DHS. *See* 8 U.S.C. § 1103; 6 U.S.C. § 557.

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) . . . that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety[.]

8 U.S.C. § 1254a(b).

TPS designations last for an initial period of 6 to 18 months, effective upon notice in the Federal Register. *Id.* § 1254a(b)(2). At least 60 days before the end of a designation period, the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . and shall determine whether the conditions for such designation under [the statute] continue to be met." *Id.* § 1254a(b)(3)(A). If the Secretary determines that a country "no longer continues to meet the conditions for designation," she "shall terminate the designation." *Id.* § 1254a(b)(3)(B). If, during this periodic review, the Secretary does not make such a determination, "the period of designation of the foreign state is extended" for 6, 12, or 18 months. *Id.* § 1254a(b)(3)(C).

The TPS statute also provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A).

## B.

Since the inception of the TPS program, the federal government has designated a total of 21 countries and the

Province of Kosovo for TPS. Prior to 2017, the government terminated twelve of those designations, including three terminations in 2016.

In 2017 and 2018, DHS announced the termination of TPS designations for four countries: Sudan, Nicaragua, El Salvador, and Haiti. During this same period, DHS also extended the TPS designations of four other countries: Somalia, South Sudan, Syria, and Yemen.[2] The TPS terminations for Sudan, Nicaragua, El Salvador, and Haiti form the basis of Plaintiffs' claims.

### 1. Sudan

Sudan was originally designated for TPS in 1997 because of an ongoing civil war that prevented the safe return of Sudan nationals. *Designation of Sudan Under Temporary Protected Status*, 62 Fed. Reg. 59737-01, 59737 (Nov. 4. 1997). From that time until 2017, the country was periodically extended or redesignated for TPS fifteen times by prior administrations, based on factors such as forced relocation, human rights abuses, famine, and denial of access to humanitarian agencies.[3]

---

[2] *See Extension of South Sudan for TPS*, 82 Fed. Reg. 44,205-01 (Sept. 21, 2017); *Extension of the Designation of Syria for TPS*, 83 Fed. Reg. 9329-02 (Mar. 5, 2018); *Extension of the Designation of Yemen for TPS*, 83 Fed. Reg. 40,307-01 (Aug. 14, 2018); *Extension of Designation of Somalia for TPS*, 83 Fed. Reg. 43,695 (Aug. 27, 2018).

[3] *See Extension of Designation of Sudan Under Temporary Protected Status Program*, 63 Fed. Reg. 59,337-01 (Nov. 3, 1998); 64 Fed. Reg. 61,128-01 (Nov. 9, 1999) (extension and redesignation); 65 Fed. Reg. 67,407-01 (Nov. 9, 2000); 66 Fed. Reg. 46,031-01 (Aug. 31, 2001); 67 Fed. Reg. 55,877-01 (Aug. 30, 2002); 68 Fed. Reg. 52,410-01 (Sept. 3, 2003); 69 Fed. Reg. 60,168-01 (Oct. 7, 2004) (extension and

In October 2017, Acting Secretary Duke terminated the TPS designation of Sudan, effective November 2, 2018. *Termination of the Designation of Sudan for TPS*, 82 Fed. Reg. 47,228-02, 47,228 (Oct. 11, 2017). The termination notice concluded that the conflict in Sudan was now "limited to Darfur and the Two Areas (South Kordofan and Blue Nile states)." *Id.* It explained that "in Darfur, toward the end of 2016 and through the first half of 2017, parties to the conflict renewed a series of time-limited unilateral cessation of hostilities declarations, resulting in a reduction in violence and violent rhetoric from the parties to the conflict," and "[t]he remaining conflict [was] limited and [did] not prevent the return of nationals of Sudan to all regions of Sudan without posing a serious threat to their personal safety." *Id.*

The notice further observed that "food security" had improved "across much of Sudan" because of above-average harvests, and even in conflict-affected areas where food remained scarce, there had been "some improvement in access for humanitarian actors to provide much-needed humanitarian aid." *Id.* at 47,230. Although Sudan's human rights record "remain[ed] extremely poor in general," the notice concluded that, in light of all the above factors, the ongoing conflict and extraordinary and temporary conditions that justified Sudan's most recent TPS re-designation had "sufficiently improved such that they no longer prevent nationals of Sudan from returning in safety to all regions" of the country. *Id.*

---

redesignation); 70 Fed. Reg. 52,429-01 (Sept. 2, 2005); 72 Fed. Reg. 10,541-02 (Mar. 8, 2007); 73 Fed. Reg. 47,606-02 (Aug. 14, 2008); 74 Fed. Reg. 69,355-02 (Dec. 31, 2009); 76 Fed. Reg. 63,635-01 (Oct. 13, 2011); 78 Fed. Reg. 1872-01 (Jan. 9, 2013) (extension and redesignation); 79 Fed. Reg. 52,027-01 (Sept. 2, 2014); 81 Fed. Reg. 4045-01 (Jan. 25, 2016).

*2. Nicaragua*

Nicaragua was initially designated for TPS in 1999 as a result of conditions caused by Hurricane Mitch. *Designation of Nicaragua Under Temporary Protected Status*, 64 Fed. Reg. 526-01, 526 (Jan. 5, 1999). Nicaragua's designation was then extended thirteen times by prior administrations.[4] Some of the reasons cited for the extensions included "recent droughts as well as flooding from Hurricane Michelle in 2002" and subsequent natural disasters and storms.[5]

In December 2017, the Acting Secretary terminated Nicaragua's TPS designation, effective January 5, 2019. Based on DHS's review of "conditions in Nicaragua," the Secretary "determined that conditions for Nicaragua's 1999 designation for TPS on the basis of environmental disaster is no longer met." *Termination of the Designation of Nicaragua for TPS*, 82 Fed. Reg. 59,636-01, 59,637 (Dec. 15, 2017). The termination notice stated that, by 2017, "[r]ecovery efforts relating to Hurricane Mitch ha[d] largely been completed" and the "social and economic conditions affected by Hurricane Mitch ha[d] stabilized." *Id.* It also noted that Nicaragua had "received a significant amount of international aid to assist in its Hurricane Mitch-related

---

[4] *See Extension of the Designation of Nicaragua Under Temporary Protected Status Program*, 65 Fed. Reg. 30,440-01 (May 11, 2000); 66 Fed. Reg. 23,271-01 (May 8, 2001); 67 Fed. Reg. 22,454-01 (May 3, 2002); 68 Fed. Reg. 23,748-01 (May 5, 2003); 69 Fed. Reg. 64,088-01 (Nov. 3, 2004); 71 Fed. Reg. 16,333-01 (Mar. 31, 2006); 72 Fed. Reg. 29,534-01 (May 29, 2007); 73 Fed. Reg. 57,138-01 (Oct. 1, 2008); 75 Fed. Reg. 24,737-01 (May 5, 2010); 76 Fed. Reg. 68,493-01 (Nov. 4, 2011); 78 Fed. Reg. 20,128-01 (Apr. 3, 2013); 79 Fed. Reg. 62,176-01 (Oct. 16, 2014); 81 Fed. Reg. 30,325-01 (May 16, 2016).

[5] *See, e.g.*, 71 Fed. Reg. at 16,334; 72 Fed. Reg. at 29,535.

recovery efforts," "many reconstruction projects ha[d] now been completed[,]" "[a]ccess to drinking water and sanitation ha[d] improved[,]" 90% of the country had electricity in 2017 (compared to 50% in 2007), and per-capita GDP was higher than it had been prior to the hurricane, reaching an all-time high in 2016. *Id.* The notice also emphasized that conditions had improved to the point where the country attracted tourism and foreign investment. *Id.* Based on these conditions, the Acting Secretary concluded that it was "no longer the case that Nicaragua is unable, temporarily, to handle adequately the return of nationals of Nicaragua." *Id.*

### 3. El Salvador

El Salvador was designated for TPS in 2001 because of the effects of three earthquakes that caused the displacement of 17% of the population; the destruction of 220,000 homes, 1,696 schools, and 856 public buildings; and losses in excess of $2.8 billion. *Designation of El Salvador Under Temporary Protected Status Program*, 66 Fed. Reg. 14214-01, 14215 (Mar. 9, 2001). Since then, El Salvador's designation was extended eleven times by prior administrations.[6] The bases for these extensions included "a subsequent drought" (2002 notice), the effects of Tropical Storm Stan, the eruption of the Santa Ana volcano,

---

[6] *See Extension of the Designation of El Salvador Under the Temporary Protected Status Program*, 67 Fed. Reg. 46,000-01 (Jul. 11, 2002); 68 Fed. Reg. 42,071-01 (Jul. 16, 2003); 70 Fed. Reg. 1450-01 (Jan. 7, 2005); 71 Fed. Reg. 34,637-01 (June 15, 2006); 72 Fed. Reg. 46,649-01 (Aug. 21, 2007); 73 Fed. Reg. 57,128-01 (Oct. 1, 2008); 75 Fed. Reg. 39,556-01 (July 9, 2010); 77 Fed. Reg. 1710-02 (Jan. 11, 2012); 78 Fed. Reg. 32,418-01 (May 30, 2013); 80 Fed. Reg. 893-01 (Jan. 7, 2015); 81 Fed. Reg. 44,645-03 (July 8, 2016).

subsequent earthquakes, and Hurricane Ida (2010 notice). *Id.*

In January 2018, Secretary Nielsen terminated El Salvador's TPS designation effective September 9, 2019. *Termination of the Designation of El Salvador for Temporary Protected Status*, 83 Fed. Reg. 2654-01, 2654 (Jan. 18, 2018). Secretary Nielsen found that the "conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster due to the damage caused by the 2001 earthquakes are no longer met." *Id.* at 2655–56. The notice highlighted that recovery efforts relating to the 2001 earthquakes "ha[d] largely been completed"; that "social and economic conditions affected by the earthquakes have stabilized"; that El Salvador had received millions of dollars in international aid, enabling it to complete many reconstruction projects; and that "schools and hospitals have been reconstructed and repaired, homes have been rebuilt, and money has been provided for water and sanitation and to repair damaged roads and other infrastructure." *Id.* at 2656. It also emphasized that El Salvador's economy was steadily improving, with GDP reaching an all-time high in 2016 and more growth expected through 2020. *Id.* The Secretary also noted that El Salvador had accepted almost 40,000 of its nationals who had been removed from the United States in 2016 and 2017. *Id.* The notice acknowledged that assistance and resources for returnees are "limited," but that the governments of the United States and El Salvador and international organizations "are working cooperatively to improve security and economic opportunities." *Id.*

### 4. Haiti

Haiti was originally designated for TPS in 2010 after a 7.0-magnitude earthquake, which affected a third of Haiti's

population and severely impaired the country's critical
infrastructure. *Designation of Haiti for Temporary
Protected Status,* 75 Fed. Reg. 3476-02, 3477 (Jan. 21,
2010). Subsequently, Haiti's TPS designation was extended
or redesignated five times, including once by the Trump
administration.[7] The 2012, 2014, and 2015 extensions cited
factors other than the original earthquakes, such as
subsequent "steady rains . . . which led to flooding and
contributed to a deadly cholera outbreak." *E.g.*, 77 Fed. Reg.
at 59944. The 2014 extension noted the Haitian
government's "considerable progress in improving security
and quality of life of its citizens." 79 Fed. Reg. at 11,809.

In May 2017, Secretary Kelly extended Haiti's
designation for six months from its planned expiration on
July 2017 to January 2018. 82 Fed. Reg. at 23,830. The
extension notice noted that "Haiti has made significant
progress in addressing issues specific to the earthquake,"
that 96% of people living in displaced-person camps had left
those camps, and that security had improved enough for the
United Nations to announce its intention to withdraw its
peacekeeping mission in the following months. *Id.*
at 23,832. It also encouraged beneficiaries to prepare to
return to Haiti should its TPS designation be terminated after
six months. *Id.*

In January 2018, Acting Secretary Duke terminated
Haiti's TPS designation with an effective date of July 22,
2019, stating that DHS, in consultation with other federal
agencies, had "determined . . . that the conditions for Haiti's

---

[7] *See Extension of the Designation of Haiti for Temporary Protected
Status*, 76 Fed. Reg. 29000-01 (May 19, 2011); 77 Fed. Reg. 59943-01
(Oct. 1, 2012); 79 Fed. Reg. 11,808-01 (Mar. 3, 2014); 80 Fed. Reg.
51,582 (Aug. 25, 2015); 82 Fed. Reg. 23,830-01 (May 24, 2017).

designation for TPS—on the basis of 'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning safely—are no longer met." *Termination of the Designation of Haiti for Temporary Protected Status*, 83 Fed. Reg. 2648-01, 2650 (Jan. 18, 2018). The notice stated that Haiti "has made progress recovering from the 2010 earthquake and subsequent effects that formed the basis for its designation," noting that: Haiti had closed 98% of the displaced-person sites; only approximately 38,000 of the estimated two million Haitians who lost their homes in the earthquake were still living in camps as of June 2017; the United Nations had withdrawn its peacekeeping mission in October 2017; the country had completed a presidential election in February 2017; its Supreme Court was again operational; the country was in the process of rebuilding government infrastructure destroyed by the earthquake and had experienced continuing growth of its GDP since the earthquake. *Id.* The notice also stated that although Haiti had grappled with a cholera epidemic that began after the earthquake, cholera was at its lowest level since the earthquake occurred. *Id.*

## C.

In March 2018, Plaintiffs filed a putative class action challenging the decisions to terminate the TPS status of Sudan, Nicaragua, Haiti, and El Salvador, on the grounds that (1) the Secretary's actions violated the APA by departing from prior practice without an adequate explanation and (2) the decisions were motivated by discriminatory animus in violation of Fifth Amendment equal protection principles.[8] According to Plaintiffs, DHS

---

[8] Plaintiffs' original complaint also raised two substantive due process claims that are not at issue in this appeal.

justified its TPS terminations with "a novel interpretation of
the TPS statute" that rejected without explanation a
"decades-old" agency policy and practice of considering
"intervening natural disasters, conflicts, and other serious
social and economic problems as relevant factors when
deciding whether to continue or instead terminate a TPS
designation."  Plaintiffs alleged that DHS's new rule for
making TPS determinations "was motivated in significant
part by racial and national-origin animus" against "non-
white and non-European immigrants," which was
"evidenced by numerous statements made by President
Donald J. Trump and other officials in his administration."
Plaintiffs sought declaratory and injunctive relief regarding
the four challenged TPS terminations.

The Government moved to dismiss, arguing that judicial
review of Plaintiffs' claims was barred by 8 U.S.C.
§ 1254a(b)(5)(A) and that in any event, the claims failed as
a matter of law.  After a hearing, the district court denied the
motion.  The district court held that the statutory bar on
judicial review of TPS decisions did not apply to Plaintiffs'
claims because the provision did not bar either challenges to
general collateral practices or colorable constitutional
claims.  As to the merits of the claims that the Government
sought to dismiss, the district court concluded that Plaintiffs
had plausibly alleged both APA and EPC claims.

After the court's denial of the motion to dismiss,
Plaintiffs proceeded to conduct limited discovery, which
eventually led to several court rulings compelling production
by the Government.  The court ordered the Government to
produce the administrative record for the four termination
decisions and further held that "[d]eliberative material that
was relied upon directly or indirectly [by the Secretaries] is
presumptively part of the administrative record."  In

subsequent rulings, the district court largely rejected the government's invocation of the deliberative process privilege to shield certain documents. The government produced thousands of documents, including a significant number of drafts, emails, and other deliberative materials.

### D.

In August 2018, Plaintiffs moved for a preliminary injunction to enjoin the Government "from engaging in, committing, or performing implementation and/or enforcement of the decisions to terminate" TPS for the four countries at issue pending resolution of the case on the merits. After another hearing, the district court granted the preliminary injunction.

Regarding the first three factors of the preliminary injunction test, the court concluded that the balance of hardships tips "decidedly in Plaintiffs' favor." Accordingly, to satisfy the final factor of likelihood of success on the merits under the Ninth Circuit's "sliding scale" preliminary injunction standard, the district court noted that Plaintiffs "need only show serious questions on the merits have been raised in order to obtain preliminary injunctive relief."

On Plaintiffs' APA claim, the district court found that a "wealth of record evidence" supported their assertion that DHS had made an unexplained change in its approach to evaluating TPS designations. According to the court, "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad, and that this was a clear departure from prior administration practice" that the Secretaries failed to explain. The district court compared the TPS designation notices issued by prior administrations with

the ones issued under the Trump administration, and also relied heavily on testimony and decision memoranda from Leon Rodriguez, a former U.S. Citizenship and Immigration Services (USCIS) director, regarding past policy and practices.[9]  It also cited various public statements by former Secretaries and other officials, internal agency emails and communications, and the TPS decision memoranda, all of which indicated or expressed the agency position that TPS extensions would be made based only on country conditions related to the originating event, rather than intervening country conditions.

With respect to the equal protection claim, the court also held that Plaintiffs "provided sufficient evidence to raise serious questions as to whether a discriminatory purpose was a motivating factor in the decisions to terminate the TPS designations" based on (1) evidence that the DHS Secretaries were influenced by President Trump and/or the White House in their TPS decision-making, and (2) evidence that President Trump had expressed animus against non-white, non-European immigrants.  Applying the standard from *Village of Arlington Heights v. Metropolitan Housing*

---

[9] Rodriguez stated in a declaration that, both before and during his tenure at USCIS, there was no agency policy or practice that precluded "consideration of the full range of current country conditions" in assessing whether a TPS designation should be terminated or extended. "Rather, USCIS had broad discretion to consider current conditions in the subject country. Intervening factors arising after a country's original TPS designation, such as subsequent natural disasters, issues of governance, housing, health care, poverty, crime, general security, and other humanitarian considerations were considered relevant to determining whether a country continued to meet the conditions for continuing TPS designation. This was true regardless of whether those intervening factors had any connection to the event that formed the basis for the original designation or to the country's recovery from that originating event."

*Development Corp.*, 429 U.S. 252 (1977),**10** the court found that, even if Acting Secretary Duke or Secretary Nielsen did not personally harbor discriminatory animus, their actions could rise to an equal protection violation if they were influenced or manipulated by President Trump's alleged animus.

In finding "that the White House was putting pressure on DHS to end TPS," and "did, in fact, have influence on the TPS decisions," the district court cited:

- testimony from James Nealon, a former Assistant Secretary for International Affairs under the Trump administration (and a former ambassador to Honduras):

    o that "the White House was keenly interested in the [DHS] Secretary's decisions related to TPS";

    o that Stephen Miller, "an important [senior] adviser to the President and the White House," "frequently" reached out to Chad Wolf, the DHS Chief of Staff, about TPS, as well as Gene Hamilton, the Senior Counselor to the DHS Secretary; and

---

**10** The district court rejected the Government's contention that *Arlington Heights* did not provide the proper legal standard in light of *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), concluding that the latter case was inapplicable because the decisions to terminate TPS did not rest on the same national security or foreign policy concerns. The district court alternative concluded that, even under *Trump v. Hawaii*, Plaintiffs had raised "serious questions" as to the merits of their EPC claim.

     ○  that, on more than one occasion, Mr. Hamilton stated that "Mr. Miller favored the termination of TPS."

- actions and communications surrounding a White House Principals Meeting held to discuss the TPS designations (whose attendees included White House officials such as Chief of Staff Kelly, then-Principal Deputy Chief of Staff Nielsen, and Press Secretary Sanders), which include:

     ○  a memo distributed by the White House National Security Council (NSC) in advance of the meeting recommending that the TPS designations be terminated and that Congress be engaged "to pass a comprehensive immigration reform to include a merit-based entry system," which was given to Acting Secretary Duke;

     ○  a subsequent conversation between Chief of Staff Kelly with Acting Secretary Duke about the TPS designations for the Central American countries; and

     ○  Acting Secretary Duke's termination of the TPS designation for Nicaragua soon after the meeting.

- a November 2017 email from Acting Secretary Duke to Chief of Staff Kelly, in which she reported on her decision to terminate TPS for Nicaragua and temporarily extend for Honduras, and stated that:

     ○  "[t]hese decisions along with the public statements will send a clear signal that TPS in general is coming to a close. I believe it is

consistent with the President's position on immigration . . . ."; and

o "this decision is really just a difference in strategy to get to the President's objectives."

- a subsequent email from Acting Secretary Duke to Chief of Staff Kelly noting that Tom Bossert of the NSC had "informed [her] of a strategy [she] was not previously aware of" and she had now "incorporated this new information into [her] final decision."

- a draft TPS decision memo by Acting Secretary Duke stating, "The TPS program must end for these countries soon . . . . [¶] This conclusion is the result of an America first view of the TPS decision."

In finding that President Trump harbored "an animus against non-white, non-European aliens," the district court cited the following comments made by President Trump, both before and after his election:

- In June 2015, before his election to office, Mr. Trump announced that he was running for President and delivered remarks characterizing Mexican immigrants as drug dealers or users, criminals, and rapists.

- In December 2015, while still a campaign candidate, he called for 'a total and complete shutdown of Muslims entering the United States.'"

- In June 2017, President Trump stated that "15,000 recent immigrants from Haiti 'all have AIDS' and that 40,000 Nigerians, once seeing the United States, would never 'go back to their huts' in Africa."

- On January 11, 2018, during a meeting with
  lawmakers where immigrants from Haiti, El
  Salvador, and African countries were discussed,
  including with respect to TPS designations that had
  been terminated, President Trump asked: "'Why are
  we having all these people from shithole countries
  come here?' [He] then suggested that the United
  States should instead bring more people from
  countries such as Norway," which has a
  predominantly white population. He also told
  lawmakers that immigrants from Haiti "must be left
  out of any deal."

- In February 2018, President Trump gave a speech at
  the annual Conservative Political Action Conference
  where he used MS-13—a gang with members having
  ties to Mexico and Central America—to disparage
  immigrants, indicating that that they are criminals
  and comparing them to snakes.

- In July 2018, President Trump told European leaders
  that "they 'better watch themselves' because a wave
  of immigration of 'changing the culture' of their
  countries,'" which he characterized as being "'a very
  negative thing for Europe.'"

The district court also found that a review of the
*Arlington Heights* factors provided "circumstantial evidence
of race being a motivating factor" in the challenged TPS
terminations. Of note, the district court found that "the
sequence of events leading up to the challenged decisions"
were "irregular and suggestive of a pre-determined outcome
not based on an objective assessment," given the record
evidence of, "after receiving Decision Memos from career
DHS employees, higher-level DHS employees—i.e., the

political appointees—'repackaging' the memos in order to get to the President/White House's desired result of terminating TPS." The court found that this "was especially apparent with respect to the process on Sudan," and that a similar "repackaging" process also occurred "for the decisions on Honduras, Nicaragua, and El Salvador." The district court also found significant the acknowledgement from Acting Secretary Duke that "terminations of TPS designations were 'a strong break with past practice'" but "consistent with the President's position on immigration" and "the result of an America first view of the TPS decision." Based on the above, the district court concluded that the evidence submitted by Plaintiffs raised serious questions on the merits of the Equal Protection Claim."

The district court enjoined the Government "from engaging in, committing, or performing . . . implementation and/or enforcement of the decisions to terminate TPS for Sudan, Haiti, El Salvador, and Nicaragua pending a resolution of this case on the merits." In addition, it ordered the Government to "take all administrative actions needed to preserve the status quo pending completion of discovery and a ruling on the merits . . . ." After the Government filed its notice of appeal to this court, the district court, pursuant to the parties' request, entered an order staying further proceedings pending appellate review of the preliminary injunction.[11]

---

[11] Under that order, the Government stipulated that the TPS designations for Sudan, Nicaragua, Haiti, and El Salvador will remain in effect on a nationwide basis until the later of (a) 120 days following the issuance of any mandate to the district court reversing the injunction or (b) the Secretary's previously announced termination date.

## II.

"[The] purpose of a preliminary injunction . . . is to preserve the status quo and the rights of the parties until a final judgment issues in the cause." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). "A preliminary injunction . . . is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). "A party seeking a preliminary injunction must meet one of two variants of the same standard." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). Under the original standard, plaintiffs seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit employs an alternative "serious questions" standard, also known as the "sliding scale" variant of the *Winter* standard, which we have upheld as a viable test even after *Winter*. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) (concluding that "the 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*"). Under this alternate standard, we weigh the preliminary injunction factors "on a sliding scale, such that where there are only 'serious questions going to the merits'—that is, less than a 'likelihood of success' on the merits—a preliminary injunction may still issue so long as 'the balance of hardships tips sharply in the plaintiff's favor' and the other two factors are satisfied." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citations omitted).

On appeal, the Government's arguments focus only on Plaintiffs' likelihood of success on the merits, arguing that Plaintiffs fail to meet this prong of the preliminary injunction standard because (1) their APA claim is not reviewable under the TPS statute, but even if it were, the claim would fail on the merits, and (2) their EPC likewise fails, even under the "serious questions" standard. We address each of these issues in turn. We review for an abuse of discretion the district court's decision to grant a preliminary injunction. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000). Within this inquiry, we review the district court's legal conclusions de novo and its factual findings for clear error. *Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017).

### III.

### A.

We consider first whether Plaintiffs' claims are reviewable in light of 8 U.S.C. § 1254a(b)(5)(A), which states: "There is no judicial review of any determination of the [Secretary of Homeland Security] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." To answer this question, we must first determine the type of claims that this provision precludes from judicial review, and then determine whether Plaintiffs' particular claims fall within the scope of this statutory bar.

### 1. *Scope of Section 1254a*

In construing the scope of any jurisdictional statute, we are guided by the well-established presumption in favor of judicial review over colorable constitutional claims, *see Webster v. Doe*, 486 U.S. 592, 603 (1988) ("[W]here

Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."), as well as over challenges to agency actions, *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (beginning its reviewability analysis with the APA's "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action'" (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967))); *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir. 1988) ("The courts have long recognized . . . a presumption in favor of judicial review of administrative actions."). "This presumption, like all presumptions used in interpreting statutes, may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984); *see also Abbott Labs.*, 387 U.S. at 141 ("[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." (citation omitted)).

Keeping these principles in mind, we turn first to the text of the statute. *See Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 802 (9th Cir. 2017) ("[W]e start, as we must, with the text of the statute."). Section 1254a(b)(5)(A) precludes review of "any determination . . . with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). The statute does not define the phrase "any determination" except to use it in immediate reference to "the designation . . . of a foreign state" for TPS. However, the Supreme Court has placed significance on the term "determination" in its analysis of a similar judicial review bar provision in the Immigration Reform and Control Act of the 1986 ("Reform Act"), which states: "There shall be no administrative or judicial review of a determination

respecting an application for adjustment of status" under the Reform Act's Special Agricultural Workers ("SAW") amnesty program. *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 486 n.6 (1991) (quoting 8 U.S.C. § 1160(e)(1)). According to the Court in *McNary*, the "critical words" in that statute "describe the provision as referring only to review 'of a *determination* respecting an *application*' for SAW status," and "[s]ignificantly, the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *McNary*, 498 U.S. at 491–92 (emphasis in original). When read in the context of the surrounding statutory provisions, the Court concluded that this judicial review bar precluded only "direct review of individual denials of SAW status, rather than . . . general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.* at 492.

Two years later, the Court reached the same conclusion in the context of another statutory provision that limited review over "determination[s] respecting . . . application[s] for adjustment of status." *See Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 53 (1993) ("*CSS*") (analyzing 8 U.S.C. § 1255a(f)). Applying *McNary*, the Court found that the "language setting the limits of the jurisdictional bar 'describes the denial of an individual application.'" *Id.* at 56 (quotation omitted). Consequently, the Court concluded that "an action challenging the legality of a regulation without referring to or relying on the denial of any individual application" was not barred from judicial review under the statute. *Id.* at 56.

The textual similarities between section 1254a(b)(5)(A) and the provisions at issue in *McNary* and *CSS*, *see* 8 U.S.C.

§ 1160(e)(1), § 1255a(f), provide us an important starting point for understanding the scope of the TPS statute's judicial review bar. Specifically, like the provisions in *McNary* and *CSS*, section 1254a(b)(5)(A)'s reference to "determination" limits the scope of the provision to individual decisions regarding the designation of a foreign country for TPS. Thus, the provision generally precludes direct review of the Secretary's country-specific TPS determinations, but does not bar review of "general collateral challenges to unconstitutional practices and policies used by the agency" in reaching those determinations. *McNary*, 498 U.S. at 492.

Our view of the limits of section 1254a(b)(5)(A) is further solidified when we compare it with the language of other statutory provisions by which Congress has barred a greater scope of claims from judicial review. *See id.* at 494 ("[H]ad Congress intended the limited review provisions . . . to encompass challenges to INS procedures and practices, it could easily have used broader statutory language."). For instance, in *Gebhardt v. Nielsen*, 879 F.3d 980 (9th Cir. 2018), we considered a pair of jurisdictional provisions that insulated from review the Secretary's "no-risk" determinations under the Adam Walsh Act in adjudicating I-130 petitions. *Id.* at 984. The first provision barred judicial review of any "decision or action . . . the authority for which is specified [as falling under] the discretion of the Attorney General or the Secretary of Homeland Security," 8 U.S.C. § 1252(a)(2)(B)(ii), and the second granted "the Secretary 'sole and unreviewable discretion' in making 'no-risk' determinations" under the Adam Walsh Act, *Gebhardt*, 879 F.3d at 984 (citing 8 U.S.C. § 1154(a)(1)(A)(viii)(I)). We found that the language of these "provisions clearly demonstrate Congress' intent to prevent us from reviewing how the Secretary exercises his or her 'sole and

unreviewable discretion' to make 'no risk' determinations." *Id.* Accordingly, we held that we lacked jurisdiction to review the claims raised in that case "because each one challenges *how* the Secretary exercises—or has exercised— his or her 'sole and unreviewable discretion' to adjudicate I-130 petitions." *Id.* at 987.

Unlike the provisions in *Gebhardt*, section 1254a(b)(5)(A) does not expressly grant the Secretary "sole and unreviewable" discretion in her TPS decision-making or even refer to the discretionary nature of the Secretary's TPS determinations. In fact, the statute sets forth at least *some* limitations on the Secretary's discretion to make TPS decisions. For instance, it specifies the three situations under which the Secretary may designate a country for TPS, 8 U.S.C. § 1254a(b)(1), and imposes a number of procedural requirements—such as interagency consultation and a periodic review process under which the Secretary "shall" consider "conditions in the foreign state" and "determine whether the conditions [for TPS designation] continue to be met." 8 U.S.C. § 1254a(b)(1), (b)(3). Thus, unlike decisions in which Congress has expressly granted the Secretary "sole and unreviewable discretion," the Secretary's discretion to make TPS determinations is not wholly unfettered. The fact that Congress enacted the TPS statute to curb and control the executive's previously unconstrained discretion under the EVD process also supports this conclusion.

We therefore find significant that section 1254a(b)(5)(A) is textually more akin to the judicial review bar provisions in *McNary* and *CSS* than those in *Gebhardt*. At the same time, we recognize that the judicial review bar in the TPS statute is not entirely identical to those in *McNary* and *CSS*. Although these provisions may be similar in their use of the term "determination," the TPS statute otherwise differs in

both text and context.  In effect, while *McNary* and *CSS* may help us understand that section 1254a(b)(5)(A) bars judicial review of the Secretary's country-specific TPS determinations, it sheds little light as to what precisely constitutes such an unreviewable TPS determination.  For that, we must look to the rest of the TPS statute.

Under section 1254a, the Secretary's discretion to make TPS determinations, while not without check, is undoubtedly broad and unique in nature.  To begin, the authority to designate a foreign country for TPS is vested solely with the Secretary "after consultation with the appropriate agencies of the Government."  8 U.S.C. § 1254a(b)(1).  And when it comes to designating a country for TPS, the Secretary "may" do so if she finds that the country has been stricken by a natural disaster, armed conflict, or other "extraordinary and temporary conditions in the foreign state."  8 U.S.C. § 1254a(b).  The word "may" indicates that, even if the Secretary finds one of these three requisite criteria is met, she retains the discretion *not* to designate a country for TPS.  In contrast, once a country has been designated for TPS, the Secretary "shall" periodically review the country conditions and "shall" terminate TPS if she finds the requisite criteria are no longer met.  These provisions, taken together, indicate a legislative intent to limit the designation, redesignation, and extension of TPS by requiring both periodic review as well as termination when those conditions are no longer met.  Thus, to the extent the TPS statute places constraints on the Secretary's discretion, it does so in favor of limiting unwarranted designations or extensions of TPS.

Moreover, designations of TPS directly concern the status of "any foreign state (or any part of such foreign state)", *see id.*, rather than that of any individual, even if such

designation ultimately benefits individual nationals of the designated foreign states.  In that regard, a Secretary's TPS determination under section 1254a is quite unlike an agency "determination respecting an application for adjustment of status" under the immigration relief programs that the Court considered in *McNary* and *CSS*.  Here, the TPS statute does not provide any formal avenue or administrative process for foreign citizens to "apply" for TPS designation of their countries.  Rather, the decision to designate any foreign country for TPS begins and ends with the Secretary, so long as certain limited statutory criteria are met.  This makes perfect sense, given that the TPS program was intended to provide a substitute for EVD under which the executive branch, subject to some legislative control, could continue to exercise its discretionary power to grant humanitarian relief to citizens of foreign countries on a nation-state level.

The TPS statute also does not dictate any substantive guidelines or restrictions on the manner by which the Secretary may reach her TPS determinations, other than setting forth the three possible findings that the Secretary must make before designating a country for TPS.  *See* 8 U.S.C. § 1254a(b)(1).  Nor does the statute set forth or define the "conditions in the foreign state" that the Secretary must consider in her periodic review, or how she should weigh these conditions.  *See id.* § 1254a(b)(1).  Read in the context of these provisions, section 1254a(b)(5)(A) makes clear that the Secretary's discretion to consider and weigh various conditions in a foreign country in reaching her TPS determinations is not only broad, but unreviewable.  In other words, the statute not only sets forth very few legal parameters on what the Secretary must consider in designating, extending, or terminating TPS for a foreign country, but also expressly bars judicial review over these determinations.   Logically then, section 1254a(b)(5)(A)

generally precludes courts from inquiring into the underlying considerations and reasoning employed by the Secretary in reaching her country-specific TPS determinations.

In short, the TPS statute precludes review of non-constitutional claims that fundamentally attack the Secretary's specific TPS determinations, as well as the substance of her discretionary analysis in reaching those determinations. But, as *McNary* instructs us, where a court "lacks jurisdiction over a challenge to the agency's 'actions' or 'conduct' 'in adjudicating a specific individual claim,'" it may still have "jurisdiction over 'a broad challenge' to the agency's 'procedures' or 'practices.'" *City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 875 (9th Cir. 2009) (quoting *Mace v. Skinner*, 34 F.3d 854, 858–59 (9th Cir. 1994)). To the extent a claim purports to challenge an agency "pattern or practice" rather than a specific TPS determination, we may review it only if the challenged "pattern or practice" is indeed collateral to, and distinct from, the specific TPS decisions and their underlying rationale, which the statute shields from judicial scrutiny.

The scope of section 1254a's bar on judicial review does not change even in the context of the APA, which codifies the "basic presumption of judicial review" over agency action. *Abbott Labs.*, 387 U.S. at 140. Indeed, the APA by its own provisions does not apply where "statutes preclude judicial review" or where the "agency action" challenged is "committed to agency discretion by law." 5 U.S.C. § 701(a)(1), (2). Accordingly, where a claim challenges an agency action over which the TPS statute precludes judicial review, or which the TPS statute has committed to agency discretion, the APA cannot be invoked as an independent basis for affording judicial review. For instance, an

allegation that the Secretary reached certain TPS determinations in an "arbitrary and capricious" manner would not be reviewable under section 1254a. Although such a claim raises a cognizable violation of the APA, it also directly attacks the Secretary's specific TPS determinations, rather than a broad agency pattern or practice, and is thereby shielded from judicial review by the TPS statute. With these principles in mind, we turn next to whether Plaintiffs' APA claim qualifies as a reviewable challenge to a collateral agency practice or policy under the TPS statute.

### 2. *Plaintiffs' APA Claim*

In assessing whether Plaintiffs' APA claim raises a reviewable challenge to a collateral agency "pattern or practice" rather than a challenge to specific TPS determinations barred by section 1254a, we are guided by several considerations. One "guiding principle" from *McNary* and *CSS* is "whether the claim challenges a procedure or policy that is collateral to an alien's substantive eligibility, for which the administrative record is insufficient to provide a basis for meaningful judicial review." *City of Rialto*, 581 F.3d at 874 (quotations and internal marks omitted). We have also emphasized the distinction between procedural challenges and substantive ones, and between claims seeking collateral relief and those seeking direct relief from an agency decision, finding that the former types of claims may be reviewable under *McNary* while the latter usually are not. *See City of Rialto*, 581 F.3d at 875 (discussing *Skagit Cty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 386 (9th Cir. 1996)). Likewise, we have stated that claims "like those asserted in *McNary*" are reviewable when: (1) they are "not based on the merits of [a plaintiff's] individual situation, but constitute a broad challenge to allegedly unconstitutional [agency] practices"; (2) "the

administrative record for a single [decision] would have little relevance"; and (3) the court's "examination is neither peculiarly within the agency's 'special expertise' nor an integral part of its 'institutional competence.'" *Mace*, 34 F.3d at 859.

Our cases demonstrate that the nature and scope of a particular claim, the type of agency action that it challenges, and the type of relief sought are all important factors to consider in determining whether the claim is indeed a reviewable *McNary*-like claim. Applied to Plaintiffs' APA claim as alleged in their original complaint, many of these factors lean in favor of concluding that the claim is not reviewable. For one, Plaintiffs' APA claim does not challenge any agency procedure or regulation. "True procedural challenges confront an agency's methods or procedures and do not depend on the facts of any given individual agency action." *City of Rialto*, 581 F.3d at 876. In alleging that the Secretary has violated the APA by no longer considering intervening events in the TPS terminations at issue, Plaintiffs essentially raise a substantive challenge to the Secretary's underlying analysis in reaching those specific decisions. Their claim also largely depends on a review and comparison of the substantive merits of the Secretary's specific TPS terminations, which is generally barred by section 1254a. Moreover, the consideration of "intervening events" in a TPS determination is a task squarely within the agency's "special expertise" and "institutional competence" and which section 1254a commits to the Secretary's discretion. And insofar as Plaintiffs' request declaratory and injunctive relief in setting aside the TPS terminations, they appear to seek direct relief from the challenged decisions, rather than collateral relief from an allegedly unlawful agency practice.

Plaintiffs, however, insist that their APA claim does not challenge the specific TPS determinations, but "goes to the agency's underlying practice" and does not "seek to establish that a particular country must remain designated[.]" They characterize their APA claim as a challenge to an "arbitrary and capricious" change in a broad agency practice: specifically, they allege that the agency, without explanation, adopted a new practice of refusing to consider intervening events in its TPS extension determinations, and that this practice is unlawful under the APA. Despite this characterization, we find that Plaintiffs' claim is not reviewable under section 1254a. As we have reiterated several times before, "the phrase 'pattern and practice' is not an automatic shortcut to federal court jurisdiction." *Gebhardt*, 879 F.3d at 987 (citing *City of Rialto v. W. Coast Loading Corp.*, 581 F.3d at 872). In other words, Plaintiffs cannot obtain judicial review over what is essentially an unreviewable challenge to specific TPS terminations by simply couching their claim as a collateral "pattern or practice" challenge. "No matter how a plaintiff characterizes an argument, we can review a claim in this context only if it challenges a genuinely *collateral* action." *Id.*

Our analysis of section 1254a dictates that a claim challenging the Secretary's failure to "consider intervening events"—or even her failure to adequately explain why the agency is no longer considering intervening events when it did so in the past—is essentially an attack on the substantive considerations underlying the Secretary's specific TPS determinations, over which the statute prohibits judicial review. Nothing in the language of the TPS statute requires the Secretary to consider intervening events prior to terminating TPS, or to explain her failure to do so. In fact, the statute is entirely silent as to the specific types of events

or factors the Secretary must consider in reaching her TPS determinations. As far as the TPS statute is concerned, the decision whether to consider intervening events when making TPS determinations appears to be fully within the Secretary's discretion. Thus, even presuming that DHS adopted a new practice of refusing to consider intervening events, as Plaintiffs allege, the TPS statute provides no legal basis to challenge such an action.

Instead, the alleged illegality of the agency action here is based solely on the APA and its requirement that agencies not "arbitrarily and capriciously" depart from past practice. *See* 5 U.S.C. § 706(2)(A); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009). To review Plaintiffs' claim, we must accept that—even though the TPS statute affords the Secretary full discretion as to whether she considers intervening events (or any other factors) when making her TPS determinations—the APA's prohibition on "arbitrary and capricious" changes in practice may nonetheless require her to consider intervening events if prior Secretaries did so before her, and to explain herself if she chooses to depart from this "practice." We must also presuppose that—even though section 1254a precludes us from reviewing the Secretary's TPS determinations and her underlying considerations—the APA may independently form the basis of a justiciable challenge and thereby allow such a claim to elude the statute's judicial review bar. This cannot be so. As we have noted, the APA cannot be used as the sole basis for conferring justiciability over what would otherwise be unreviewable claim. To conclude otherwise would render section 1254a(b)(5)(A) virtually meaningless and would contradict the APA's express language on the limits of the statute's applicability. *See* 5 U.S.C. § 701(a) ("This chapter applies . . . except to the extent that— (1) statutes preclude judicial review; or (2) agency action is

committed to agency discretion by law."). Because Plaintiffs' APA claim alleges an "arbitrary and capricious" change in agency practice that is otherwise committed to the Secretary's discretion under the TPS statute and, at its core, challenges only the Secretary's specific TPS determinations, we find that it is unreviewable.

The dissent criticizes our application of the *City of Rialto* factors to Plaintiffs' APA claim, even asserting that we "dismiss[] one of *City of Rialto*'s guiding principles" in our analysis.**[12]** We think the dissent's criticisms ultimately miss the point in a few respects. For one, the dissent seems to conceive the *City of Rialto* factors as providing a strict mechanical test for reviewing *McNary*-type claims. But this is a misconception. Our court has, in fact, employed a fluid range of considerations in assessing the reviewability of a *McNary*-type claim, which we even recognize in our lengthy discussion of these considerations in *City of Rialto*. Not every factor that we discussed in *City of Rialto* will bear the same weight in every case because not every claim or statutory context is the same.

Under *McNary* and its progeny, a statutory jurisdictional bar that is limited to specific agency "determinations" does not bar challenges to agency "patterns or practices" that are collateral to those individual decisions. But the question of what constitutes an unreviewable agency action, as opposed to a reviewable collateral one, is largely defined by the precise statute at issue. As we have already noted, the

---

**[12]** In *City of Rialto*, we identified "two 'guiding principles,'" the first of which we have already discussed, and the second of which is "whether Plaintiffs' claim is ripe." 581 F.3d at 875 (citation omitted). Because the ripeness of Plaintiffs' claim in this case is neither in dispute nor significant to our analysis, we did not need to address it at length.

statutory judicial review bar in the TPS statute is different in several respects from the Reform Act provisions considered in *McNary* and *CSS*, as it is from other statutory provisions that limit judicial review over agency decisions on individual applications for relief.

In the same vein, the dissent's point regarding the unavailability of another forum for Plaintiffs' APA claim overlooks the unique statutory context of this case. We fully recognize that Plaintiffs cannot raise their APA challenge in another forum or at a different stage in the proceedings. But that is precisely what Congress intended under the TPS statute. The statute not only bars from judicial review APA challenges to specific TPS determinations, but more broadly, it provides no administrative avenue whatsoever for individual aliens, or foreign states, to apply for TPS designation. In light of this critical distinction between the TPS statute and the provisions in *McNary*, *CSS*, and many other immigration statutes, we do not find the lack of an alternative review forum particularly critical to our analysis.

Finally, we decline to adopt the dissent's reconstruction of Plaintiffs' APA claim as a challenge to an agency interpretation of the TPS statute. In general, a claim that an agency has adopted an erroneous interpretation of a governing statute would be reviewable under *McNary*, particularly because the court's resolution of these sort of challenges turns on a review of the law itself, rather than a review of the merits of any specific agency determinations. Plaintiffs, however, do not squarely raise such a claim. Although they loosely assert that "DHS adopted a novel interpretation of the TPS statute" by taking the position of no longer considering intervening events, the facts and arguments they raise pertain almost exclusively to the alleged change in agency practice, rather than any official

DHS interpretation of the statute. As the dissent even highlights, the only facts from the complaint specifically alleging a novel interpretation include several sentences from oral testimony by then-Secretary Nielsen totaling over four and a half hours in front of a Congressional subcommittee, a similar excerpt from testimony by then-Secretary Kelly lasting over two hours, and an informal internal briefing paper prepared for a meeting attended by acting Secretary Duke. Plaintiffs' focus throughout on the alleged change in agency practice dwarf the cursory allegations of a novel interpretation. A bare assertion that DHS adopted a novel interpretation is insufficient to achieve judicial review given our analysis of the statute and its grant of wide discretion for TPS determinations.

We elect to address Plaintiffs' APA claim as they present it—a challenge to the agency's new and unexplained practice of refusing to consider intervening events in its TPS decisions. Because such a claim fundamentally attacks the Secretary's specific TPS determinations, we find that it is barred from review by section 1254a. Given that Plaintiffs may not raise their APA claim as a matter of law, the claim cannot serve as a basis for the preliminary injunction and we need not consider its likelihood of success on the merits.

### B.

The remaining issue is whether Plaintiffs have raised serious questions to the merits of their EPC claim so as to warrant the issuance of the preliminary injunction.

#### 1. *Applicable Legal Standard for Plaintiffs' EPC Claim*

The Government argues that, in light of *Trump v. Hawaii*, the district court erred by applying the standard from *Arlington Heights* to Plaintiffs' EPC claim. In *Trump*

*v. Hawaii*, the Supreme Court applied the rational basis review standard in upholding an executive order suspending the entry of aliens into the United States against an EPC challenge based on alleged animus by the President. The Court prefaced its reliance on the deferential standard with a discussion of cases that "recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Trump*, 138 S. Ct. at 2418 (citing *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). Thus, the deferential standard of review applied in *Trump v. Hawaii* turned primarily on the Court's recognition of the fundamental authority of the executive branch to manage our nation's foreign policy and national security affairs without judicial interference. *See id.* at 2419 ("The upshot of our cases in this context is clear: 'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and national security is highly constrained." (citation omitted)).

Here, the executive's administration of the TPS program, which provides widescale, nationality-based humanitarian harbor for foreign citizens, also involves foreign policy and national security implications, albeit to a lesser extent than the executive order suspending the entry of foreign nationals in *Trump v. Hawaii*. The former involves the implementation of a congressionally created program subject to certain statutory guidelines, while the latter falls squarely in the core realm of executive power to make foreign policy decisions. As the Supreme Court has recognized, "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas*

*v. Davis*, 533 U.S. 678, 693 (2001). Accordingly, the level of deference that courts owe to the President in his executive decision to exclude foreign nationals who have not yet entered the United States may be greater than the deference to an agency in its administration of a humanitarian relief program established by Congress for foreign nationals who have lawfully resided in the United States for some time.

For similar reasons, we declined to apply the *Trump v. Hawaii* standard in favor of the *Arlington Heights* standard in our review of an equal protection challenge to the administration's rescission of the Deferred Action for Childhood Arrivals (DACA) program. *See Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 519–20 (9th Cir. 2018), *rev'd in part, vacated in part*, 140 S. Ct. 1891 (2020) (distinguishing *Trump v. Hawaii* "in several potentially important respects, including the physical location of the plaintiffs within the geographic United States, the lack of national security justification for the challenged government action, and the nature of the constitutional claim raised." (citation omitted)). The Supreme Court, in its review of the same EPC claim on appeal, also applied the *Arlington Heights* standard. *See Regents*, 140 S. Ct. at 1915–16. Given the similarities between the EPC claim in this case and *Regents*, we reject the Government's contention that *Trump v. Hawaii*'s standard of review should apply in this case. We therefore review Plaintiffs' likelihood of success on their EPC claim under the *Arlington Heights* standard.

### 2. *Merits of the EPC Claim*

Under *Arlington Heights*, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 265. However, a plaintiff asserting an equal protection claim need not "prove that the challenged action rested solely on racially

discriminatory purposes" or even that racial discrimination was "the 'dominant' or 'primary'" purpose. *Id.* Rather, Plaintiffs need only show that racial discrimination was at least "a motivating factor" for the challenged TPS terminations in order to prevail on their equal protection claim. *Id.* at 265–66 ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, th[e] judicial deference [that courts normally afford legislators and administrators] is no longer justified."). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Factors to consider in this inquiry include: the "impact of the official action" and whether it "'bears more heavily on one race than another'"; the "historical background of the decision" and whether it "reveals a series of official actions taken for invidious purposes"; the "specific sequence of events leading up the challenged decision" and whether it departs procedurally or substantively from normal practice; and the "legislative or administrative history" and what it reveals about the purpose of the official action. *Id.* at 266–68 (citations omitted).

Applying this standard, we conclude that Plaintiffs fail to present even "serious questions" on the merits of their claim that the Secretaries' TPS terminations were improperly influenced by the President's "animus against non-white, non-European immigrants." The Supreme Court recently rejected a similar equal protection claim in *Regents* that the administration's decision to rescind DACA was motivated by racial animus under *Arlington Heights*. There, the Court held that none of the points raised by the plaintiffs—*i.e.*, the "disparate impact of the rescission on Latinos from Mexico," "the unusual history behind the rescission," and "pre- and post-election statements by

President Trump"—"either singly or in concert, establishes a plausible equal protection claim." *Id.*

Here, Plaintiffs' EPC claim fails predominantly due to the glaring lack of evidence tying the President's alleged discriminatory intent to the specific TPS terminations—such as evidence that the President personally sought to influence the TPS terminations, or that any administration officials involved in the TPS decision-making process were themselves motivated by animus against "non-white, non-European" countries. While the district court's findings that President Trump expressed racial animus against "non-white, non-European" immigrants, and that the White House influenced the TPS termination decisions, are supported by record evidence, the district court cites no evidence linking the President's animus to the TPS terminations. Rather, the district court makes this leap by relying on what appears to be a "cat's paw" theory of liability—wherein the discriminatory motive of one governmental actor may be coupled with the act of another to impose liability on the government. We doubt that the "cat's paw" doctrine of employer liability in discrimination cases can be transposed to this particular context. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 418 (2011) (noting that, while "the answer is not so clear," one agency law treatise "suggests that the malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold the principal liable for a tort that requires both." (citing Restatement (Second) of Agency § 275, Illustration 4 (1957)). Plaintiffs argue that this court has employed the "cat's paw" doctrine in several employment discrimination cases involving government actors, but do not provide any case where such a theory of liability has been extended to governmental decisions in the foreign policy and national security realm.

Moreover, while the record contains substantial evidence that White House officials sought to influence the Secretaries' TPS decisions, and that the Secretaries sought and acted to conform their TPS decisions to the President's immigration policy, we find these facts neither unusual nor improper. It is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies. The mere fact that the White House exerted pressure on the Secretaries' TPS decisions does not in itself support the conclusion that the President's alleged racial animus was a motivating factor in the TPS decisions.

Nor do we find that an inference of racial animus behind the TPS terminations is any stronger when the evidence of White House pressure on DHS is joined by evidence of the President's expressed animus towards "non-white, non-European" countries and ethnicities. While we do not condone the offensive and disparaging nature of the President's remarks, we find it instructive that these statements occurred primarily in contexts removed from and unrelated to TPS policy or decisions. *See Regents*, 140 S. Ct. at 1916 (finding that the "President's critical statements about Latinos," which were "remote in time and made in unrelated contexts . . . do not qualify as 'contemporary statements' probative of the decision at issue."). Here, the only "contemporary statement" might be the President's comments at the January 11, 2018 meeting with lawmakers, during which TPS terminations were discussed; however, the influence of these remarks on the actual decisions to terminate TPS is belied by the fact that the meeting occurred three days *after* the TPS termination notices for Haiti and El Salvador issued. Without evidence that the President's statements played any role in the TPS decision-making process, the statements alone do not demonstrate that the

President's purported racial animus was a motivating factor for the TPS terminations. *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016) (holding that "offensive quotes about Mexican nationals attributed to Sherriff Arpaio" that did "not mention" the policy in question did not "lead to any inference" that the policy "was promulgated to discriminate against Mexican nationals").

As *Arlington Heights* instructs us, circumstantial evidence may be sufficient to prove a discriminatory intent claim. Even so, we find that the circumstantial evidence here do not help Plaintiffs much. First, there is no indication that the impact of the TPS terminations bear more heavily on "non-white, non-European" countries. The district court concluded otherwise by finding that "it affects those populations exclusively." While the four countries at issue in this case are "non-European" with predominantly "non-white" populations, the same is true for the four other countries whose TPS designations were extended by the Trump Administration during the same period. In fact, virtually every country that has been designated for TPS since its inception has been "non-European" (with the exception of Bosnia and the Province of Kosovo) and most have majority "non-white" populations. Under the district court's logic, almost any TPS termination in the history of the program would bear "more heavily" on "non-white, non-European" populations and thereby give rise to a potential equal protection claim. This cannot be the case, as the Supreme Court recently pointed out in rejecting the disparate impact argument in *Regents*. 140 S. Ct. at 1915 ("[B]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually

any generally applicable immigration policy could be challenged on equal protection grounds.").

Nor does the historical background of the TPS terminations reveal "a series of official actions taken for invidious purposes" or otherwise indicate a racially discriminatory purpose behind the TPS terminations. The district court found that the specific sequence of events leading up to the TPS terminations were "irregular and suggestive of a predetermined outcome not based on an objective assessment," particularly based on the "repackaging" of the decision memos by higher-level DHS employees. But even accepting that the agency made its decisions with a predetermined objective to terminate TPS, there is still no evidentiary support for the conclusion that this overarching goal was motivated by racial animus. Instead, the record indicates that any desire to terminate TPS was motivated by the administration's immigration policy, with its emphasis on a "merit-based entry" system, its focus on America's economic and national security interests, and its view on the limitations of TPS and the program's seeming overextension by prior administrations. As to the evidence that higher agency officials "repackaged" the TPS decision memoranda and overruled the recommendations of lower-level employees, this seems to be a commonplace aspect of how agencies often operate that, without more, does not demonstrate discriminatory animus. *See Wisconsin v. City of New York*, 517 U.S. 1, 23 (1996) ("[T]he mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision."); *St. Marks Place Hous. Co. v. HUD*, 610 F.3d 75, 83 (D.C. Cir. 2010) (noting that the "[S]ecretary, like all agency heads, usually makes decisions after consulting subordinates, and those subordinates often have different views").

In sum, Plaintiffs fail in their burden of showing a likelihood of success, or even serious questions, on the merits of their claim that racial animus toward "non-white, non-European" populations was a motivating factor in the TPS terminations.

## IV.

We hold that the district court abused its discretion in issuing the preliminary injunction on two grounds. First, the district court committed legal error when it deemed Plaintiffs' APA claim reviewable, despite 8 U.S.C. § 1254a's bar to judicial review of challenges to the Secretary's TPS determinations. Plaintiffs assert, and the district court accepted, that their claim is reviewable because they challenge only the agency's new practice of refusing to consider "intervening events" in its TPS extension determinations. However, under the TPS statute, the Secretary possesses full and unreviewable discretion as to whether to consider intervening events in making a TPS determination. Plaintiffs' attempt to rely on the APA to invoke justiciability over what would otherwise be an unreviewable challenge to specific TPS determinations, constitutes an impermissible circumvention of 8 U.S.C. § 1254a(b)(5)(A). Accordingly, the district court did not have jurisdiction to review Plaintiffs' APA claim.

Second, the district court also abused its discretion in concluding that Plaintiffs present at least serious questions going to the merits of their EPC claim. The district court found that the DHS Secretaries were influenced by President Trump and/or the White House in their TPS decision-making, and that President Trump had expressed animus against non-white, non-European immigrants. However, without any evidence linking them, these two factual findings alone cannot support a finding of discriminatory

purpose for the TPS terminations. Based on our review of the evidence, we find that Plaintiffs do not meet their burden of showing a likelihood of success, or even serious questions, on the merits of their EPC claim.

Therefore, we **VACATE** the preliminary injunction and remand to the district court for further proceedings.

R. NELSON, Circuit Judge, concurring:

The executive action at issue affects at least 300,000 immigrants and their families—probably more—many of whom have lived in this country for years, if not decades. Each of them has, undoubtedly, contributed to the United States in meaningful ways, culturally, economically, and otherwise. As just one example, Plaintiff Ebtihal Abdalla and her husband are TPS beneficiaries from Sudan who have lived in the United States since the late 1990s and have three children. There is no question that these individuals deserve our sympathy. And they may well warrant legislative protection. *City & Cty. of San Francisco v. USCIS*, 944 F.3d 773, 809 (9th Cir. 2019) ("By constitutional design, the branch that is qualified to establish immigration policy and check any excesses in the implementation of that policy is Congress.") (Bybee, J., concurring).

But that does not dictate the outcome of this case. Our sole responsibility as Article III judges is narrow—"to say what the *law* is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added). And here, the most salient human components of this case do not answer that question. But the law does. Plaintiffs' APA procedural

claim is not reviewable[1] and there are no serious questions going to the merits of Plaintiffs' equal protection claim. I concur in the panel's holding, which does not opine on the moral equities or the merits of President Trump's political statements.

I write separately, however, to address two additional errors by the district court, both implicating separation-of-powers concerns: the scope of the administrative record in cases challenging agency action and the advent of the so-called "nationwide" or "universal" injunction.

## I

First, the scope of the administrative record. Proper consideration of the administrative record has become a stumbling block for district courts and even some appellate courts in recent years. It is a fundamental issue, and vitally important to APA review. After all, under the APA, the United States waives sovereign immunity. 5 U.S.C. § 702. But that waiver—which "must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires," *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992) (internal quotation marks and alterations omitted)— is subject to certain limitations, one of which is the APA's record-review requirement. 5 U.S.C § 706. As such, the record-review requirement is not just a meaningless

---

[1] I express no view on the merits of Plaintiffs' APA procedural claim because we lack jurisdiction to decide that claim. *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1173 (9th Cir. 2013) (holding it "not appropriate" to resolve the merits in the alternative); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) (rejecting concept of assuming "hypothetical jurisdiction" to rule on the merits).

procedural hurdle to overcome, but a fundamental constitutional protection to government agency action.

Under that requirement, a court's review of agency action is typically "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). This principle "reflects the recognition that further judicial inquiry into executive motivation represents a substantial intrusion into the workings of another branch of Government and should normally be avoided." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (internal quotation marks omitted). In other words, the APA's record-review limitation reflects a desire to avoid interfering with the decisionmaking process of a co-equal branch of government. *Id.*

Despite these separation-of-powers considerations, the general rule is not absolute. Extra-record discovery may be permitted "in limited circumstances." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 975 (9th Cir. 2006) (internal quotation marks omitted). These limited circumstances may include, for example, when there has been a "strong showing of bad faith or improper behavior," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), or "[w]hen it appears the agency has relied on documents or materials not included in the record," *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).

But as the Supreme Court recently reiterated in *Department of Commerce*, any such extra-record discovery should only be ordered *after* the government produces the administrative record. In *Department of Commerce*, the plaintiffs brought APA and equal protection challenges to the Secretary of Commerce's decision to add a citizenship

question to the 2020 census.  139 S. Ct. at 2562–64.  After briefing on a motion to dismiss, the administrative record was still not complete.  *Id.* at 2563–64.  As a result, the district court ordered the government to complete the administrative record.  *Id.* at 2564.  But it also went a step further, ordering extra-record discovery in the same hearing. *Id.*  The Supreme Court held—and eight Justices who reached the question agreed—that the district court abused its discretion in "order[ing] extra-record discovery when it did."  *Id.* at 2574; *id.* at 2580 (Thomas, J., concurring in part and dissenting in part) (noting that "all Members of the Court who reach the question agree that the District Court abused its discretion in ordering extra-record discovery" when it did).  "At that time, the most that was warranted was the order to complete the administrative record."  *Id.* at 2574.

The district court committed that same legal error here, albeit prior to the Supreme Court's clear directive in *Department of Commerce*.  The district court ordered additional discovery at the same time it ordered the government to complete the administrative record—that is, before it could even determine whether any exception to the APA's record-review requirement applied.  In addition, it ordered that some of the discovery be turned over before the deadline to produce the administrative record.  The district court then compounded this error by relying on what both parties recognize as significant extra-record evidence in assessing Plaintiffs' APA procedural claim, including internal emails, a declaration from a former USCIS official, congressional testimony, and press call minutes, among other things.

Whether the district court could have eventually justified ordering extra-record discovery under an exception to the APA's record-review requirement, like the district court did

in *Department of Commerce*, is beside the point. At the time the district court ordered discovery—before the administrative record was even complete—the district court could not make such a determination. The district court therefore abused its discretion in "order[ing] extra-record discovery when it did." *Dep't of Commerce*, 139 S. Ct. at 2574.

It is true that a majority of the Supreme Court looked to improperly ordered extra-record evidence to vacate the Secretary of Commerce's decision under the APA. *Id.* But those were "unusual circumstances" in which the "sole stated reason" for agency action "seem[ed] to have been contrived." *Id.* at 2575–76. Put differently, there was a "disconnect between the decision made and the explanation given" because the explanation given actually "played an insignificant role in the decisionmaking process." *Id.* at 2574–75. Here, there may well be "stated and unstated reasons" for the decision, as is true in "a typical case," *id.* at 2575, but nothing brings this within the realm of the "unusual circumstances" of *Department of Commerce*, *id.* at 2576.[2]

Ultimately, the government made a strategic decision not to contest the district court's erroneous discovery ruling via a mandamus petition. But the government should not be forced to seek extraordinary mandamus relief to correct such fundamental APA errors. *E.g.*, *In re United States*, 875 F.3d 1200, 1205 (9th Cir. 2017), *vacated*, 138 S. Ct. 443, 444–45 (2017) (mem.) (vacating an opinion that upheld a district

---

[2] My dissenting colleague does not dispute that the district court erred under *Department of Commerce* in ordering discovery before the administrative record was filed or that the district court relied on documents outside the administrative record. Dissent at 102–104.

court's grant of extra-record discovery in an APA case). Whether extra-record discovery may be available for APA claims can only be decided by applying the well-established rules for making such a decision.

Fundamental errors like this are an affront to the United States' limited waiver of sovereign immunity under the APA. 5 U.S.C. §§ 702, 706. Such errors also disrespect "the integrity of the administrative process." *United States v. Morgan*, 313 U.S. 409, 422 (1941). True, "the administrative process" "pursues somewhat different ways from those of courts." *Id.* But "they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other." *Id.* Just as we would not probe the mental processes of a judge, we cannot probe further into agency action without first assessing whether the law would allow such probing. Our co-equal branch of government must be allowed to do its job—subject to the proper mechanisms for judicial review. Any other approach subverts the executive branch to the judiciary, a result precluded by the legislative branch's enactment of the APA.

## II

On to the scope of relief. Today, we vacate the district court's injunction. Majority Op. at 54. Still, even if we had upheld the injunction, the district court erred in granting an injunction that could be construed to apply universally—that is, to all individuals regardless whether they were a party to the case.[3] That is because the district court never specifically

---

[3] The term "universal" rather than "nationwide" injunction is more "precise," *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 n.1 (2018) (Thomas,

addressed "whether a nationwide injunction [was] necessary to remedy [the] alleged harm." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019). The answer here would be no. So even if we were to uphold the preliminary injunction, it would have to be substantially narrowed to be no broader than necessary to give Plaintiffs complete relief. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

But a bigger problem looms. "Nothing we say or do in today's decision has any practical effect" on the government's ability to carry out its planned revocation of Haiti's TPS designation, even within our jurisdiction. *California v. U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 432 (9th Cir. 2019) (Kleinfeld, J., dissenting). That is because a judge in the Eastern District of New York has also preliminarily enjoined the government's ability to carry out its plans—on a universal basis—as to the decision to revoke Haiti's TPS designation. *Saget v. Trump*, 375 F. Supp. 3d 280, 378 (E.D.N.Y. 2019). It is a strange rule indeed that would allow a district court in New York to effectively nullify our panel opinion today, even partially. Judicial comity alone—separate from inherent limitations on a court's injunctive authority—suggest a different outcome. *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 770 (9th Cir. 2008) ("Courts ordinarily should not award injunctive relief that would cause substantial interference with another court's sovereignty.")

This previously rare situation has occurred with increasing frequency since the advent of the universal injunction. In the case involving military service for

---

J., concurring), because it refers to *who* is protected and bound by the injunction—in this context, everyone, including nonparties.

transgender individuals, for example, the D.C. Circuit vacated one universal injunction. *Doe 2 v. Shanahan*, 755 F. App'x 19, 23–24 (2019). But that vacatur had no effect because other district courts had also granted universal injunctions. *Stockman v. Trump*, 2017 WL 9732572, at \*16 (C.D. Cal. Dec. 22, 2017); *Karnoski v. Trump*, 2017 WL 6311305, at \*10 (W.D. Wash. Dec. 11, 2017).

This scenario results in a balance of power between the executive and legislative branches and the judicial branch that is, in my view, more than slightly off kilter. The judiciary, for its part, now regularly issues rulings that govern parties not directly before the court, in disregard of usual constraints on judicial power. *See Trump*, 138 S. Ct. at 2425–29 (Thomas, J., concurring); *Rodgers v. Bryant*, 942 F.3d 451, 460–62 (8th Cir. 2019) (Stras, J., concurring in part and dissenting in part) (explaining "party-centered" original "understanding of injunctions"). In doing so, it can halt an entire executive policy or Congressional mandate with one stroke of the judicial pen, without Congressional authority to do so. *Cf.* 42 U.S.C. § 7607(b)(1) (mandating that certain challenges to "nationally applicable" rules be filed in the D.C. Circuit).

And the executive and legislative branches, for their part, can do little about it. Generally, the government can take advantage of the "non-acquiescence doctrine, under which [it] may . . . relitigate issues in multiple circuits." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Now, however, the government must halt enforcement of its objectives and policies even if it bats .999 in court. If one out of 100 district court judges is willing to declare a statute, rule, or regulation invalid and enjoin its enforcement, the other nine—or even 99—at bats before the judiciary have no effect. *Dep't of Homeland Sec. v. New*

*York*, 140 S. Ct. 599, 601 (2020) (mem.) (Gorsuch, J., concurring). This scenario, of course, forces the government to repeatedly seek urgent review before the Supreme Court, resulting in an oft-repeated "familiar pattern." *Wolf v. Cook Cty.*, 140 S. Ct. 681, 681 (2020) (mem.) (Sotomayor, J., dissenting).

The effect of all of this is that there is no time for issues to percolate among the circuits before Supreme Court review. *California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018). Take, for example, *Texas v. United States*, which was the only case to address the viability of President Obama's "Deferred Action for Parents of Americans and Lawful Permanent Residents" before the issue was decided by an equally divided Supreme Court. 86 F. Supp. 3d 591 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016) (mem.). Or, consider the two cases addressing President Trump's so-called "travel ban," which were quickly decided on parallel tracks, without further analysis from other circuits, before the Supreme Court stepped in. *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233 (4th Cir. 2018); *Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017).

These cases "involve[d] important or difficult questions of law" that would undoubtedly "benefit from development in different factual contexts and in multiples decisions by the various courts of appeal." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011). That is how our judicial system is designed to work, by allowing lower courts to reach conflicting interpretations of federal law unless and until the Supreme Court resolves those conflicts. Yet very little percolation on these important questions is happening.

This lack of percolation has serious consequences for judicial decisionmaking. And it breeds another, more

serious problem—that of "forum shopping." *Azar*, 911 F.3d at 583. When one judge can halt the implementation of a policy nationwide, the natural inclination is to "shop 'til the statute, [regulation, or executive order] drops." Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 460 (2017). That is what has repeatedly happened of late. *E.g.*, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D. Cal. 2017); *Saget*, 375 F. Supp. 3d at 378. This type of litigation conduct, in turn, undermines public confidence in the judiciary and "hinders the equitable administration of laws." *Azar*, 911 F.3d at 583.

This Court has already offered some solutions to the myriad problems caused by universal injunctions. We have limited the scope of injunctive relief to "the geographical boundaries of the Ninth Circuit." *Innovation Law Lab v. Wolf*, 951 F.3d 986, 990 (9th Cir. 2020) We have also declined to issue a universal injunction because "several other courts of appeals [were] currently reviewing decisions of other district courts" on the same issue. *Haven Hospice*, 638 F.3d at 665.

But these approaches are largely prudential. Any more lasting fix—absent resolution by the Supreme Court[4] or Congress—will only come by returning universal injunctions to their proper status as the exception rather than the rule. Our caselaw repeatedly recognizes that universal injunctions are warranted only in "exceptional cases." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th

---

[4] The Supreme Court recently declined to address the propriety of universal injunctions in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1916 n.7 (2020).

Cir. 2018). Yet many district courts have done just the opposite, "treat[ing] this exceptional mechanism as a new normal," granting—and affirming—universal injunctions "reflexively." *Cf. Barr v. E. Bay Sanctuary Covenant*, 140 S. Ct. 3, 6 (2019) (mem.) (Sotomayor, J., dissenting). This reflexive reaction should be eliminated by recognizing the requirement that universal relief is warranted only when "necessary to give Plaintiffs a full expression of their rights." *Trump*, 878 F.3d at 701, *rev'd on other grounds*, 138 S. Ct. at 2393.

To do so, we must first abandon factors that have nothing to do with that requirement. For example, our cases frequently cite a need for uniformity in the law as a reason to uphold a universal injunction. *E.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018), *rev'd in part, vacated in part*, 140 S. Ct. at 1916. But disuniformity in the law has nothing to do with the plaintiff's rights. Nor is it a convincing justification for a universal injunction. Temporary disuniformity in federal law is an intentional feature of our constitutional system. That is how issues percolate in the lower courts until they can be decided by the Supreme Court. So any "interim uncertainty about a rule's final fate" does not justify granting relief to parties not before the court. *Dep't of Homeland Sec.*, 140 S. Ct. at 600 (Gorsuch, J., concurring).[5] There is

---

[5] We have also justified universal injunctions on the ground that a more limited injunction would "needlessly complicate" immigration enforcement. *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1284 (9th Cir. 2020). This justification also has nothing to do with giving full relief to plaintiffs. What's more, "it is the Executive Branch, not the courts, that [is] charged with enforcing the immigration laws." *Doe #1 v. Trump*, 957 F.3d 1050, 1097 (Bress, J., dissenting). Any decision by the judicial branch about the best way to enforce immigration law is "far outside our role and competence" and a severe overreach. *Id.*

nothing inherently problematic about agency action being implemented differently in different areas of the country. *See id.*

Another common justification for universal injunctions in these types of cases—that APA claims can lead to universal vacatur of a rule or action if they are arbitrary or capricious, *e.g.*, *Regents*, 908 F.3d at 511—also has nothing to do with the scope of relief "necessary to give Plaintiffs a full expression of their rights." *Trump*, 878 F.3d at 701, *rev'd on other grounds*, 138 S. Ct. at 2393. And just because agency action can be vacated after a trial on the merits does not mean such action need be—or even should be—preliminarily enjoined on a universal basis. *See E. Bay Sanctuary Covenant v. Barr*, -- F. 3d --, 2020 WL 3637585, at *24 (9th Cir. July 6, 2020) (Miller, J., concurring in part and dissenting in part) ("[W]e have not construed section 706 to require vacatur in every case in which an agency action is determined to be unlawful."). The costs of doing so—including no percolation, forum shopping, and emergency appeals—are too high to justify such extraordinary relief.

Once these erroneous justifications are stripped out, universal injunctions should become much rarer. This case is illustrative. A universal injunction would not be warranted here. Had we upheld the injunction, we could have limited the scope of it to the individual Plaintiffs in this case while still giving them full relief. *See City & Cty. of San Francisco v. Barr*, -- F.3d --, 2020 WL 3957184, at *10 (9th Cir. July 13, 2020) ("Accordingly, we vacate the nationwide reach of the permanent injunction and limit its reach to California's geographical boundaries."); *Azar*, 911 F.3d at 584 (narrowing injunction to apply only to plaintiff states because doing so still "would provide

complete relief to them"); *Haven Hospice*, 638 F.3d at 665
(vacating the nationwide portion of an injunction barring
enforcement of a regulation because an injunction limited to
the plaintiff "would have afforded the plaintiff complete
relief").[6]

That Plaintiffs seek relief on behalf of a putative class
does not change that conclusion. "[I]n the absence of class
certification, [a] preliminary injunction may properly cover
only the named plaintiffs." *Nat'l Ctr. for Immigrants Rights,
Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984). Here, no
class has been certified. So putative class members can only
benefit from injunctive relief incidentally—not by design.
*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486,
1501–02 (9th Cir. 1996) (upholding injunction "extending
benefit or protection to persons other than prevailing parties
in the lawsuit" because the benefit was incidental to a
properly tailored injunction).

To be sure, litigation involving certified class actions
may minimize some of the problems presented by universal
injunctions. For example, in a certified class action, the
government would not be the only party unable to re-litigate
its position in multiple courts. *City of Chicago v. Sessions*,
888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., concurring in
part and dissenting in part). That is so because any rulings
by a court after certification would bind not only the

---

[6] My dissenting colleague suggests a universal injunction would be
proper here because revoking a TPS designation is a "single decision on
a nationwide policy" that does not involve "case-by-case enforcement."
Dissent at 103 n.12. But this ignores the key question for injunctive
relief: whether a more limited injunction would have afforded Plaintiffs
complete relief. Regardless, there is no dispute that the district court
erred under our precedent by not explaining the need for a universal
injunction. *See Trump*, 897 F.3d at 1244–45.

government, but also all class members who did not opt out. *See Crawford v. Honig*, 37 F.3d 485, 487 n.2 (9th Cir. 1994). But the percolation problem and its effect on judicial decisionmaking would continue. *See United States v. Mendoza*, 464 U.S. 154, 160 (1984) (binding government to ruling in one case "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue"). To avoid nationwide class actions becoming a substitute for universal injunctions and leaving many of these same problems unsolved, courts must carefully assess not only limits on injunctive relief, but also those under Rule 23, before granting universal relief. *Doe #1*, 957 F.3d at 1096 (Bress, J., dissenting).

CHRISTEN, Circuit Judge, dissenting:

In 2017 and 2018, the Secretary of Homeland Security terminated the Temporary Protected Status (TPS) designations for Sudan, Haiti, El Salvador, and Nicaragua. In doing so, the Secretary decided that the TPS statute, 8 U.S.C. § 1254a, did not allow her the discretion to consider intervening events that occurred in these countries after they were designated for TPS. The Secretary's new statutory interpretation resulted in a practice that sharply differed from the way the TPS statute was applied by previous administrations.

Because my colleagues insist the complaint seeks judicial reconsideration of the Secretary's four TPS termination decisions, they conclude the district court lacked jurisdiction to hear plaintiffs' Administrative Procedure Act (APA) claim. But their premise is incorrect. The complaint plainly alleges that the Secretary of Homeland Security

violated the APA by interpreting the TPS statute in a way that starkly differs from previous administrations, and denying that there had been any resulting change to the agency's practice of considering intervening events. Plaintiffs' claim is a classic collateral challenge.

The TPS statute's judicial review bar prevents courts from second-guessing the Secretary's decisions to grant, extend, or terminate TPS, but that provision has no bearing on plaintiffs' collateral challenge to the Secretary's new practice of ignoring intervening events when making TPS determinations. The complaint challenges the process used to make TPS termination decisions, not the decisions themselves. Plaintiffs did not ask the district court to reweigh the factors the Secretary considered when she terminated TPS for these four foreign states, nor did they seek a ruling that Sudan, Haiti, El Salvador, and Nicaragua are entitled to TPS designations. In fact, even if plaintiffs ultimately prevail on their APA claim and the decisions are reconsidered, the Secretary could still decide to terminate these country designations.

Plaintiffs demonstrated a likelihood of success on the merits of their APA claim. Though the government denies that it changed any policy or practice, the district court identified an unambiguous and abrupt change in DHS's practice, and the record includes compelling evidence—including the Secretaries' frank party-opponent admissions—that the process DHS used resulted from the Secretaries' new interpretation of the TPS statute.

The district court also decided that plaintiffs demonstrated serious questions going to the merits of their Equal Protection claim. This part of the district court's order catalogued a long list of evidence of racial animus and concluded that internal agency documents raised serious

questions about whether the terminations were motivated, at least in part, by racial animus. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). The court found that the Secretary's decisions were the result of an irregular process and "suggestive of a pre-determined outcome not based on an objective assessment." The majority itemizes the same list of profoundly denigrating statements, but finds a lack of evidence tying them to the TPS terminations. In my view, the doctrine of constitutional avoidance counsels that we should not reach the Equal Protection claim at this stage because the preliminary injunction is easily supported by plaintiffs' demonstration that they will likely succeed on their APA claim alone.

Our task on appeal is limited to deciding whether the district court abused its discretion when it granted preliminary injunctive relief. Unquestionably, it did not. Plaintiffs' APA claim is collateral to the Secretary's merits decisions, and we owe significant deference to the district court's order granting preliminary injunctive relief. Accordingly, I would affirm the district court's well-reasoned decision.

## A.

This case is not about allowing noncitizens to cross our borders. Plaintiffs are U.S. citizen children, their non-citizen parents, and other non-citizens who are already in the United States legally. They have lived in this country lawfully for many years, some for more than twenty years. Plaintiffs filed a putative class action challenging the Department of Homeland Security's (DHS) new interpretation of the TPS statute and the resulting change to the practice used to decide whether to terminate or extend the TPS designations for Sudan, Haiti, El Salvador, and Nicaragua.

TPS is a form of humanitarian immigration relief that allows individuals from "designated" countries to live and work lawfully in the United States when they cannot return safely to their country of origin due to armed conflict, natural disaster, or other extraordinary and temporary circumstances. *See* 8 U.S.C. § 1254a. Once a country receives a TPS designation, nationals of that country who are already lawfully present in the United States may apply for individual temporary protected status.[1] *Id.* § 1254a(a)(1). Individual TPS status is only available to foreign nationals who: (1) have been continuously physically present in the United States since the date of their home country's most recent TPS designation; (2) have continuously resided in the United States from a date identified by the Secretary; and (3) are otherwise admissible as immigrants. *Id.* § 1254a(c). A non-citizen granted TPS receives authorization to work in the United States and protection against removal while their home country has a TPS designation. *Id*. § 1254a(a)(1).

Congress created the TPS program in 1990 to establish formal criteria and procedures to replace Extended Voluntary Departure (EVD), a practice the executive branch had used for decades to provide similar relief on an *ad hoc* basis. Although some countries' TPS designations last for short periods, other countries' designations have lasted for many years, including the four in this case. El Salvador has been designated since 2001, Nicaragua has been designated since 1999, Sudan has been designated since 1997, and Haiti has been designated since 2010.

---

[1] The TPS program also applies to noncitizens without nationality if they "last habitually resided" in the designated state. 8 U.S.C. § 1254a(a)(1).

The district court recognized that if the subject countries' TPS designations are terminated, over 200,000 U.S. citizen children will face the prospect of leaving the only home they have ever known, or growing up without one or both of their parents.  In addition, some 300,000 non-citizens face the loss of their homes, jobs, careers, and communities.

The complaint alleges that when previous administrations decided whether to extend or terminate a foreign state's TPS designation, the Secretary regularly considered intervening circumstances such as natural disasters and social or economic crises that occurred after the country was designated for TPS.  For example, plaintiffs assert that Haiti received a TPS designation after a 7.0 magnitude earthquake in 2010, and that when Haiti's TPS status was extended most recently, the Secretary considered "crime, poverty, unemployment, lack of adequate social services, and successive health and environmental disasters, including destruction caused by Hurricane Matthew."  The complaint also alleges that although "no relevant statute or regulation has changed in the intervening decades," DHS now takes the position that intervening events cannot be considered.  According to the complaint, the Secretaries adopted a novel interpretation of the TPS statute, and concluded that they lacked the statutory authority to consider intervening events.  This change was adopted "without a formal announcement to disclose its rationale for making a dramatic change to a decades-old policy."[2]

---

[2] Secretary John Kelly served as the administration's first Secretary for DHS, but the four TPS terminations decisions were made by Acting Secretary Elaine Duke and Secretary Kirstjen Nielsen.  For the sake of clarity, I refer to a singular Secretary except where relevant.

The district court ruled that it had jurisdiction to consider plaintiffs' claims, that plaintiffs demonstrated a likelihood of success on their APA claim and serious questions going to the merits of their Equal Protection claim, and it entered a preliminary injunction to preserve the status quo while the parties' dispute is litigated.  Three of the district court's four *Winter* findings are uncontested.[3]  The only *Winter* factor challenged on appeal is whether the district court erred by finding that plaintiffs sufficiently demonstrated they will succeed on the merits of their claims.

### i.

We begin with the strong presumption favoring judicial review of agency action.  *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020); *Columbia Riverkeeper v. United States Coast Guard*, 761 F.3d 1084, 1091 (9th Cir. 2014).  Yet the majority decides the district court lacked jurisdiction to consider plaintiffs' APA claim.  The text of the TPS statute certainly does not overcome the presumption of reviewability. Indeed, the judicial review bar in the TPS statute mirrors the review bars at issue in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), and *Reno v. Catholic Social Services*, 509 U.S. 43 (1993) (*Catholic Social Services*), and the Supreme Court has already ruled that this statutory language does not bar collateral challenges.  Though the majority does not contest this part of the analysis, a brief recap of *McNary* and *Catholic Social Services* is important

---

[3] Plaintiffs seeking a preliminary injunction must establish that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

to illustrate why the majority's ultimate conclusion is incorrect.

*McNary* involved Special Agricultural Worker (SAW) status, an amnesty program codified in the Immigration and Nationality Act at 8 U.S.C. § 1160. 498 U.S. at 483. Much like TPS, SAW status allows work authorization for certain non-citizens and temporary protection from removal. *Id.* at 490. The *McNary* plaintiffs claimed that the SAW interview process was arbitrary and violated their due process rights because, among other things, applicants were not given notice of adverse evidence or allowed an opportunity to respond to it. *Id.* at 487–88. The *McNary* plaintiffs' challenge was not to the merits of the agency's SAW decisions; they challenged the process the agency used to make the decisions. *Id.* at 491–92. Nevertheless, the government argued that the judicial review bar in the SAW statute required dismissal of the claim. *Id.* The Supreme Court disagreed.

*McNary* is critical to the subject appeal because the SAW statute's judicial review bar mirrors the one in the TPS statute. *Id.* at 486 n.6. The SAW provision reads:

> There shall be no administrative or judicial review *of a determination* respecting an application for adjustment of status under this section except in accordance with this subsection.

8 U.S.C. § 1160(e)(1) (emphasis added). The Supreme Court reasoned that the SAW statute's "reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 492. The Court concluded the statutory bar did not preclude plaintiffs' collateral challenge to the

practice or procedure used to make the SAW determinations. *Id.* In *Catholic Social Services*, the Supreme Court addressed another judicial review bar in the INA, § 1255a(f)(1), and reached the same result.[4] 509 U.S. at 55–56. The judicial review bar in the TPS statute includes the critical language at issue in *McNary* and *Catholic Social Services*:

> There is no judicial review *of any determination* of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under [the TPS statute].

8 U.S.C. § 1254a(b)(5)(A) (emphasis added). *McNary* and *Catholic Social Services* leave no doubt that the TPS statute bars direct review of the Secretary's TPS determinations, but not the policies or practices used to make them.

The government's contrary argument relies on *Gebhardt v. Nielsen*, 879 F.3d 980 (9th Cir. 2018), a case in which we considered the Adam Walsh Child Protection and Safety Act. *Id.* at 984 (citing 8 U.S.C. § 1154(a)(1)(A)(viii)(I)). The INA allows United States citizens to submit I-130 petitions for noncitizen relatives to lawfully enter or remain in the United States. *See* 8 U.S.C. § 1154(a)(1)(A)(i). The Adam Walsh Act created an exception to that provision to prevent citizens who had been convicted of specified crimes against minors from submitting I-130 petitions, unless the

---

[4] The statutory provision in *Catholic Social Services* read, "There shall be no administrative or judicial review *of a determination* respecting an application for adjustment of status under this section except in accordance with this subsection." 8 U.S.C. § 1255a(f)(1) (emphasis added).

Secretary of Homeland Security, in her "sole and unreviewable discretion," determined that the citizen posed "no risk" to the subject of the petition. *Gebhardt*, 879 F.3d at 984. The judicial review bar in the Adam Walsh Act is demonstrably stronger and broader than the one in § 1254a. *See, e.g.*, *Bremer v. Johnson*, 834 F.3d 925, 931 (8th Cir. 2016) (comparing the judicial review bar in the Adam Walsh Act with the statute at issue in *McNary* and noting, among other differences, that "[a] grant of 'sole' discretion [in the Adam Walsh Act] is among the strongest known to the law"). By contrast, as the majority itself explains, the TPS program was created to rein in the unfettered discretion the executive branch previously exercised through the EVD program.[5] *See Amici Curiae* Immigration Law Scholars Br. at 2–5.[6] The government's reliance on *Gebhardt* is sorely misplaced. The judicial review bar in the TPS statute, § 1254a(b)(5)(A), contains the same operative phrase used in the statutes described in *McNary* and *Catholic Social Services*, and those cases, not *Gebhardt*, control the outcome of this appeal. *See McNary*, 498 U.S. at 494 ("[H]ad Congress intended the limited review provisions . . . to

---

[5] The parties agree that TPS designations are made by the Secretary of Homeland Security, and that the Secretary's discretion is not unfettered. The statute requires the Secretary to consult "with appropriate agencies of the Government." *See* 8 U.S.C. 1254a(b)(1). The Secretary receives a Country Conditions Memo and Decision Memo from at least two different divisions within United States Citizenship and Immigration Services (USCIS). The Decision Memo contains a recommendation to grant, extend, or terminate a TPS designation. The State Department also provides input, including country conditions and recommendations, and the statute allows the Secretary to receive input from other governmental sources.

[6] Citing H.R. Rep. No. 100-627, 100th Cong., 2d Sess. at 4, 6 (1988); 136 Cong. Rec. (House) 8686–8687.

encompass challenges to [DHS] procedures and practices, it could easily have used broader statutory language.").

Up to this point, the majority's analysis does not differ from this dissent. It agrees we must begin with a presumption of reviewability; it does not deny the holdings of *McNary* or *Catholic Social Services*; and it agrees that the Adam Walsh Act does not support the government's position because the outcome in that case depended on a statute vastly more restrictive of judicial review than the one at issue here. Boxed in, the majority circles back and strains to find reason to give the phrase "a determination" different meaning in the TPS statute. The majority's efforts are in vain. The Supreme Court ruled that the phrase does not bar collateral challenges: "'*a determination' describes a single act*," the Supreme Court explained, "*rather than a group of decisions or a practice or procedure employed in making decisions*." *McNary*, 498 U.S. at 492 (emphasis added). The judicial review bars in these statutes do not foreclose collateral challenges.

Yet the majority forges on. At pages 36–38, it advances an argument not made by the government, and conjures from whole cloth a new meaning for the phrase "a determination." This part of the opinion includes the undisputed observation that TPS designation decisions are the Secretary's to make, and devotes considerable effort to explaining that the TPS statute was clearly intended to limit the discretion exercised by the executive under the now-replaced EVD program. The opinion goes on to argue the uncontested point that the TPS statute still affords the Secretary considerable discretion to decide what factors to consider, and how to weigh them, when making TPS determinations.

Plaintiffs do not dispute that the judicial review bar in the TPS statute prevents courts from second-guessing the

Secretary's TPS determinations, but there is no way to stretch "a determination" so that it bars consideration of plaintiffs' APA claim. One need not look past the statute's text to discern the types of "determinations" that may not be reviewed by the court:

> There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

8 U.S.C. § 1254a(b)(5)(A) (emphasis added). The majority claims the *McNary* rule emanated from the context of surrounding statutory provisions. But the decision shows otherwise. The Supreme Court's decision hinged upon "Congress' choice of statutory language," not the statute's overall context. *McNary*, 498 U.S. at 494. After the Supreme Court's interpretation of the judicial review bars in the INS provisions at issue in *McNary* and *Catholic Social Services*, it is clear the Secretary's TPS merits decisions are unreviewable; collateral challenges to those decisions are not.

### ii.

Because the TPS statute bars review of TPS determinations only, not collateral challenges, the question is whether plaintiffs' APA claim is collateral. Our case law clearly delineates the factors we consider to distinguish between direct challenges to agency action and collateral challenges to agency action. All of them weigh in favor of the conclusion the complaint makes obvious: the nature of plaintiffs' APA claim is collateral to the Secretary's TPS determinations, and thus it is plainly reviewable.

In *City of Rialto v. West Coast Loading Corp.*, we "distilled two 'guiding principles'" from our case law to differentiate between direct and collateral challenges. 581 F.3d 865, 874 (9th Cir. 2009) (quoting *Ortiz v. Meissner*, 179 F.3d 718, 721–22 (9th Cir. 1999)). First, we ask "whether the claim challenges a 'procedure or policy that is collateral to an alien's substantive eligibility,' for which 'the administrative record is insufficient to provide a basis for meaningful judicial review.'" *Id.* (quoting *Proyecto San Pablo v. INS*, 189 F.3d 1130, 1138 (9th Cir. 1999)). This first principle highlights the central importance of meaningful judicial review of agency action, and examines whether the plaintiff's claims can be effectively advanced in another forum or stage in the proceedings. *Id.*; *see also Naranjo-Aguilera v. INS*, 30 F.3d 1106, 1114 (9th Cir. 1994). *City of Rialto*'s second factor requires that we look to whether the plaintiff's claims satisfy all of the traditional elements of justiciability; i.e., whether plaintiffs can show that their claims are ripe, that they have standing, and that they exhausted their administrative remedies by taking the steps available to them before the agency blocked their path. *City of Rialto*, 581 F.3d at 874 (citing *Catholic Social Services*, 509 U.S. at 56). Here, the government does not contest the court's jurisdiction based on ripeness, standing, or administrative exhaustion grounds.

As in *McNary* and *Catholic Social Services*, plaintiffs' APA claim is not based on their own substantive eligibility for a statutory benefit, or even on the merits of the TPS designations for Haiti, Sudan, El Salvador, and Nicaragua. Plaintiffs challenge the sudden shift in the Secretary's statutory interpretation and the Secretary's changed practice used to make TPS determinations. As the district court specifically recognized, if plaintiffs are successful, the Secretary will "not be compelled to extend each country's

TPS designation." Instead, the Secretary will have the opportunity to reconsider the four TPS country designations with the discretion to take into account intervening events. Individual Haitians, Sudanese, Salvadorans, and Nicaraguans will still be required to qualify for TPS status pursuant to § 1254a(c). The Secretary may reach the same result if she considers intervening events; plaintiffs do not dispute that these determinations are the Secretary's to make. *See, e.g., Immigrant Assistance Project of the L.A. Cty. Fed'n of Labor v. INS*, 306 F.3d 842, 863 (9th Cir. 2002) (deeming plaintiffs' challenge collateral where the relief the district court granted compelled the agency to use a particular procedure, not to reach a particular outcome).

*City of Rialto* also directs us to consider whether a claim necessarily requires looking beyond the administrative record. 581 F.3d at 874. Plaintiffs' claim does. The central allegation in plaintiffs' APA claim is that DHS arbitrarily changed a practice that had been followed by several administrations. Because DHS continues to deny that any change occurred, the district court looked to previous TPS designation decisions and compared the criteria used in them to the criteria applied when the Secretary terminated the TPS designations for Sudan, Haiti, El Salvador, and Nicaragua. An examination of the administrative records for these four TPS decisions would have allowed the district court to determine what factors the Secretary considered, but it was necessary to compare those factors to records for prior TPS decisions in order to discern whether the agency's treatment of intervening events had changed over time. The need to look outside of the administrative records for these four decisions weighs in favor of concluding that plaintiffs' claim raises a collateral challenge. *See Mace v. Skinner*, 34 F.3d 854, 859 (9th Cir. 1994); *see also City of Rialto*, 581 F.3d at 874 (observing that, when deciding if a claim is collateral,

courts consider whether the administrative record is "insufficient to provide a basis for meaningful judicial review" (quoting *Ortiz*, 179 F.3d at 722)).

To decide whether a claim is collateral, we also consider whether it requires an examination that is "neither peculiarly within the agency's 'special expertise' nor an integral part of its 'institutional competence.'" *Mace*, 34 F.3d at 859. Applied to the facts of this case, this factor is straightforward. Whether to extend or terminate a foreign state's TPS designation is a question that lies squarely within the agency's province and expertise, but determining whether the Secretary misinterpreted her statutory authority or acted unlawfully by abruptly breaking from past practice *sub silentio*, is not. Compliance with the APA is a legal question routinely and properly addressed by the courts. *See, e.g.*, Charles H. Koch, Jr. & Richard Murphy, 4 Admin. L. & Prac. § 11:41 (3d ed. 2020). Whether the Secretary correctly interpreted the extent of her statutory authority when she made these four decisions is a question of law that is collateral to the Secretary's TPS merits decisions. *See, e.g.*, *John v. United States*, 247 F.3d 1032, 1038 (9th Cir. 2001) (en banc) (Tallman, J., concurring).

Finally, *City of Rialto* teaches that we must consider whether another forum exists where plaintiffs' claim may be heard. 581 F.3d at 874. Application of this factor is also straightforward. The TPS statute includes an administrative review process for challenging denials of individual noncitizen TPS applications, *see* 8 U.S.C. § 1254a(b)(5)(B), but it does not include a path for challenging the termination of a foreign state's TPS designation. The administrative record from the denial of individual noncitizens' TPS applications could not possibly allow review of plaintiffs' APA claim because evaluating the claim requires a

longitudinal comparison of the criteria the agency considered when deciding country designations, not individual eligibility for temporary protected status.

The majority points to no other administrative process available for considering this type of claim. Accordingly, the majority's conclusion that § 1254a precludes judicial review of plaintiffs' APA claim requires it to concede that there will be no review at all of the claim that the Secretary made an unannounced change in the practice used to make TPS country determinations. *See McNary*, 498 U.S. at 497 (observing that restricting judicial review to individual deportation orders "is the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims"). The absence of any forum for review would leave the Secretary with complete discretion—a result plainly inconsistent with the purpose of the TPS statute, which the majority concedes was intended to curb the previously unchecked discretion exercised by the executive branch in the form of EVD. We know that when Congress wants to grant "sole and unreviewable discretion" to the Secretary, it does so. *See Gebhart*, 879 F.3d at 984. But Congress took a different approach in the TPS statute. It employed the same language used in *McNary* and *Catholic Social Services* rather than the language used in the Adam Walsh Act. *See McNary*, 498 U.S. at 494 (discussing *McNary*'s review bar and concluding "had Congress intended the limited review provisions . . . to encompass challenges to INS procedures and practices, it could easily have used broader statutory language").

The majority also concedes that a legal challenge to the agency's interpretation of its statutory authority would be a *McNary*-style claim reviewable under § 1254a(b)(5)(A), so it is equally boxed in on this part of plaintiffs' APA claim.

The majority's only response is to deny the complaint's express allegations and argue that the Secretary's new and unannounced interpretation of the TPS statute is not part of plaintiffs' APA claim. According to the majority, plaintiffs only "loosely assert" such a challenge. But this characterization of plaintiffs' APA claim cannot be squared with the complaint's actual allegations, nor with the arguments plaintiffs advanced in the district court.

What the complaint alleges is that the agency's new statutory interpretation and practice of not considering intervening events "constitutes an arbitrary, unexplained abandonment of the government's longstanding interpretation of the TPS statute, on which several hundred thousand people have come to rely." The complaint expressly alleges that the agency's changed practice resulted from the Secretary's re-interpretation of the TPS statute. It asserts that in testimony she gave to Congress, the Secretary explained that "DHS has now taken the position that such factors *cannot* be considered." The complaint even quotes Secretary Nielsen, who testified before Congress that, "[T]he law *does not allow me* to look at the country conditions of a country writ large. It requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist." The complaint also alleges that then-Secretary Kelly described the scope of his statutory authority the same way in his testimony before a Senate subcommittee.

The majority attempts to minimize the significance of the Secretaries' testimony because both of the Secretaries' statements were made during fairly lengthy congressional hearings. But the Secretaries' descriptions of their authority were unequivocal, and the relevant point is the prominence of the statements in the complaint, not the number of minutes

it took to deliver the testimony. The complaint quoted both statements verbatim, and as party-opponent admissions go, plaintiffs could not have hoped for statements more favorable to their claims. *See* Fed. R. Evid. 801(d)(2).

Plaintiffs have not engaged in *post hoc* revision of their legal theory in order to avoid the TPS statute's jurisdictional bar. The complaint alleges that "without any formal announcement or other explanation—[DHS] adopted a new, novel interpretation of the TPS statute that eschews consideration of any intervening country conditions," and that "[u]nder previous administrations, DHS regularly considered natural disasters and social or economic crises that occurred *after* a country was originally designated for TPS in deciding whether to continue or instead terminate a country's designation." The complaint unmistakably asserts that "Defendants' sudden and unexplained departure from decades of consistent interpretation and corresponding practice violates the Administrative Procedure Act." The complaint is replete with these allegations, but the APA section summarizes the claim in one succinct paragraph:

> Defendants' adoption of a new, drastically narrower interpretation of the TPS statute was arbitrary, capricious, and contrary to law in violation of the APA because it represented a sudden and unexplained departure from decades of decision-making practices and ordinary procedures. By shifting the decision-governing standard for country designations without explanation, Defendants have ignored a clear statutory command and engaged in procedurally flawed decision-making. Further, Defendants changed their policy without

taking into account the serious reliance
interests that their prior policy had
engendered.

Yet the majority denies the words used by the drafters of
the complaint.  It repeatedly incants the conclusion that
plaintiffs' claim must be, "at its core," "an attack on the
substantive considerations underlying the Secretary's
specific TPS determinations."  The majority says this is so
because plaintiffs' APA claim challenges the Secretary's
failure to consider intervening events or to explain why the
agency no longer considers them.  The cornerstone of this
argument is the majority's assumption that the TPS statute
grants the Secretary unbridled discretion to decide whether
to consider intervening events.  But a key allegation in the
complaint is that both Secretary Kelly and Secretary Nielsen
testified before Congress that the TPS statute did *not* allow
them that discretion.  As discussed *infra*, the district court
cited additional evidence that strongly suggests Acting
Secretary Duke had the same understanding regarding the
scope of her statutory authority.  The need to resolve whether
the Secretaries were mistaken about the degree of discretion
afforded to them by the TPS statute compels the conclusion
that plaintiffs' claim falls squarely within the ambit of the
APA.  *See Regents*, 140 S. Ct. at 1916 (observing that
"doubts about whether the agency appreciated the scope of
its discretion or exercised that discretion in a reasonable
manner" raised a valid APA claim).[7]

---

[7] Indeed, despite Secretary Kelly's testimony that he did not have
the discretion to consider intervening events, it is uncontested that he
considered them when he extended Haiti's designation in 2017.  82 Fed.
Reg. 23,830, 23,832.  As the district court recognized, DHS later adopted
a very different interpretation of the statute.

The majority's application of the *City of Rialto* factors lends no support to its position. First, the majority lops off the last half of the first factor (which asks whether the claim challenges a procedure or policy that is collateral to an alien's substantive eligibility). 581 F.3d at 874 (quoting *Ortiz*, 179 F.3d at 722). The majority's application of this factor asserts that plaintiffs do "not challenge any agency procedure or regulation." But plaintiffs do just that. Without question, the very centerpiece of the complaint is the allegation that DHS discontinued its decades-long practice of considering intervening events that occur after a country's most recent TPS designation. Plaintiffs do not seek rulings that they are entitled to TPS, nor rulings that their home countries are eligible for TPS, and there is no basis for the majority's assertion that plaintiffs do not challenge an agency procedure. As to the majority's observations that the complaint does not challenge a specific regulation or official interpretation, there is no regulation or official position to challenge because the agency denies that it has changed its practice, and as the complaint explains, "no relevant statute or regulation has changed in the intervening decades."

The majority offers no response to *City of Rialto*'s second factor, which asks whether plaintiffs' claims require looking beyond the administrative record. This factor also favors the conclusion that plaintiffs' claims are collateral.

Considering the "agency's special expertise" factor, the majority again assumes a legal ruling the district court has not yet reached—that the TPS statute allows the Secretary the unfettered discretion to decide whether to consider intervening events. From there, the majority argues that whether or how to weigh intervening events is within the agency's special expertise. In other words, the majority reframes plaintiffs' central allegation. If one focuses on the

complaint as it was written, plaintiffs unambiguously allege that the Secretary's new statutory interpretation resulted in a stark change in the agency's practice and that by "shifting the decision-governing standard for country designations without explanation, Defendants have ignored a clear statutory command and engaged in procedurally flawed decision-making." *City of Rialto*'s third factor asks whether *that* claim lies within the agency's special expertise. The majority's analysis side-steps *City of Rialto*'s third factor and dodges the unrefutable conclusion that review of executive agency action for procedural correctness is not within DHS's special expertise. Instead, this is a task routinely and appropriately undertaken by the court.

The majority brushes aside *City of Rialto*'s final factor, which asks whether an alternative forum is available to hear plaintiffs' APA claim. *City of Rialto*'s first guiding principle comprises this factor, but the majority deems it not "particularly critical" because, the majority decides, Congress intended the TPS statute to grant the Secretary unreviewable discretion. The majority's view on this point cannot be squared with the fact that the TPS statute includes a *McNary*-style judicial review bar, not the complete *Gebhardt*-style judicial review bar that Congress employed elsewhere.

In the end, the majority's consideration of the *City of Rialto* factors repeats a conclusory mantra that plaintiffs' claims are not collateral; ignores some of the complaint's express allegations and reimagines others; and dismisses one of *City of Rialto*'s guiding principles. The majority's only response is to argue that "our court has . . . employed a fluid range of considerations" to determine whether a claim is collateral. But any such "fluidity" cannot permit the conclusion that a claim is not collateral when all the relevant

factors point in the opposite direction.  Every one of the *City of Rialto* factors favors reviewability.

The majority separately argues that the complaint's prayer for relief supports its conclusion that the APA claim is not collateral.  In particular, the majority finds it important that the complaint seeks an injunction preventing implementation of the Secretary's decisions to terminate the TPS designations for these four countries.  It reasons that because "Plaintiffs request declaratory and injunctive relief in setting aside the TPS terminations, they appear to seek direct relief from the challenged decisions, rather than collateral relief from an allegedly unlawful agency practice." To the contrary, the only conclusion that may fairly be drawn from plaintiffs' request for injunctive relief barring implementation of the TPS terminations is that plaintiffs allege the terminations were unlawful.

There is nothing remarkable about the complaint's prayer for relief.  It seeks a declaration that the four TPS terminations were unconstitutional and unlawful under the APA, an order vacating the termination decisions, and an order enjoining enforcement until plaintiffs' claims can be adjudicated on the merits.  *See, e.g.*, *Regents*, 591 140 S. Ct. at 1901 (vacating the Secretary's action after concluding that the Secretary violated the APA); *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 690–91 (9th Cir. 2007) (declaring the agency's decision arbitrary, capricious, and contrary to law and setting aside the decision "unless and until it has established a proper basis" for the departure from its two-decade-old precedent); *see also* 5 U.S.C. § 703 (explicitly authorizing "actions for declaratory judgments . . . or mandatory injunction"); 5 U.S.C. § 706(2)(A) (empowering reviewing courts to "hold unlawful and set aside agency action" that is arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law); Koch, & Murphy, 3 Admin. L. & Prac. § 8:31 ("Remand is the proper remedy when agency explanation is inadequate . . . .").

The government's argument on this point is slightly different from the majority's. It contends that plaintiffs' APA claim must be deemed a direct challenge because, in the government's view, plaintiffs *only* seek an injunction preventing implementation of the Secretary's decision without also requesting an order "invalidating a collateral agency policy or practice." The government's spin on this argument also falls flat. As the district court recognized, this case is unlike others in which agencies have announced a change in policy or practice and explained the reasons for the change. DHS continues to deny that it changed its practice and it certainly has not offered an explanation for the new practice the complaint describes. Contrary to the government's contention, the complaint does include a request for declaratory relief. And after the district court decides the threshold questions presented by the APA claim (whether a change occurred; if so, what that change was; and whether the agency's decision-making process was flawed), the complaint's prayer for relief would certainly support a declaration clarifying the scope of the Secretary's discretion to consider intervening events, invalidating the terminations, and remanding to the Secretary for reconsideration.

To support its argument that the nature of the claim is determined by the relief plaintiffs seek, the government relies on *Martinez v. Napolitano*, 704 F.3d 620 (9th Cir. 2012). But the government reads *Martinez* wholly out of context. Martinez was denied asylum, withholding, and CAT relief. *Id.* at 621. After he twice unsuccessfully sought review in the Ninth Circuit, Martinez filed an APA claim in

the district court seeking an order of mandamus requiring the immigration court to rehear his claims. *Id.* at 622. The district court dismissed the claim for lack of jurisdiction, and we affirmed. The government seizes upon our approval of the dismissal in *Martinez* to argue that the district court lacked jurisdiction over plaintiffs' APA claim. In the government's view, the request for injunctive relief in *Martinez* signaled a direct challenge.

*Martinez* cannot possibly bear the weight the government places on it. The plaintiff in *Martinez* merely repackaged his third attempt to obtain relief as an APA claim. The case stands for the simple proposition that the district court lacked jurisdiction because Martinez sought a third chance to argue that he was entitled to asylum and withholding, rather than following the path Congress specified for seeking review of orders of removal. *Id.* at 622. *Martinez* lends no support to the government's argument that plaintiffs' APA claim is not collateral. Notably, the majority does not try to argue otherwise.

We need look no further than *McNary* for an example of a reviewable collateral challenge that included a similar request for declaratory and injunctive relief vacating and enjoining enforcement of an unlawfully entered administrative order. The relief requested in *McNary* was "an injunction requiring the INS to vacate large categories of [SAW] denials," and reconsider the applications using proper procedures. 498 U.S. at 489. The Supreme Court rejected the government's argument that the complaint challenged the merits of the agency's individual SAW decisions merely because it sought vacation of the agency's decisions. *Id.* at 495. It was critical to the Court's ruling that the complaint did "not seek a substantive declaration that [plaintiffs] are entitled to SAW status," and that plaintiffs

would only be entitled to have their applications reconsidered in light of newly prescribed procedures. *Id.*; *cf. Heckler v. Ringer*, 466 U.S. 602, 614 (1984) (holding that although the *Heckler* plaintiffs attempted to frame their claim as a challenge to a policy or practice for Medicare reimbursements, they actually sought to circumvent the administrative appeal process available to them and obtain a court order entitling them to reimbursement).

Finally, the majority contends that the APA cannot be used as an end-run around a judicial review bar. This is an uncontested point, and one that has no application to the plaintiffs' claim because, as explained, the TPS statute does not preclude all judicial review; it precludes only direct challenges to TPS determinations. Here, the majority assumes that the TPS statute grants the Secretary unfettered discretion to consider intervening events, and asserts that she cannot be required to explain the departure from past practice just because previous Secretaries considered them. But Supreme Court precedent establishes that this is precisely what the APA requires. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency must display awareness that it is changing its position, and explain what that change is, and the basis for it); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016). Just months ago, the Supreme Court admonished that this requirement is particularly pronounced where serious reliance interests are at stake, as they are here. *See Regents*, 140 S. Ct. at 1915 (discussing the termination of the DACA program and explaining that "because DHS was not 'writing on a blank slate,' . . . it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." (emphasis in original)).

### iii.

The consequences of the majority's decision are monumental, but the majority's reasoning is deeply flawed. In *City of Rialto*, we recognized that many of the cases addressing judicial review bars arise from immigration statutes, including *McNary* and *Catholic Social Services*. *See* 581 F.3d at 878; *accord Immigrant Assistance Project*, 306 F.3d at 847; *Proyecto San Pablo*, 189 F.3d at 1134. *City of Rialto* also recognized that concern for the substantial liberty interests at stake in immigration cases was front and center in the Supreme Court's *McNary* decision. 581 F.3d at 878 (citing *McNary*, 498 U.S. at 490). Here, the importance of the interests at stake make the argument in favor of reviewability even more compelling, because the lives of 300,000 non-citizens and 200,000 U.S. citizen children will be forever changed by these TPS terminations. Depriving plaintiffs of any opportunity for meaningful judicial review contravenes one of *City of Rialto*'s guiding principles. 581 F.3d at 874.

Ultimately, my colleagues do not point to a single factor from our case law that suggests plaintiffs' APA claim is a direct challenge. Worse, they forget that the starting place for our analysis is the presumption that plaintiffs' APA claim is reviewable. Lacking clear and convincing evidence of "specific language or specific legislative history that is a reliable indicator of congressional intent," the presumption of reviewability remains unrebutted. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). The district court properly asserted jurisdiction over plaintiffs' APA claim.

### B.

After deciding it had jurisdiction to review plaintiffs' APA claim, the district court concluded that plaintiffs

demonstrated a likelihood of success on the merits of the claim and enjoined enforcement of the four TPS terminations pending the outcome of this litigation. Specifically, the district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad," and "this was a clear departure from prior administration practice." The district court found that "this departure was a substantial and consequential change in practice," and the "government has offered no explanation or justification for this change."

The majority fails to acknowledge Supreme Court precedent requiring that an agency cannot depart from its prior policy or practice without acknowledgment or explanation, particularly where a prior agency policy has created serious reliance interests. *See Encino Motorcars*, 136 S. Ct. at 2127 ("Whatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all. In light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision."); *see also Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996) (explaining that "[s]udden and unexplained change" in agency position, or change that "does not take account of legitimate reliance on prior interpretation" may be arbitrary and capricious); *California Trout v. FERC*, 572 F.3d 1003, 1023 (9th Cir. 2009) (same).[8]

---

[8] Even though TPS designations are temporary, the district court found that the risk of harm faced by plaintiffs is not entirely attributable to the temporary nature of the program. According to the complaint, plaintiffs are homeowners, mortgage-holders, employers and

The requirement that an agency provide a reasoned explanation for its action demands that the agency first "display awareness that it *is* changing position," and then "show that there are good reasons for the new policy." *Fox*, 556 U.S. at 515. This does not require that the reasons for the new policy "are *better* than the reasons for the old one," only that reasons exist for the change. *Id.* When an agency changes a policy that has engendered serious reliance interests "a more detailed justification" may be necessary. *Id.*; *see also Regents*, 140 S. Ct. at 1915.

The district court prepared a table comparing the Federal Register notices announcing the terminations for Haiti, Sudan, El Salvador, and Nicaragua with notices of TPS extensions granted prior to October 2017.[9] Though the majority attempts to cast plaintiffs' claim as requiring a review and comparison of the substantive merits used to make TPS determinations, the district court's comparison of

---

entrepreneurs. They are engaged in careers, faith communities, labor unions, and educational institutions. *See Regents*, 140 S. Ct. at 1913–14 (noting that "DACA recipients have enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance on the DACA program," and observing that there is no "legal authority establishing that" the temporary nature of DACA "automatically preclude[s] reliance interests" (internal quotation marks omitted)). At the very least, if DHS is required to comply with the APA's procedural requirements, plaintiffs will have additional time to sell their homes and businesses—hopefully avoiding fire sale prices—make difficult decisions regarding the care of their children, and prepare to return to their home countries in an orderly fashion.

[9] The district court created this chart for its order denying the government's motion to dismiss, and later incorporated the table by reference into its order granting plaintiffs' motion for preliminary injunction.

the factors DHS has considered in the past only allowed the court to determine whether DHS has changed its practices over time. The court found that previous administrations "consistently considered" intervening events, including instances when intervening events had no causal connection to the original reason a TPS designation was granted. The district court also found that "factors that were explicitly considered recently by prior administrations were wholly absent" from the subject termination notices.

There is no real room for debate that the agency changed its practice. Former Secretary Kelly, former Acting Secretary Duke, and former Secretary Nielsen all said as much. In January 2018, Secretary Nielsen testified before the Senate Judiciary Committee and described the administration's process for making TPS decisions:

- "We did not talk generally about the country conditions, and I want to be very clear on this. The law does not allow me to look at the country conditions of a country, writ large."

- The TPS statute "requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist."

- Referring specifically to El Salvador, Secretary Nielsen stated, "[W]e didn't dispute the country conditions are difficult . . . , unfortunately, *the law requires me, if I cannot say that the conditions emanating from the earthquakes still exist, regardless of other systemic conditions, I must terminate TPS*." (second alteration in original).

Secretary Nielsen also testified in April 2018 before the House Appropriations Subcommittee on Homeland Security. In response to the question, "How can we possibly rationalize sending 59,000 people back to those kinds of conditions?" The Secretary stated:

- "[T]he law really restricts my ability to extend TPS. The law says that if the effects of the originating event, so that's a causation issue, do not continue to exist, then the [S]ecretary of Homeland Security must terminate."

In 2017, before Elaine Duke became Acting Secretary, Secretary Kelly testified to a similar understanding of the scope of his authority pursuant to the TPS statute, explaining that TPS is granted "for a specific event," such as the 2010 earthquake in Haiti, and the law required that he look only at whether the original condition warranting the TPS designation had abated. Kelly testified that it was admittedly hard to remove people who had relied on TPS for twenty years, "[b]ut according to the law, I don't have the ability to solve it." Later, in an email to then-White House Chief of Staff Kelly, Acting Secretary Duke made clear that she understood the agency's practice had changed. Acting Secretary Duke wrote that her decision to terminate the TPS designation for Nicaragua reflected "a strong break with past practice" that "will send a clear signal that TPS in general is coming to a close." Additionally, the government's excerpts of record include a briefing paper prepared for Acting Secretary Duke immediately prior to a meeting of principals to discuss several countries' TPS designations, including Nicaragua and Haiti. The discussion paper articulated the same standard that Secretaries Kelly and Nielsen testified to: the TPS statute "*requires* the Acting Secretary of Homeland Security to determine . . . whether to extend or terminate the

status *based on an evaluation of the conditions that initially warranted granting TPS*."

On appeal, the government argues that it did not change its policy, practice, or interpretation of the TPS statute, but in the district court it conceded that there may have been "a change in emphasis" and weight given to various factors. Thus, in the district court the government reframed the complaint's central allegation rather than responding to it. Plaintiffs' claim is not that the Secretary incorrectly weighed intervening events; they contend that intervening events were entirely omitted from the Secretary's calculation because she understood she lacked the discretion to consider them. Before our court, the government more directly responds to the allegation that the agency began treating intervening events as irrelevant. It now argues that the Secretary's assessment of current country conditions "necessarily involved consideration of whether intervening events hampered the country's recovery" from the circumstance that warranted the original TPS designation. But this logic is also faulty. A survey of current country conditions would likely answer whether a foreign state has recovered from an earthquake or flood that prompted its original TPS designation, but such a survey may not say anything at all about *unrelated* intervening events such as an armed conflict or epidemic.[10] *See* 8 U.S.C. § 1254a.

---

[10] The government also argues on appeal that the Secretary's interpretation of her statutory authority follows from a natural reading of the TPS statute. But we may only review the explanation an agency gave contemporaneously, and here it is undisputed that DHS denied that it changed its practice, and certainly gave no explanation for the change. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (holding that although an agency may justify its policy change by explaining that the policy is more consistent with the statutory language,

The January 18, 2018 termination notice for El Salvador illustrates the very apparent flaw in the government's reasoning. The Secretary summarized the reason for termination by stating "DHS has reviewed conditions in El Salvador" and "determined that the conditions supporting El Salvador's 2001 designation for TPS" based on a series of earthquakes "are no longer met" because "[r]ecovery efforts . . . have largely been completed" and "social and economic conditions affected by the earthquakes have stabilized." 83 Fed. Reg. 2654, 2655–56. By contrast, the previous notice extending El Salvador's TPS designation cited a number of intervening events, many of which were unrelated to the 2001 earthquake:

- "subsequent natural disasters and environmental challenges, including hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity, [and] an ongoing coffee rust epidemic";

- a prolonged drought causing ongoing food insecurity and projected to cause more than $400 million in agricultural losses, malnutrition, and forced migration;

- outbreaks of mosquito-borne illnesses;

- a housing deficit of 630,000 houses, created *in part* by homes destroyed by the original earthquake;

---

the agency must provide that explanation at the time of the action). Notably, the government's position on appeal is in significant tension with the majority's view that the statute grants the Secretary unfettered discretion to consider or not consider intervening events.

- lack of potable water and electricity, water contamination and shortages, and resulting conflicts over water, including extortion demands from gangs;

- increased inflation caused by general insecurity and water shortages;

- poor fiscal, unemployment, and security situations, including nearly one-third underemployment and one-third of the country's population living in poverty;

- high rates of murder, extortion, and robbery, and significant gang activity;

- the government's general inability to respond adequately to crime, including insufficient staffing and training in police departments, as well as corruption; and

- a weak judicial system with low criminal conviction rates and high levels of corruption.

81 Fed. Reg. 44,645, 44,647. There is no evidence in the 2018 termination notice that the Secretary considered any of these intervening events beyond the conclusory statements that "homes have been rebuilt," "money has been provided for water," and the country's "economy is steadily improving." 83 Fed. Reg. at 2656.

In addition to comparing the factors cited in the Federal Register notices announcing the TPS terminations, the district court cited other evidence showing that DHS changed its policy. The court called out a "particularly telling communication" between the recently appointed Chief of the USCIS Office of Policy and Strategy, Kathy

Kovarik, and career employees at USCIS.  In October 2017, Chief Kovarik alerted the career staff that there was a "problem" with their draft Decision Memos for El Salvador, Nicaragua, and Honduras.  According to Kovarik, the Decision Memos "read[] as though we'd recommend an extension" of TPS because the draft "talk[ed] so much about how bad it is, but there's not enough in there about positive steps that have been taken since it's [sic] designation."  One recipient of Chief Kovarik's email responded that staff could:

> comb through the country conditions to try to see what else there might be, but the basic problem is that it IS bad there [with respect to] all of the standard metrics.  Our strongest argument for termination, we thought, is just that it is not bad in a way clearly linked to the initial disasters prompting the designations. We can work with RU to try to get more, and/or comb through the country conditions we have again looking for positive gems, but the conditions are what they are.

In a separate email exchange, Kovarik received feedback from the person appointed to serve as her Senior Policy Advisor that the draft Haiti memo compiled by career employees was "overwhelmingly weighted for extension," which he did "not think [was] the conclusion we are looking for."  This email explained that the Senior Policy Advisor edited the memo to "fully support termination" and noted areas "where additional data should be provided to back up this decision."

In perhaps the most graphic example, the district court recounted evidence of a highly irregular sequence of events

leading up to the Sudan decision. USCIS initially submitted a decision memo to the Secretary of Homeland Security explaining the conditions on the ground were such that termination of Sudan's TPS designation was not warranted. The memo concluded that Sudan continued to meet the statutory requirements for a TPS designation because it "remains unsafe for individuals to return." Just one week later, USCIS submitted a second decision memo on Sudan reiterating the same country conditions, but this time it recommended termination of TPS. In response to the new memo, the nominee to head USCIS, Lee Francis Cissna,[11] wrote:

> This memo reads like one person who strongly supports extending TPS for Sudan wrote everything up to the recommendation section, and then someone who opposes extension snuck up behind the first guy, clubbed him over the head, pushed his senseless body out of the way, and finished the memo.

The government argues that these emails simply reflect internal debate about TPS designation decisions, and the majority characterizes them as "a commonplace aspect of how agencies often operate." But read in conjunction with the district court's chart comparing TPS notices in the Federal Register that tracked over time the criteria the agency actually considered, these email exchanges powerfully support the district court's conclusion that DHS embarked on a new practice of ignoring intervening events when reviewing TPS determinations. They also leave no

---

[11] At the time, Cissna had been nominated by the President to serve as Director of USCIS. He was confirmed as Director in October 2017.

doubt that there was ample support for the district court's preliminary conclusion that the subject TPS terminations may have been the result of an irregular, non-evidence based process. The evidence cited by the district court overwhelms any objection to the injunction the court entered to maintain the status quo until this concerning record can be sorted.

The district court's review of the record compellingly supports the plaintiffs' contention that DHS changed its policy in the way plaintiffs' complaint describes, but plaintiffs also introduced a sworn declaration from former USCIS Director Leon Rodriguez that unequivocally confirms this. According to Rodriguez, during his tenure as Director from 2014 to 2017, the agency had broad discretion to consider both current and intervening events "regardless of whether those intervening factors had any connection to the event that formed the basis for the original designation or to the country's recovery from that originating event."

My concurring colleague strongly suggests that consideration of the Rodriguez declaration may have been error. He argues that the district court prematurely ordered discovery, but also acknowledges that the government did not appeal the district court's discovery orders. The majority does not reach this issue. I agree that we should not reach it, and briefly explain why.

On appeal, the government's opening brief made passing mention that it objected in the district court to the court's discovery orders. The discovery issue was not briefed by either party and it was not an issue in this appeal. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) ("[A] bare assertion does not preserve a claim." (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1110 n.1 (9th Cir. 2000) (en banc)). The propriety of the discovery orders was first raised by a member of our panel

at oral argument, and we issued an order requesting supplemental briefing concerning the scope of the permissible record. Specifically, we asked the parties to "identify the documents that comprise the reviewable administrative record" and "identify any documents that the district court relied upon or cited" in its preliminary injunction order "that are not contained within the administrative record." In response, the government took the position that we need not decide the discovery dispute at this stage of the proceedings, and restated its position that it had preserved the issue for a future merits appeal. Plaintiffs' response to our order also argued that we should not take up the discovery dispute in this interlocutory appeal, citing *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 108 (2009). That should be the end of the matter, particularly because plaintiffs so clearly demonstrated a likelihood of success on the merits of their APA claim based solely on the administrative record the government certified. The district court's analysis of the APA claim does not depend on former Director Rodriguez's declaration.

I write separately on this point to explain that even if we were inclined to wade into the discovery dispute, the record would surely stymy our efforts. According to plaintiffs, the government argued to the district court that making an *Overton Park* finding "would be a waste of judicial resources" because discovery was already taking place and there was an "overlap between the administrative record and the documents produced in discovery." *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Assuming the government elsewhere preserved an objection to the district court's discovery orders, the government's supplemental brief states that it "is not now contesting the inclusion in the administrative record of the deliberative materials that appear there," but it does not

explain which materials it considers to be deliberative, or why. As plaintiffs' brief argues, the government's choice to produce documents exclusively from persons who directly or indirectly advised the Secretary strongly suggests that the produced materials are likely included within the scope of the administrative record.

In any event, our supplemental order requested information that would have allowed us to parse the evidence relied upon by the district court, and we did not receive it. The government's supplemental briefing raises more questions than it answers concerning the discovery issues that were litigated in the district court, and as my concurring colleague notes, no interlocutory appeal was taken from the district court's discovery orders. For purposes of this appeal, the government has waived this issue.**12**

The district court's analysis of the evidence in the record was thorough, careful, and detailed. The court applied the

---

**12** The concurrence also shares concerns about nationwide injunctions, though this issue was raised by the government for the first time on appeal. I agree this is an unsettled and difficult area of the law; but here, it is not even clear the district court entered a nationwide injunction. The district court was only asked to consider four discrete country designations. The TPS statute makes individual determinations dependent upon country designations. In this way, the district court's preliminary injunction is readily distinguishable from cases in which courts have enjoined nationwide application of other immigration provisions and policies. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 379 (E.D.N.Y. 2019) (observing Secretary Duke's termination of Haiti's TPS designation "concerns a single decision on a nationwide policy," not case-by-case enforcement, and the government does not argue how the TPS terminations could apply to some beneficiaries and not to others). Questions regarding the intended scope of the injunction should be first addressed by the district court.

correct legal standard.  Within the stipulated record, the
district court found "a wealth of record evidence" supporting
its factual finding that the current administration changed its
practice and based the TPS decisions in this case "solely on
whether the originating conditions or conditions directly
related thereto persisted, regardless of other current
conditions no matter how bad."  An abrupt and unexplained
change in agency policy or practice is a classic basis for an
APA challenge, as is the allegation that an agency
erroneously interpreted its governing statute.  The district
court correctly concluded that plaintiffs demonstrated a
likelihood of success on their APA claim.

## C.

The government began its Equal Protection argument
with the contention that § 1254a(b)(5)(A) also bars judicial
review of colorable constitutional claims.  The majority does
not acknowledge that the government argued this point.

It is black-letter law that "where Congress intends to
preclude judicial review of constitutional claims[,] its intent
to do so must be clear."  *Webster v. Doe*, 486 U.S. 592, 603
(1988).  The TPS statute does not come close to meeting this
rigorous standard; in fact, § 1254a makes no mention of
constitutional claims at all. Thus, the government's
argument that our court is barred from reviewing plaintiffs'
Equal Protection claim is squarely contradicted by
controlling precedent. *See, e.g.*, *Demore v. Hung Joon Kim*,
538 U.S. 510, 517 (2003); *Sierra Club v. Trump*, 929 F.3d
670, 698 (9th Cir. 2019); *Allen v. Milas*, 896 F.3d 1094, 1108
(9th Cir. 2018).

The district court correctly ruled that it had jurisdiction
to review plaintiffs' Equal Protection claim.  The claim is
premised on a record peppered with statements that plaintiffs

proffered as direct evidence of racial animus. After reviewing the evidence in detail, the court ruled that plaintiffs raised serious questions that racial animus was at least "a motivating factor" in the decisions to terminate TPS for Haiti, Sudan, El Salvador, and Nicaragua because the statements were made by the President. *See Arlington Heights*, 429 U.S. at 266 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.").

Remarkably, the government urges us to interpret the many denigrating comments in the record as descriptions of inferior living conditions in foreign countries, rather than evidence of racial animus. But we cannot sweep aside the words that were actually used, and it would be worse for us to deny their meaning. Some of the statements expressly referred to people, not to places. The President's statements require no deciphering.[13]

The majority does not dispute that the evidence supported the district court's finding of racial animus, but it finds no evidence that the statements were tied to the subject TPS terminations. Nothing in the record suggests that

---

[13] The district court's order denying the government's motion to dismiss included the painful observation that "President Trump did not merely call Haiti and El Salvador 'shithole countries.' He asked 'Why are we having all these people from shithole countries come here?' and 'Why do we need more Haitians?' These are not merely comments about a place, but can reasonably be understood as comments about the *people* who come from those places and their intrinsic worth."

The same is true of the President's statements that 15,000 Haitian immigrants "all have AIDS," and his statements characterizing immigrants from Mexico and Central America as criminals and snakes.

Secretary Kelly, Acting Secretary Duke, or Secretary Nielsen made or repeated any of the racially charged statements recounted by the district court and by the majority, and we should be exceptionally reticent to attribute racial animus from one person to another.

The doctrine of constitutional avoidance counsels that we should not reach plaintiffs' Equal Protection claim in this interlocutory appeal because plaintiffs easily demonstrated a likelihood of success on the merits of their APA claim. That claim alone supports the district court's preliminary injunction.

The doctrine of constitutional avoidance serves an important purpose. Interpreting the Constitution is "the most important and the most delicate of the Court's functions" and has perhaps the most profound consequences for others. *Rescue Army v. Mun. Court of City of Los Angeles*, 331 U.S. 549, 569 (1947). Issuing constitutional rulings prematurely or in the abstract risks creating uncertainty and insecurity about our most fundamental rights. *Id.* at 569–72.

The exceptional record in this case is reason for caution, especially because we have a duty to avoid unnecessarily deciding constitutional questions. *See Jean v. Nelson*, 472 U.S. 846, 857 (1985); *Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 470 (1945). The longstanding principle especially applies when the decision on a constitutional claim would not provide plaintiffs any additional type of relief or remedy beyond what they are already entitled to on their other, non-constitutional claims. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 446 (1988); *see also Alma Motor Co. v. Timken-Detroit Axle Co.*, 329 U.S. 129, 136 (1946). Here, a decision on plaintiffs' Equal Protection claim would not entitle them to

any additional relief. They are entitled to a preliminary injunction based on their APA claim alone.

### D.

Plaintiffs' APA claim is subject to judicial review and plaintiffs undoubtedly demonstrated a likelihood of success on its merits. The government does not contest three of the four *Winter* factors, but it must not be forgotten that the district court was responsible for balancing all four factors when deciding whether to enter a preliminary injunction. Unsurprisingly, the district court concluded that the "balance of hardships tips decidedly" in plaintiffs' favor. The irreparable harm faced by plaintiffs—who include 300,000 non-citizens and 200,000 U.S. citizen children facing separation from their parents or their country—could hardly be more compelling. The district court also considered the public's interest, including the integral role of TPS holders in national and local economies, the public's interest in avoiding dividing families, and the harm to local communities. The court recognized that the government could not in good faith argue that it would suffer any concrete harm if TPS holders are allowed to remain in the United States pending resolution of this litigation because they have been lawfully present in the United States for many years. The district court did not abuse its discretion when it granted preliminary injunctive relief to preserve the status quo. I would affirm that order.

Accordingly, I respectfully dissent.