## No. 18-16981

### IN THE
# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————

CRISTA RAMOS, *et al.*,
*Plaintiffs and Appellees*,

v.

CHAD WOLF, *et al.*,
*Defendants and Appellants.*

———————

On Appeal from the United States District Court
for the Northern District of California, Case No. 3:18-cv-01554-EMC
Honorable Edward M. Chen

———————

### APPELLEES' PETITION FOR PANEL REHEARING AND REHEARING EN BANC

———————

ALYCIA A. DEGEN
SEAN A. COMMONS
ANDREW B. TALAI
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
(213) 896-6000
adegen@sidley.com
scommons@sidley.com
atalai@sidley.com

AHILAN T. ARULANANTHAM
JESSICA KARP BANSAL
ZOË N. MCKINNEY
ACLU FOUNDATION
  OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017
(213) 977-5211
aarulanantham@aclusocal.org
jbansal@aclusocal.org
zmckinney@aclusocal.org

*Counsel for Plaintiffs and Appellees*

*(Additional counsel listed on next page)*

CALEB SOTO
NATIONAL DAY LABORER
  ORGANIZING NETWORK
1030 S. Arroyo Parkway
  Suite 106
Pasadena, CA 91105
(626) 799-3566
csoto@ndlon.org

WILLIAM S. FREEMAN
ACLU FOUNDATION
  OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
wfreeman@aclunc.org

MARK E. HADDAD
PART-TIME LECTURER IN LAW
USC GOULD SCHOOL OF LAW *
University of Southern California
699 Exposition Boulevard
Los Angeles, CA 90089
(213) 675-5957
markhadd@usc.edu

NICOLE M. RYAN
SIDLEY AUSTIN LLP
555 California Street
  Suite 2000
San Francisco, CA 94104
(415) 772-1200
nicole.ryan@sidley.com

*Additional Counsel for Plaintiffs and Appellees*
*\* Institution listed for identification purposes only*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................... iii

INTRODUCTION ............................................................................. 1

ARGUMENT ..................................................................................... 3

    I.    THIS CASE PRESENTS QUESTIONS OF
            EXCEPTIONAL IMPORTANCE ................................... 3

    II.   THE PANEL'S JURISDICTIONAL RULING
            CONFLICTS WITH *McNARY* AND THIS
            COURT'S CASES CONSTRUING IT ........................... 5

    III.  THE PANEL'S APPLICATION OF *ARLINGTON
            HEIGHTS* CONFLICTS WITH THIS COURT'S
            ANTI-DISCRIMINATION PRECEDENTS ................ 12

CONCLUSION................................................................................ 21

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) ................................................14, 16

*Ave. 6E Invs., LLC v. City of Yuma*,
    818 F.3d 493 (9th Cir. 2016) .........................................15, 16, 19

*Bowen v. Mich. Acad. of Family Physicians*,
    476 U.S. 667 (1986) ................................................................... 10

*Campos v. Nail*,
    43 F.3d 1285 (9th Cir. 1994) ..................................................... 11

*City of Rialto v. W. Coast Loading Corp.*,
    581 F.3d 865 (9th Cir. 2009) ................................................. 7, 9

*Cooper v. Harris*,
    137 S. Ct. 1455 (2017) ............................................................... 14

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) ............................................................. 5, 6

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ...............................................6, 10, 17, 18

*France v. Johnson*,
    795 F.3d 1170 (9th Cir. 2015) ................................................... 19

*Gebhardt v. Nielsen*,
    879 F.3d 980 (9th Cir. 2018) ....................................................... 9

*Immigrant Assistance Project of L.A. Cnty. Fed'n of
    Labor (AFL-CIO) v. INS*,
    306 F.3d 842 (9th Cir. 2002) ................................................. 8, 11

*Lal v. INS*,
    255 F.3d 998 (9th Cir. 2001) ..................................................... 11

iii

*McGinest v. GTE Serv. Corp.*,
    360 F.3d 1103 (9th Cir. 2004) .................................................. 16

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991) .......................................................*passim*

*Naranjo-Aguilera v. INS*,
    30 F.3d 1106 (9th Cir. 1994) ..................................................... 9

*Ortiz v. Meissner*,
    179 F.3d 718 (9th Cir. 1999) ..................................................... 8

*Poland v. Chertoff*,
    494 F.3d 1174 (9th Cir. 2007) .................................................. 18

*Proyecto San Pablo v. INS*,
    189 F.3d 1130 (9th Cir. 1999) .............................................. 8, 11

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ................................................................ 16

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993) .................................................................. 11

*Skagit Cnty. Pub. Hosp. Dist. No. 2 v. Shalala*,
    80 F.3d 379 (9th Cir. 1996) ....................................................... 8

*Smith v. Town of Clarkton*,
    682 F.2d 1055 (4th Cir. 1982) .................................................. 19

*Staub v. Proctor Hospital*,
    562 U.S. 411 (2011) .......................................................2, 12, 20

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) ..................................................2, 12, 14, 16

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ................................................................ 19

**Statutes**

8 U.S.C. 1254a ........................................................................ 6, 7

iv

## INTRODUCTION

This case concerns decisions terminating the lawful immigration status and work authorization of approximately 300,000 people under the Temporary Protected Status (TPS) statute. The district court preliminarily enjoined the terminations, thereby allowing these TPS holders and their families—including 200,000 children who are U.S. citizens by birth, many of whom are school-aged—an opportunity to remain here while Plaintiffs complete discovery and present their full case on the merits.

In a split decision, the Panel reversed. It held that Congress stripped federal courts of jurisdiction over any challenge to TPS decisions as arbitrary and capricious, even one limited to an unexplained departure from past practice in statutory interpretation rather than the merits of any individual decisions. It also held the district court committed clear error in finding "serious questions" on the merits of Plaintiffs' Fifth Amendment claim.

This Court should grant rehearing or rehearing en banc for three reasons. *First*, this case presents questions of exceptional importance. The Panel's decision will bring catastrophic and irreversible harm to several hundred thousand families and cascading damage to the economy and public health, all before the district court even considers the merits on a full record.

1

*Second*, the Panel's decision conflicts with *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), and this Court's cases applying it. Statutes barring review of "determinations" are ubiquitous in administrative law, and this Court's prior cases have *always* found jurisdiction where, as here, the plaintiffs *did not* seek a ruling on their substantive eligibility for the underlying statutory benefit.

Moreover, by stripping courts of jurisdiction to review arbitrary and capricious TPS decision-making by the Executive Branch, the Panel's decision leaves the judiciary powerless to stop future administrations from using TPS for reasons wholly unrelated to the statute's humanitarian objectives, writing a blank check for the Executive Branch to advance whatever immigration objectives it prefers. That unchecked power could be used to harm immigrants (as here) *or to help them*. Future administrations could grant TPS to Mexico or China just to sweeten a trade deal or increase the pool of authorized immigrant workers, and courts could do nothing.

*Third*, the Panel's decision adopts a virtually insurmountable standard for proving discrimination in contravention of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). The record here contains powerful evidence of discriminatory animus backed by findings as detailed as any described in this Court's

precedent, yet the Panel found no "serious questions" even when reviewing only for clear error.

## ARGUMENT

## I. THIS CASE PRESENTS QUESTIONS OF EXCEPTIONAL IMPORTANCE.

Rarely do issues of legal significance so directly and profoundly affect the lives of so many people. The Panel's decision will fundamentally alter the lives of 300,000 TPS holders, many of whom have lived here lawfully for nearly *twenty years*. It will also immeasurably harm their 200,000 U.S. citizen children, many of whom are school-aged. If their parents lose status, these American children will be forced to either separate from their parents or move to countries historically deemed too unstable to accept returnees.[1]

The TPS terminations would also severely damage the nation's economy and public health during a national crisis. They would end employment authorization for these 300,000 TPS holders, costing our economy $132.6 billion in GDP, $5.2 billion in Social Security and Medicare contributions, and $733 million in employers' turnover costs. 1-ER-10. They would also compromise public health because more than 100,000 TPS holders perform "essential

---

[1] The district court found Defendants' determinations that these countries are now safe were the product of "a pre-determined outcome." 1-ER-31–32. The Panel did not disturb that finding. Op. 28.

work" under DHS's classification system, including 11,000 in our beleaguered healthcare system. Dkt. 88.

In contrast, Defendants suffer *no harm* from maintaining the injunction pending final judgment, as they have acknowledged. *See* Oral Argument 18:06–19:19.

The equities supporting a preliminary injunction therefore remain uncontested, and they strongly counsel in favor of rehearing. Plaintiffs seek only to maintain the TPS status they have held for years pending final judgment. The Panel's decision acknowledged some "record evidence" already supports "the district court's findings" of "racial animus," and suggested more could strengthen Plaintiffs' discrimination claims. Op. 49. Because discovery remains unfinished, Plaintiffs may yet uncover that evidence. The Panel's conclusion that Plaintiffs could succeed if they discover more facts renders its decision to so profoundly alter the status quo truly shocking. Defendants would suffer *no harm* from maintaining the preliminary injunction until the district court renders final judgment. In contrast, if further discovery confirms the terminations were unlawful, most of the catastrophic harm caused by permitting them to take effect in the interim would be irreversible. Given the lives at issue in this case, that error alone warrants rehearing.

## II.    THE PANEL'S JURISDICTIONAL RULING CONFLICTS WITH *McNARY* AND THIS COURT'S CASES CONSTRUING IT.

The Panel's jurisdictional holding conflicts with *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), and this Court's decisions interpreting it. *McNary* and its progeny establish a simple rule for applying jurisdictional provisions that bar review of agency "determinations": a claim does not challenge an agency's determination if it does not seek to dictate the outcome of the agency's decision. If the relief requested does not compel a particular result, then the claim seeking that relief does not impair an agency's ability to make its own "determination." This Court has applied that rule many times, consistently finding jurisdiction to review claims challenging a generally applicable flaw in agency determinations.

Under *McNary*, Plaintiffs' primary APA claim is obviously reviewable. For decades DHS considered intervening events when making termination decisions, but then suddenly read the statute to forbid that practice without explaining the change. As Judge Christen's dissent explains, the extensive record of procedural irregularity here establishes a radical departure from past practice with no explanation. Op. 94–104 (Christen, J., dissenting). DHS's decisions were "contrived," *Dep't of Com. v. New York*, 139 S. Ct.

2551, 2575 (2019), to reach "the conclusion [they] [we]re looking for." 1-ER-25–36; *see also* Op. 84 (Christen, J., dissenting) (noting similarity to APA claim in *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020)).

Plaintiffs do not challenge the TPS determinations themselves. Because "Plaintiffs did not ask the district court to reweigh the factors the Secretary considered when she terminated TPS … nor did they seek a ruling that [their countries] are entitled to TPS designations," they did not challenge the substance of DHS's "determination" to terminate TPS under 8 U.S.C. 1254a(b)(5)(A). Op. 68, 72–91 (Christen, J. dissenting); *see also McNary*, 498 U.S. at 495 (challenge reviewable where individuals "d[id] not seek a substantive declaration that they are entitled to [lawful immigration] status").

The Panel reached a contrary conclusion by disregarding *McNary*. For three reasons, this Court should grant rehearing and rectify the conflict.

*First*, the Panel's departure from *McNary* effectively immunizes Executive Branch action under the TPS statute from virtually all review for arbitrary decision-making. The Panel holds "an allegation that the Secretary reached certain TPS determinations in an 'arbitrary and capricious' manner would not be reviewable under

6

section 1254a." Op. 38–39; *see also* Op. 41 (holding "failure to adequately explain" departure from past practice unreviewable).

That holding empowers future administrations to limit *or expand* TPS in other arbitrary ways. For example, the government would escape judicial review even if it granted TPS to Mexico or China simply to expand the pool of immigrant workers or advance trade negotiations. Under the Panel's decision, challenges to such arbitrary decisions would have to be dismissed as "an attack on the substantive considerations underlying the Secretary's specific TPS determinations, over which the statute prohibits judicial review." Op. 41. That a future administration could totally fail to explain how such decisions conform to the TPS statute's humanitarian criteria would make no difference, because the failure to explain departures is now unreviewable. *Id.*

*Second*, the conflict created by the Panel's treatment of *McNary* will create confusion in administrative law jurisprudence, because "the principles announced [in *McNary*] apply more generally to all statutes that bar judicial review of *individual* agency actions." *City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 875 (9th Cir. 2009).

The conflict is inescapable because the district court's ruling left the Secretary free to "make a new determination whether TPS should be extended or terminated" after correcting the legal errors

the district court identified (primarily the failure to explain a dramatic departure from past practice). 1-ER-62. The district court had "not … compelled [the Secretary] to extend each country's TPS designation." *Id.*

Under *McNary*, that fact alone should have disposed of the jurisdictional issue. This Court has never before found a claim unreviewable under a *McNary*-type statute where the plaintiffs *did not* seek a ruling on their "substantive eligibility for a statutory benefit." Op. 78 (Christen, J., dissenting). Until now, where the relief sought did not compel any particular "determination," this Court always found jurisdiction. *E.g.*, *Immigrant Assistance Project of L.A. Cnty. Fed'n of Labor (AFL-CIO) v. INS*, 306 F.3d 842, 870 (9th Cir. 2002) (finding jurisdiction where INS ordered "to adjudicate such applications in accordance with the procedures established in this court's rulings"); *Proyecto San Pablo v. INS*, 189 F.3d 1130, 1138, 1140 (9th Cir. 1999) (jurisdiction over "procedures by which the legalization program is administered," despite "exclusive review scheme," "[b]ecause resolution of Plaintiffs' claim need not implicate … their eligibility"); *Ortiz v. Meissner*, 179 F.3d 718, 722 (9th Cir. 1999) (jurisdiction where "plaintiffs d[id] not challenge the INS's interpretation of the substantive eligibility requirements for legalization"). *Cf. Skagit Cnty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 384–87 (9th Cir. 1996) (distinguishing *McNary* because

hospital sought order awarding reimbursement). The Panel's decision conflicts with every one of these cases.

Even where plaintiffs *did* attempt to dictate an agency's decision, this Court has not automatically found the claim barred. Instead, it has looked to other factors, generally finding no jurisdiction only where plaintiffs' rights could "be effectively advanced" through other avenues, such as by "appeal from an individual order of deportation." *Naranjo-Aguilera v. INS*, 30 F.3d 1106, 1114 (9th Cir. 1994) (no jurisdiction where claim could be raised in removal proceedings). *See also City of Rialto*, 581 F.3d at 876 (no jurisdiction where "meaningful judicial review of [plaintiff's] substantive challenge is available" through another mechanism). Here, however, the Panel stated there is no other avenue for judicial review of these claims, but barred them anyway. Op. 44. Courts properly demand far stronger preclusive language before construing statutes to *entirely* foreclose review. *E.g.*, *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018).

*Third*, the Panel's new rule barring Plaintiffs' claim as "essentially … a substantive challenge to the Secretary's underlying analysis" of the TPS terminations, Op. 40, based on "a fluid range of considerations," Op. 43, creates yet more conflict with prior law. For example, the Panel barred review based on purported structural cues in the TPS statute. Op. 36–38. That rationale conflicts with

*McNary*'s reliance on the "well-settled presumption" favoring judicial review of agency action, 498 U.S. at 496–97, which ordinarily requires "specific language or specific legislative history," or other comparably definitive evidence to foreclose all judicial review of agency action. *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670–71, 673 (1986) ("strong presumption"); *see also Regents*, 140 S. Ct. at 1905 ("basic presumption"). Although the Panel mentioned that presumption, Op. 32, its reliance on implicit statutory signals makes clear that it did not apply the presumption. *Compare* Op. 36, *with* Op. 91 (Christen, J., dissenting).[2]

The Panel further relied on the fact that Plaintiffs did not challenge "any agency procedure or regulation," but rather the new *practice* of refusing to consider intervening conditions. Op. 40. But *McNary* itself involved a challenge to agency practices, as did other

---

[2] In addition to ignoring that *McNary* does not permit reliance on implicit statutory cues, the Panel misread the cues on which it erroneously relied. It claimed the statute's limitations on the Secretary's discretion counsel only "in favor of limiting unwarranted designations or extensions of TPS." Op. 36. But the statute also deprives the Secretary of discretion to *terminate* TPS where country conditions warrant continued designation. Immigration Law Scholars Amici Br. 10–11 (citing 8 U.S.C. 1254a(b)(3)(B)–(C)). The Panel also invoked the Secretary's broad power "to designate any foreign country for TPS," Op. 36, but this case concerns limits on authority to *terminate* existing designations, not initial designations. And Defendants themselves disagreed with the Panel's holding that the statute allows the Secretary to disregard intervening events. *Compare* Op. 42, *with* AOB 31–32.

cases applying it. *McNary*, 498 U.S. at 489 n.9. *See also Immigrant Assistance Project*, 306 F.3d at 863 (finding jurisdiction to challenge "INS's practice"); *Proyecto San Pablo*, 189 F.3d at 1138–39 (same).

The Panel also pointed to the declaratory and injunctive relief Plaintiffs sought, which asks to set aside the terminations. Op. 40. But, again, no prior decision had considered that relevant. In fact, *McNary* and several of its progeny enjoined agency decisions, just as the district court did here. *McNary*, 498 U.S. at 489 & n.10 (affirming "injunction requiring the INS to vacate large categories of denials"). *See also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 48–49, 52 (1993) (requiring re-adjudication of thousands of previously-rejected applications); *Immigrant Assistance Project*, 306 F.3d at 851, 873 (remanding for re-adjudication under correct legal standards); *Campos v. Nail*, 43 F.3d 1285, 1287 (9th Cir. 1994) (affirming order "nullifying all deportation orders of class members who were denied changes of venue").[3]

---

[3] Although it does not directly implicate *McNary*, the Panel's suggestion that review was unavailable because the Secretary need not explain a departure from a discretionary practice, Op. 42, conflicts with *Lal v. INS*, 255 F.3d 998, 1007 (9th Cir. 2001) (reviewing and reversing claim of "irrational departure" from pre-existing "general policy" governing exercise of discretion), and several Supreme Court cases. Op. 90 (Christen, J., dissenting) (collecting cases).

## III. THE PANEL'S APPLICATION OF *ARLINGTON HEIGHTS* CONFLICTS WITH THIS COURT'S ANTI-DISCRIMINATION PRECEDENTS.

Were this Court to affirm the preliminary injunction on Plaintiffs' APA claim, it would not need to reach the constitutional question. But the Panel's resolution of that issue independently warrants rehearing. The Panel's decision conflicts with settled anti-discrimination doctrine in several respects as set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). Most important, a claim of racially-motivated decision-making does not require a smoking-gun admission by the most senior decisionmaker. Rather, factfinders may infer intent based on all relevant evidence, including conduct by other actors and irregular decision-making.

In rejecting the constitutional claim because early discovery had not uncovered a smoking-gun admission, the Panel disregarded the central teaching of *Arlington Heights*. The Panel also contravened precedent by considering the record evidence supporting a finding of discrimination only in isolation rather than as a whole, by assuming the role of trier of fact rather than reviewing for clear

error, and by rewriting the law governing causation in discrimination cases. This Court should not let such departures from settled law stand.

Based on a large (albeit preliminary) record, the district court found both direct and circumstantial evidence of "race being a motivating factor" in the terminations. 1-ER-31. Just days after his DHS Secretary made the last (and largest) TPS termination decision at issue here, the President rejected a proposal to permit TPS holders to stay, asking "[w]hy are we having all these people from shithole countries come here?" and then suggesting "the United States should instead bring more people from countries such as Norway." 1-ER-30–31. The district court also found the "White House was putting pressure on DHS to end TPS" and "did, in fact, have influence on the TPS decisions," 1-ER-28–29, "to get to the President/White House's desired result of terminating TPS." 1-ER-32. The district court found this pressure worked, as Acting Secretary Duke was "largely carrying out or conforming with a pre-determined presidential agenda to end TPS." 1-ER-29. In her own words, she believed her termination decisions were "the result of an America First view," 1-ER-36—a slogan long associated with racial discrimination, as the President himself knew. Anti-Defamation League Amici Br. 18–23.

The district court's findings of racial animus were reviewable only for clear error. Op. 31. Because the equities overwhelmingly favor Plaintiffs, "serious questions" as to whether those findings were "plausible" should have sufficed to affirm. *Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017) (in race discrimination case, holding animus finding may be "plausible" "even if another [explanation] is equally or more so"). "[W]hen relying on *Arlington Heights* to demonstrate that an action was motivated by a discriminatory purpose, a plaintiff need provide '*very little such evidence* to raise a genuine issue of fact; *any indication of discriminatory motive* may suffice to raise a question that can only be resolved by a fact-finder.'" *Arce v. Douglas*, 793 F.3d 968, 977–78 (9th Cir. 2015) (emphases added).

The Panel subjected the findings below to a different, far higher standard, creating obvious conflicts with this Court's precedent in several ways.

*First*, the Panel refused to permit the factfinder to infer discriminatory motive from proof that the White House influenced the terminations coupled with the President's expressions of racial animus against TPS holders close in time to the termination decisions. Instead, it insisted on even more direct proof that the President's pressure on TPS decisionmakers was motivated by and traceable to

14

his expressed animus against TPS holders. Op. 50 (requiring evidence that "the President's statements played [a] role in the TPS decision-making process"); Op. 53 (requiring evidence "linking" the fact that "DHS Secretaries were influenced by President Trump … in their TPS decision-making" and evidence that President Trump "expressed animus against non-white, non-European immigrants").

This Court has never previously required such "caught-in-the-act" evidence to infer discriminatory intent. In effect, that requirement leaves courts powerless to remedy a huge swath of unconstitutional discriminatory conduct for purported lack of proof. Defendants already have asserted executive privilege over evidence responsive to Plaintiffs' discovery requests—documents and communications the Panel would apparently require for Plaintiffs to raise even a "serious question" of discriminatory intent. *E.g.*, ECF 84 at 1–2. The Panel's rule would leave the most powerful actors in our government largely unconstrained by the Constitution's prohibition on discrimination.

*Second*, the Panel erroneously discounted overwhelming evidence of irregular decision-making and other indirect evidence, even though this Court has repeatedly found it highly probative of discriminatory animus. This Court has even affirmed animus findings based almost *entirely* on irregular decision-making. *E.g.*, *Ave.*

*6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 505 (9th Cir. 2016) (crediting irregular decision-making though "[n]one of the alleged statements [of councilmembers] expressly refer[red] to race"); *Arce*, 793 F.3d at 978 (irregular decision-making enough despite "only a few snippets of overtly discriminatory expression," because "officials … seldom, if ever, announce on the record … their desire to discriminate against a racial minority").

No prior decision has dismissed irregularities as essentially irrelevant. But the Panel dismissed multiple irregularities as not indicative of *any* discriminatory motive: "[E]ven accepting that the agency made its decisions with a predetermined objective to terminate TPS, there is still no evidentiary support for the conclusion that this overarching goal was motivated by racial animus" rather than "the administration's immigration policy." Op. 52. This contravenes *Arlington Heights*, which holds "[s]ubstantive departures too may be relevant, particularly if the factors usually considered … strongly favor" a different outcome. *Arlington Heights*, 429 U.S. at 267. Moreover, "[p]roof that the defendant's explanation is unworthy of credence … is probative of intentional discrimination, and it may be quite persuasive." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (factfinder "can reasonably

16

infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose" because it can "consider a party's dishonesty … as 'affirmative evidence of guilt'").

The Panel compounded this error by substituting its own view of the evidence for the district court's. Although the Panel acknowledged factual findings were reviewable for clear error, it conducted plenary review of the facts "[b]ased on [its] review of the evidence," Op. 54, and showed no sign of deference. Op. 52 (rejecting discriminatory motive explanation without discussing whether it was "plausible"). In particular, the Panel rejected reliance on the President's "shithole countries" statement because he made it three days after the last termination. *Id*. But even assuming Plaintiffs had to show his statements themselves influenced the decisionmakers, it is surely "plausible" that the President expressed similar sentiments to those involved in TPS decision-making before then, particularly given his numerous similar public statements and the record evidence establishing that the White House pressured the Secretary to end TPS. 1-ER-28–31.

The Panel also noted the Supreme Court's recent rejection of a discrimination claim in *Regents*, Op. 48–49, but the record here dwarfs those allegations. *Regents* found "nothing irregular" about the decision-making surrounding the DACA rescission, 140 S. Ct.

at 1916, whereas here the district court's extensive finding of irregularities were almost entirely unrefuted.[4] *Regents* also rejected reliance on President Trump's statements about Latinos as "remote in time and made in unrelated contexts," *id.*, whereas his statements here were specifically about TPS holders and came within days of the termination decisions. *See* 1-ER-30–31.

*Third*, the Panel created conflict by rejecting the district court's liability theory—that the President harbored animus and influenced those responsible for the termination decisions. 1-ER-27–28. This Court has repeatedly held that where one actor who harbors animus influences another, the resulting decision violates anti-discrimination law. *Compare* Op. 49 (requiring evidence either that "the President personally," rather than through his subordinates, "sought to influence the TPS terminations," or that lower-level officials "were themselves motivated by animus"), *with Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (animus could be

---

[4] The Panel took issue with one aspect of the evidence of irregular decision-making—that "higher agency officials 'repackaged' the TPS decision memoranda." Op. 52. Its treatment of that evidence understates it, but in any event addresses only one piece of the overwhelming evidence establishing irregular decision-making. Op. 92–101 (Christen, J., dissenting).

imputed to DHS where "biased subordinate influenced or was in-volved in" "allegedly independent" decision), *and France v. John-son*, 795 F.3d 1170, 1176 (9th Cir. 2015) (same for Border Patrol).

The Panel suggested this Court previously imputed the ani-mus of others to a decisionmaker only in "employment discrimina-tion" cases, Op. 49, but this Court and others have done so in other contexts. *E.g.*, *Ave. 6E*, 818 F.3d at 504 (holding "community ani-mus can support a finding of discriminatory motives by government officials, even if the [city council] officials do not personally hold such views"); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (finding constitutional violation where there was "no doubt that the defendants knew that a significant portion of the public opposition [to fair housing] was racially inspired, and their public acts were a direct response to that opposition").

While the Panel suggested the district court's liability theory had not been "extended to the foreign policy or national security realm," Op. 49, its decision elsewhere recognized the "lack of na-tional security justification" for the terminations. Op. 47. The Panel also never explained why its newly created foreign-policy exception to the Constitution's prohibition on intentional race discrimination should apply here, where the decisions target individuals who have lived lawfully in this country, many for decades. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (distinction between noncitizens

who have entered and those who have not "runs throughout immigration law"). The potentially sweeping nature of this exception counsels against adopting it in a case where the Court need not even reach the constitutional question.

*Finally*, in declining to apply this Court's pre-existing liability rule, the Panel grossly misconstrued *Staub*, which it read to "suggest[]" that "the malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold the principal liable for a tort that requires both." Op. 49. But *Staub* actually held that "[s]o long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable." *Staub*, 562 U.S. at 419. Here, the President wanted to end TPS because he harbored racial animus against TPS holders. Although his subordinate (the Secretary) was the ultimate decisionmaker, "it is axiomatic under tort law that the exercise of judgment by the decisionmaker *does not prevent* the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm." *Id.* (emphasis added). A decisionmaker's "exercise of judgment" does *not* "automatically render[] the link to the supervisor's bias 'remote' or 'purely contingent.'" *Id.* Under the Panel's decision, *Staub* now stands for the opposite of what it holds.

## CONCLUSION

For these reasons, the Court should grant rehearing or re-hearing en banc.

Dated: November 30, 2020        Respectfully submitted,

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA


By:/s/ *Ahilan T. Arulanantham*
    Ahilan T. Arulanantham

    Counsel for Plaintiffs and
    Appellees

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing or Answers

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** 18-16981

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/answer to petition is *(select one)*:

[**x**] Prepared in a format, typeface, and type style that complies with Fed. R. App. P.

32(a)(4)-(6) and **contains the following number of words:** 4,197          .

*(Petitions and answers must not exceed 4,200 words)*

**OR**

[  ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** /s/ *Ahilan T. Arulanantham*          **Date** November 30, 2020
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11**                                                                *Rev. 12/01/18*